**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**IN TACOMA**

_____

UNITED STATES OF AMERICA,      )
                               )
                Plaintiff,     )     No. CR15-5351RBJ
                               )
        vs.                    )
                               )
JAY MICHAUD,                   )
                               )
                Defendant.     )
_____

**MOTIONS HEARING**

_____



**BEFORE THE HONORABLE ROBERT J. BRYAN**
**UNITED STATES DISTRICT COURT JUDGE**



**January 22, 2016**


APPEARANCES:

Keith Becker
U.S. Department of Justice Criminal Division
Matthew Hampton
Assistant United States Attorney
Representing the Plaintiff


Colin Fieman
Linda Sullivan
Federal Public Defender's Office
Representing the Defendant

```
 1                          EXAMINATION INDEX

 2   EXAMINATION OF                                            PAGE
       DANIEL ALFIN           DIRECT EXAMINATION                54
 3                            By Mr. Becker
                              CROSS-EXAMINATION                 73
 4                            By Mr. Fieman
                              REDIRECT EXAMINATION              89
 5                            By Mr. Becker
                              RECROSS-EXAMINATION               94
 6                            By Mr. Fieman
       CHRIS SOGHOIAN         DIRECT EXAMINATION                99
 7                            By Mr. Fieman
                              CROSS-EXAMINATION                120
 8                            By Mr. Becker
                              REDIRECT EXAMINATION             128
 9                            By Mr. Fieman

10

11

12                           EXHIBIT INDEX
     EXHIBITS ADMITTED                                        PAGE
13     12A                                                     57
       12B                                                     58
14     15                                                      62
       15B                                                     63
15     13B                                                     71
       13A                                                     91
16     1 - 9                                                   97
       A15 & A16                                               98
17

18

19

20

21

22

23

24

25
```

09:31:34AM 1          THE COURT:  Good morning.  This is

09:31:42AM 2    Cause No. 15-5351, United States versus Jay Michaud, who

09:31:46AM 3    is present in court with his attorneys, Mr. Fieman and

09:31:51AM 4    Ms. Sullivan.  For the government, Mr. Becker.

09:32:03AM 5          MR. BECKER:  Good morning, your Honor.

09:32:04AM 6          THE COURT:  And Mr. Hamilton.

09:32:06AM 7          MR. HAMILTON:  Good morning.

09:32:18AM 8          MR. BECKER:  At counsel table is FBI Special Agent

09:32:26AM 9    Daniel Alfin.

09:32:26AM 10          THE COURT:  Good morning.  I put out a little

09:32:38AM 11    agenda for this proceeding.  The first thing on the agenda

09:32:41AM 12    is arraignment on the superseding indictment.  So let's

09:32:46AM 13    proceed with that first.

09:32:55AM 14      Mr. Michaud, have you received a copy of the

09:32:59AM 15    superseding indictment?

09:33:00AM 16          THE DEFENDANT:  I have seen it, your Honor.

09:33:01AM 17          THE COURT:  And you have had a chance to read that

09:33:03AM 18    and discuss it with your lawyers?

09:33:06AM 19          THE DEFENDANT:  Yes, your Honor.

09:33:07AM 20          THE COURT:  I think in prior proceedings we have

09:33:11AM 21    determined that your name is Jay Michaud, as it appears in

09:33:15AM 22    the caption of these documents; is that correct?

09:33:19AM 23          THE DEFENDANT:  Yes, your Honor.

09:33:20AM 24          THE COURT:  I think we also determined that you

09:33:23AM 25    can read and write English with no difficulty, and have

09:33:29AM 1    considerable secondary education, right?

09:33:32AM 2            THE DEFENDANT:  Yes, your Honor.

09:33:33AM 3            THE COURT:  And you understand that you have the

09:33:36AM 4    right to remain silent, and are not required to make any

09:33:40AM 5    statements about these matters?

09:33:41AM 6            THE DEFENDANT:  I do, your Honor.

09:33:42AM 7            THE COURT:  You also understand that you have the

09:33:45AM 8    right to counsel.  And that has been provided in the

09:33:51AM 9    persons of Mr. Fieman and Ms. Sullivan.  You have

09:33:57AM 10   conferred with them about this matter, the superseding

09:34:00AM 11   indictment?

09:34:00AM 12           THE DEFENDANT:  Yes, your Honor.

09:34:01AM 13           THE COURT:  And you understand that this

09:34:03AM 14   indictment supersedes and takes the place of the original

09:34:11AM 15   indictment filed in the case?  Do you understand that?

09:34:13AM 16           THE DEFENDANT:  I do now, your Honor.

09:34:15AM 17           THE COURT:  Now, you have the right to have the

09:34:18AM 18   indictment read to you here in open court to be sure that

09:34:22AM 19   you understand it.  Do you wish to have the indictment

09:34:25AM 20   read to you?

09:34:26AM 21           THE DEFENDANT:  No, your Honor.

09:34:35AM 22           THE COURT:  I believe the first two counts are the

09:34:45AM 23   same as in the original indictment; is that correct?

09:34:48AM 24           MR. HAMILTON:  That's correct, your Honor.

09:34:51AM 25           THE COURT:  You were advised of the penalties

09:34:55AM 1  possible in the event of conviction of those two charges?

09:35:01AM 2          THE DEFENDANT:  Yes, your Honor.

09:35:01AM 3          THE COURT:  As to the third charge, which is

09:35:04AM 4  Count 3, and is a new charge, what is the maximum penalty

09:35:09AM 5  that Mr. Michaud is facing for that charge?

09:35:13AM 6          MR. HAMILTON:  Your Honor, the defendant faces a

09:35:22AM 7  minimum term of imprisonment of five years, and up to 20

09:35:25AM 8  years of imprisonment; a term of supervision following

09:35:29AM 9  release from prison of not less than five years, and up to

09:35:32AM 10 life; up to a $250,000 fine; a $100 mandatory special

09:35:42AM 11 assessment; and a $5,000 penalty assessment if the court

09:35:46AM 12 finds the defendant is not indigent.

09:35:49AM 13         THE COURT:  Do you understand those possible

09:35:52AM 14 penalties, Mr. Michaud?

09:35:54AM 15         THE DEFENDANT:  Yes, your Honor.

09:35:56AM 16         THE COURT:  And, counsel, are you satisfied that

09:35:58AM 17 Mr. Michaud is ready to enter a plea to these charges?

09:36:03AM 18         MS. SULLIVAN:  We are, your Honor.

09:36:06AM 19         THE COURT:  Mr. Michaud, in Count 1 you are

09:36:09AM 20 charged with possession of child pornography on or about

09:36:12AM 21 July 10th, 2015, at Vancouver, within this district.  How

09:36:17AM 22 do you plead to that charge as it is set forth in the

09:36:19AM 23 superseding indictment?

09:36:20AM 24         THE DEFENDANT:  Not guilty, your Honor.

09:36:22AM 25         THE COURT:  In Count 2 you are charged with

09:36:24AM 1    receiving child pornography between February 21st and

09:36:31AM 2    March 2nd of last year within this district.  How do you

09:36:35AM 3    plead to Count 2 as it is set forth in the superseding

09:36:39AM 4    indictment?

09:36:39AM 5             THE DEFENDANT:  Not guilty, your Honor.

09:36:41AM 6             THE COURT:  And in Count 3 you are charged with

09:36:44AM 7    receipt of child pornography on or about June 18th of last

09:36:48AM 8    year, at Vancouver, within this district.  How do you

09:36:52AM 9    plead to Count 3 as it is set forth in the superseding

09:36:56AM 10   indictment?

09:36:56AM 11            THE DEFENDANT:  Not guilty, your Honor.

09:36:58AM 12            THE COURT:  All right.  The pleas will be entered.

09:37:05AM 13   We will turn our attention to other matters.

09:37:08AM 14            MS. SULLIVAN:  Your Honor, before we turn our

09:37:11AM 15   attention to that, in connection with the arraignment we

09:37:14AM 16   had asked that Mr. Michaud's bond conditions be reduced to

09:37:20AM 17   a level where he is on electronic monitoring, but just on

09:37:24AM 18   a curfew.  I understand that Pretrial Services is prepared

09:37:28AM 19   to do that and is in agreement with that, and we would ask

09:37:32AM 20   that the bond condition be modified accordingly.

09:37:36AM 21            THE COURT:  I have not heard from Pretrial

09:37:39AM 22   Services on this.

09:37:50AM 23            PRETRIAL SERVICES OFFICER:  Good morning, your

09:37:54AM 24   Honor.  I am Jamie Parkhurst with Pretrial Services.

09:37:58AM 25   Mr. Michaud has been on supervision with our office since

09:38:00AM 1    he was placed on bond.  He has been in compliance.  He did

09:38:03AM 2    have one violation, where we recommended no action be

09:38:06AM 3    taken by the court.  At this time we do feel that it is

09:38:10AM 4    appropriate for him to be moved to a curfew.

09:38:13AM 5            THE COURT:  Mr. Becker or --

09:38:20AM 6            MR. HAMILTON:  Your Honor, the government has no

09:38:22AM 7    objection to that.

09:38:23AM 8            THE COURT:  All right.  The motion then will be

09:38:25AM 9    granted and the release bond will be modified as requested

09:38:37AM 10   in the defendant's motion.

09:38:39AM 11           MS. SULLIVAN:  Thank you, your Honor.

09:38:48AM 12           THE COURT:  I guess the next matter is the motion

09:38:52AM 13   to compel that is pending.  I read the response filed by

09:39:11AM 14   the government.  They also asked for an order granting the

09:39:18AM 15   request to file a response in excess of 12 pages.  Since I

09:39:23AM 16   have already read 21 pages, I will grant that motion.

09:39:34AM 17     But I must say, having read all of your briefs twice

09:39:38AM 18   now, and some parts of your briefs more than twice, I wish

09:39:47AM 19   that I had not granted the first motion to compel or any

09:39:50AM 20   of the ones since.  Strike that.  Not motion to compel.

09:39:56AM 21   The motion to exceed page limits.  There is a lot of

09:40:03AM 22   excess talk in all of your pleadings that just is not

09:40:12AM 23   necessary.  Be that as it may, I will grant the motion for

09:40:21AM 24   excess pages in regards to the government's motion to

09:40:29AM 25   compel.

09:40:30AM 1     Now, I read those pleadings.  Everybody seemed to want

09:40:36AM 2   more time on that issue for one reason or another.  I

09:40:44AM 3   don't know if you want to address that in any way today or

09:40:50AM 4   not, Mr. Fieman.  The government says there is no

09:40:57AM 5   relevance or materiality --

09:41:00AM 6         MR. FIEMAN:  Your Honor, I have only been able to

09:41:02AM 7   briefly skim the 21 pages since it came in.  I can only

09:41:06AM 8   say, based on my preliminary survey, there is some

09:41:09AM 9   substantial disputes.  We would want time to respond, as

09:41:11AM 10  briefly as possible.

09:41:14AM 11    But as I indicated in my initial motion to compel,

09:41:18AM 12  they have assured us that they are not withholding any

09:41:21AM 13  information that is relevant to the pending motions.  But

09:41:25AM 14  as indicated, also in our motion, if we do move into the

09:41:29AM 15  trial phase, as the case proceeds after this hearing,

09:41:32AM 16  there are now separate trial-related issues.  And we would

09:41:35AM 17  want the opportunity to respond to that and address some

09:41:38AM 18  of the claims that I very briefly saw in the government's

09:41:42AM 19  filing late last night.

09:41:46AM 20    Your Honor, I would defer to the court on how long --

09:41:49AM 21  That is at least a week to do that.  Mostly because in

09:41:53AM 22  preparation for this hearing we have a lot of things

09:41:55AM 23  backed up next week in terms of my other clients' needs.

09:42:00AM 24  But any reasonable amount of time, we can file a response.

09:42:02AM 25    I can tell your Honor this will spill over into chain

09:42:08AM 1   of custody and Daubert issues that will probably be raised

09:42:12AM 2   separately.  It might be more efficient, once we have

09:42:15AM 3   talked about some scheduling issues that the government

09:42:17AM 4   has raised with me in terms of the trial and Mr. Becker's

09:42:20AM 5   availability, possibly to confer after the hearing today,

09:42:25AM 6   if the case proceeds, and submit a proposed schedule to

09:42:29AM 7   the court.

09:42:35AM 8          THE COURT:  Just exactly what are you asking for?

09:42:39AM 9          MR. FIEMAN:  Your Honor, we are asking for what we

09:42:41AM 10  asked for from the beginning, and we thought we were

09:42:44AM 11  getting, which is the --

09:42:45AM 12         THE COURT:  I'm sorry.  I am having a hard time

09:42:45AM 13  hearing you.  Why don't you raise that whole thing up.

09:42:49AM 14  Hit the switch down by your knee.

09:43:00AM 15         MR. FIEMAN:  Is that better, your Honor?

09:43:01AM 16         THE COURT:  Yes.

09:43:03AM 17         MR. FIEMAN:  Your Honor, we are asking for what we

09:43:06AM 18  thought they agreed to, which is the NIT programming code.

09:43:09AM 19  As indicated, we got a piece of it.

09:43:12AM 20     They have a different understanding of our agreement.

09:43:15AM 21  That's fine.  I don't want to go backwards and have a he

09:43:20AM 22  said/she said contest, but the parts that are missing are

09:43:22AM 23  important for our trial preparation.

09:43:25AM 24         THE COURT:  If I understand what you're saying,

09:43:26AM 25  you want a little more time to respond?

09:43:29AM 1      MR. FIEMAN:  Yes, your Honor.  Definitely that.

09:43:31AM 2  That's where I started.  It is just a question of how much

09:43:33AM 3  time?

09:43:33AM 4      THE COURT:  That's what I am asking you, how much

09:43:35AM 5  time.

09:43:36AM 6      MR. FIEMAN:  At least a week, your Honor.  I would

09:43:39AM 7  ask for a week from Monday, actually, realistically.

09:43:46AM 8      THE COURT:  Mr. Becker.

09:43:47AM 9      MR. BECKER:  Your Honor, as to the scheduling of

09:44:00AM 10  the motion to compel, we don't have an objection to the

09:44:03AM 11  defense having that time that is requested to respond.  We

09:44:08AM 12  certainly --  We did think --  Obviously, as you have seen

09:44:12AM 13  in our pleading, we do believe that we have provided

09:44:15AM 14  sufficient information, and we don't believe the request

09:44:17AM 15  for additional information is material.  And we maintain

09:44:20AM 16  that position.

09:44:22AM 17    We certainly --  Over the last week it seemed like the

09:44:25AM 18  defense thought that this issue was pertinent to this

09:44:27AM 19  hearing, and obviously asked for an expedited hearing, and

09:44:30AM 20  we are on different footing now.  That is what it is.  We

09:44:34AM 21  did respond.  I apologize for the length, your Honor.  We

09:44:37AM 22  have obviously been --  There have been a lot of issues we

09:44:40AM 23  have been dealing with this week in getting ready for this

09:44:44AM 24  hearing.

09:44:44AM 25      THE COURT:  It takes more time to write a short

09:44:46AM 1    brief than a long one.

09:44:48AM 2          MR. BECKER:  Sometimes, your Honor.  We don't

09:44:50AM 3    object to the additional time.  I certainly do want to

09:44:52AM 4    flag for the court, as we flagged in our response, in the

09:44:55AM 5    event that the court were to find that there are material

09:44:58AM 6    issues involved, that we are requesting an ex parte

09:45:03AM 7    in camera hearing in order to present further information

09:45:06AM 8    pertinent to the law enforcement privilege.

09:45:09AM 9       As long as the court will at least hear that request

09:45:11AM 10   on this schedule, we don't object to the defense having

09:45:15AM 11   more time to respond.  I think we can confer after today's

09:45:20AM 12   hearing in terms of other scheduling matters.  We have had

09:45:23AM 13   preliminary conversations about a potential continuance of

09:45:25AM 14   the trial date in light of the numerous issues -- the

09:45:29AM 15   pretrial issues which still need to be resolved.  And I

09:45:31AM 16   think the parties have an eye towards being able to agree

09:45:35AM 17   on that, in order that the court can decide all of the

09:45:38AM 18   pretrial matters that it needs to decide.

09:45:41AM 19         THE COURT:  I think the first thing here is the

09:45:44AM 20   scheduling on this motion.  It is appropriate to set a

09:45:50AM 21   response for a week from Monday -- a reply, that is.  It

09:45:56AM 22   appears to me that the government is throwing the gauntlet

09:45:59AM 23   down on the question of relevance and materiality of the

09:46:04AM 24   requested information.  We will note it up for that, I

09:46:25AM 25   guess, the Tuesday following that.  At that point we will

09:46:28AM 1    have to decide what other hearings, if any, may be

09:46:31AM 2    necessary on that subject.

09:46:34AM 3        I am very reluctant to have an in camera hearing.  I

09:46:40AM 4    know that that's appropriate in some circumstances.  It

09:46:46AM 5    challenges due process.  I would rather deal with that

09:46:55AM 6    insofar as we can without the necessity of any hearing or

09:47:01AM 7    information that is kept from the defendant.

09:47:04AM 8            MR. BECKER:  We certainly understand and respect

09:47:06AM 9    that, your Honor.  We don't take making a request like

09:47:09AM 10   that lightly at all.  Certainly we have set forth

09:47:12AM 11   substantial arguments that have been made openly and will

09:47:16AM 12   be made openly.  That said, we have also set forth

09:47:19AM 13   substantial authority within the Ninth Circuit for the

09:47:22AM 14   resolution of issues, such as this, in part via ex parte

09:47:26AM 15   in camera hearing by the court as a part of the resolution

09:47:30AM 16   of the issues.

09:47:32AM 17           THE COURT:  If that's necessary we will deal with

09:47:35AM 18   that after we get the pleadings closed.

09:47:38AM 19           MR. BECKER:  Your Honor, in terms of the Tuesday

09:47:40AM 20   that your Honor mentioned for scheduling, I am not sure

09:47:42AM 21   what day that falls on.  I do have some trial -- some

09:47:46AM 22   other trial availability and needs in other districts.  I

09:47:51AM 23   am just not sure what date your Honor has suggested, that

09:47:53AM 24   Tuesday.

09:47:54AM 25           THE CLERK:  That would be February 2nd.

09:48:03AM 1          THE COURT:  Okay.  When I get that we will take a

09:48:06AM 2    look at it and decide the future of the motion to compel.

09:48:14AM 3          MR. BECKER:  Thank you, your Honor.

09:48:22AM 4          THE COURT:  You want to be heard further on your

09:48:24AM 5    request for a Franks hearing.

09:48:30AM 6          MR. FIEMAN:  Your Honor, as set forth in our

09:48:35AM 7    pleadings, our position is that, given the issues relating

09:48:41AM 8    to the four corners of the warrant, the undisputed facts,

09:48:44AM 9    and the exhibits that have been presented to the court, we

09:48:50AM 10   have definitely made a showing for the Franks hearing.  I

09:48:52AM 11   will briefly summarize what that is in a moment, plus some

09:48:55AM 12   new information that has come to light.

09:48:58AM 13       But the Franks hearing, as indicated in my pleadings,

09:49:01AM 14   would be rendered moot based upon what we believe are

09:49:04AM 15   dispositive issues that are already before the court.

09:49:09AM 16       But addressing your question directly, we do believe

09:49:12AM 17   we have met our burden of showing that there is a Franks

09:49:15AM 18   issue.  And that is directed primarily -- although there

09:49:19AM 19   are a host of issues that we flagged, primarily to two

09:49:23AM 20   things:  That is, first of all, intentionally false or

09:49:29AM 21   misleading statements about the location to be searched,

09:49:33AM 22   leading to a warrant on its face, as limited to the

09:49:36AM 23   Eastern District of Virginia, while the warrant was in

09:49:40AM 24   fact executed, in Mr. Michaud's case, in Washington.

09:49:43AM 25       The second core Franks issues is intentionally or

09:49:47AM 1    recklessly misleading the court or failing -- recklessly

09:49:52AM 2    failing to verify the homepage information.  And we

09:49:55AM 3    believe this is critical, because it goes to the heart of

09:49:58AM 4    the probable cause.

09:50:00AM 5        The court is aware of Gourde and the other cases.  The

09:50:04AM 6    government has essentially hung its probable cause

09:50:06AM 7    argument on the claim that this would be immediately

09:50:11AM 8    apparent as a dedicated child pornography site to even a

09:50:15AM 9    first time visitor, because that's all that matters

09:50:18AM 10   really, is what's on the homepage, because the warrant

09:50:20AM 11   authorized the search as of logging in on the homepage.

09:50:24AM 12       Now, your Honor, I don't believe in fact that there is

09:50:28AM 13   any testimony even required to resolve that issue in our

09:50:32AM 14   favor.  And I will tell you why.  Because there are only

09:50:34AM 15   two possible answers that the agent could give.  One is he

09:50:37AM 16   did not check the homepage after he viewed it, I believe,

09:50:42AM 17   on February 18th.  The site was seized on the 19th, the

09:50:48AM 18   warrant was submitted on the 20th.  Let's take that at

09:50:51AM 19   face value.  We now know from government exhibits that

09:50:54AM 20   they were aware at the time of the execution of the search

09:50:56AM 21   warrant in Naples, Florida, on the 19th, when they seized

09:51:02AM 22   the website, that the logo had changed.

09:51:09AM 23       And really it comes down to that issue of whether the

09:51:11AM 24   pictures that were on the banner as of February 3rd were

09:51:16AM 25   lascivious, and therefore qualified -- clearly indicated

09:51:22AM 1    pornography.  That point is debatable in itself.  But it

09:51:25AM 2    is a secondary point.

09:51:26AM 3        The point is, when you take the homepage at face

09:51:29AM 4    value, as it was at the time the warrant was issued, it is

09:51:32AM 5    clearly not advertising itself as a child pornography

09:51:37AM 6    site.  There is no lascivious pictures.  It doesn't

09:51:41AM 7    indicate in any way it is anything other than a chat or an

09:51:44AM 8    erotic content site.

09:51:46AM 9        Now, as I said, the officer could say one of two

09:51:50AM 10   things:  Either he didn't check after the site was seized,

09:51:53AM 11   which under the circumstances, with a dynamic website --

09:51:57AM 12   The fact that the FBI in fact had control of the site as

09:52:01AM 13   of the 19th, the day before the warrant application, we

09:52:05AM 14   submit by any common sense measure that is a reckless

09:52:08AM 15   failure to verify, particularly when there are claims

09:52:11AM 16   about the agent's experience with internet investigations

09:52:13AM 17   and the dynamic nature of websites.

09:52:16AM 18       The other alternative is that he did know that the

09:52:19AM 19   logo had changed, in which case I don't know if anything

09:52:23AM 20   more would need to be said at all.

09:52:25AM 21       So, your Honor, we believe we have amply established

09:52:28AM 22   the need for a Franks hearing in terms of the Franks

09:52:30AM 23   issues in evidence.  We do not believe the court needs to

09:52:33AM 24   reach that because we believe this case is resolved on the

09:52:37AM 25   four corners of the warrant application.

09:52:41AM 1          THE COURT:  To justify a separate Franks hearing

09:52:47AM 2     there has to be a substantial preliminary showing that a

09:52:51AM 3     false statement knowingly and intentionally, or with

09:52:54AM 4     reckless disregard for the truth, was included by the

09:53:00AM 5     affiant; and, also, that the alleged false statement is

09:53:09AM 6     necessary to a finding of probable cause.

09:53:13AM 7        I don't think that preliminary showing has been made

09:53:14AM 8     here.  I think the issues that you raise are part of the

09:53:19AM 9     other issues in the case regarding suppression and

09:53:23AM 10    sufficiency of the application, and they can fairly be

09:53:29AM 11    reached without a separate Franks hearing.  I think there

09:53:35AM 12    is just not the necessity for that hearing.  I don't think

09:53:41AM 13    the showing is sufficient under that standard.

09:53:44AM 14          MR. FIEMAN:  Your Honor, just to understand you,

09:53:46AM 15    we are still able to explore those factual --

09:53:47AM 16          THE COURT:  I'm sorry.  What?

09:53:50AM 17          MR. FIEMAN:  Your Honor, just so I'm clear, we

09:53:53AM 18    will still be able to address the evidence related to --

09:53:55AM 19          THE COURT:  Sure.

09:53:57AM 20          MR. FIEMAN:  -- all of those probable cause

09:54:00AM 21    application issues --

09:54:01AM 22          THE COURT:  It is all part of the motion to

09:54:02AM 23    suppress.

09:54:03AM 24          MR. FIEMAN:  Thank you, your Honor.

09:54:04AM 25          THE COURT:  Or motions to suppress.  The next

09:54:11AM 1    matter is the motion to dismiss based on outrageous

09:54:25AM 2    government conduct.  I would like to hear anything you

09:54:37AM 3    want to say about that.

09:54:38AM 4        MR. FIEMAN:  Thank you, your Honor.  And I do have

09:54:42AM 5    a few things I want to say about that.  Because with -- as

09:54:45AM 6    indicated in our initial motion to dismiss, the dismissal

09:54:52AM 7    motion also includes -- it says if there is a lesser

09:54:57AM 8    remedy that accomplishes the same deterrent purposes, the

09:55:00AM 9    court should take that into account.

09:55:03AM 10    Again, we are kind of overlapping with some of the

09:55:06AM 11    suppression issues.

09:55:07AM 12    I just want to very briefly state where we see this

09:55:09AM 13    case to be and the very specific issues that we think are

09:55:14AM 14    dispositive, either in terms of dismissal or finding

09:55:19AM 15    grounds for dismissal and choosing suppression as an

09:55:26AM 16    appropriate remedy.

09:55:28AM 17    Let me just summarize what we see this case to be

09:55:31AM 18    about, your Honor.  In some ways it comes down to a

09:55:35AM 19    constitutional line to the sand.  The government has

09:55:41AM 20    legitimate challenges trying to investigate internet

09:55:46AM 21    crime.  We do not dispute that.

09:55:49AM 22    What we do dispute is whether or not the government

09:55:53AM 23    can unilateral determine the scope and extent of its

09:55:57AM 24    investigatory powers without judicial oversight and in

09:56:02AM 25    defiance of the laws, Rule 41 in particular, and the

09:56:07AM 1   restrictions on illegal investigations that are on the

09:56:11AM 2   books.

09:56:12AM 3       Now, they can advocate for changes.  They can seek

09:56:17AM 4   warrants that allow them to extend their powers.  But what

09:56:20AM 5   we believe they cannot do is engage in this kind of

09:56:26AM 6   gamesmanship with judicial oversight that has been

09:56:30AM 7   evidenced not only throughout this case but in a pattern

09:56:34AM 8   of these technology cases that is leading, we think, to a

09:56:37AM 9   very substantial Fourth Amendment and privacy rights

09:56:40AM 10  crisis.

09:56:41AM 11      It is often unfortunate that these constitutional

09:56:43AM 12  issues are presented in the court in the context of the

09:56:47AM 13  type of allegations that are made in this case.  If we

09:56:50AM 14  were dealing with bank fraud or white collar defendants

09:56:53AM 15  who had their private computers hacked, there is a

09:56:57AM 16  different momentum.  We recognize that.  But Mr. Michaud

09:57:00AM 17  stands here --  This is his case.  It is not about any

09:57:02AM 18  other cases they have charged.  He stands here with the

09:57:05AM 19  presumption of innocence as a man who has been subjected

09:57:08AM 20  to a Washington search on the basis of an invalid Virginia

09:57:12AM 21  warrant.  That is the core of our claim.

09:57:16AM 22      Now, your Honor, I want to zero in on one issue that

09:57:20AM 23  goes to the heart of this dismissal, and all of the

09:57:23AM 24  issues.  It is the one issue we raised --  And it is front

09:57:26AM 25  and center.  In all the reams of paper the court has waded

09:57:30AM 1  through, the government has not once responded to it.  And

09:57:35AM 2  this is this:  They sought a warrant from the Eastern

09:57:40AM 3  District of Virginia.  They got authority to search

09:57:43AM 4  computers, persons, and property in the Eastern District

09:57:46AM 5  of Virginia.  They drafted that warrant.  They changed the

09:57:48AM 6  face of their warrants.  They used to say in Nebraska and

09:57:52AM 7  elsewhere, Colorado and elsewhere.  And once they

09:57:55AM 8  realized, after Judge Smith's decision and their own

09:57:58AM 9  internal policies, that Rule 41 simply did not allow that,

09:58:01AM 10  they simply edited the warrant.

09:58:03AM 11      Now, taking that warrant at face value --  And this is

09:58:05AM 12  why we have been really hammering this, your Honor,

09:58:09AM 13  because it is a brick and mortar issue.  There is no

09:58:11AM 14  dispute at this point that the search occurred on

09:58:14AM 15  Mr. Michaud in his home in Washington.

09:58:17AM 16      Now, imagine if the government had gotten a warrant in

09:58:22AM 17  the Eastern District of Virginia to search multiple --

09:58:25AM 18  hundreds of thousands of houses in the Eastern District of

09:58:28AM 19  Virginia, and they then decided that they were going to

09:58:31AM 20  get in that car, drive across country, go into

09:58:34AM 21  Mr. Michaud's home, extract information from his computer

09:58:39AM 22  on the basis of that Virginia warrant.  It would be a

09:58:42AM 23  non-starter.  It would be a non-starter.  It would be a

09:58:44AM 24  non-starter because it violates what is the plain language

09:58:49AM 25  of the warrant itself, and it is in violation of the

09:58:52AM 1    execution limits that were in that warrant.

09:58:55AM 2        So what I am asking the court to do, in some sense, is

09:58:58AM 3    to set aside all of these technology issues, all of this

09:59:02AM 4    back and forth about who was truthful, who was not

09:59:06AM 5    truthful, and look at the face of the warrant.  Because if

09:59:09AM 6    this were any other case, a drug bust case, a bank fraud

09:59:13AM 7    case, we would be over now.

09:59:18AM 8        And wrapped up in that, your Honor, is this

09:59:24AM 9    government -- the government's argument that somehow all

09:59:26AM 10   of this was necessary.

09:59:28AM 11             THE COURT:  All what?

09:59:30AM 12             MR. FIEMAN:  All of what they did in terms of

09:59:31AM 13   obtaining the warrant and executing the NITs was

09:59:35AM 14   necessary, that they had no alternatives.  That is a false

09:59:37AM 15   statement.

09:59:38AM 16       This warrant authorized them to deploy NITs at the

09:59:44AM 17   time people logged into the home site.  They did not need

09:59:48AM 18   to allow access to actual pornography on the site.

09:59:51AM 19       We have learned as of last night that in fact this is

09:59:53AM 20   not the first time the government has run a child

09:59:55AM 21   pornography site.  It has apparently been done in secret

09:59:58AM 22   several times before, and we have received confirmation of

10:00:01AM 23   that.

10:00:01AM 24       This is a very troubling aspect of the case.  Not only

10:00:04AM 25   are they not being candid with the court in terms of

10:00:07AM  1   allowing magistrates to supervise, or limit, or simply

10:00:13AM  2   exercise full review of the warrant applications, they are

10:00:16AM  3   now not even disclosing to the courts in all of these

10:00:20AM  4   cases that they are planning to continue the distribution

10:00:23AM  5   of child pornography as part of their investigations.

10:00:25AM  6       We consider that outrageous, because even if there is

10:00:29AM  7   a legitimate argument for doing that as an investigatory

10:00:32AM  8   need, which is not true, judges need to be able to decide

10:00:38AM  9   if it is appropriate.  And, frankly, we believe it is

10:00:43AM 10   appalling.

10:00:46AM 11       Now, your Honor, as I also indicated, wrapped up with

10:00:52AM 12   this dismissal motion is the core issue of probable cause,

10:00:56AM 13   because we do think it is outrageous that when presenting

10:01:00AM 14   such a sweeping warrant to a magistrate, that in this case

10:01:05AM 15   authorized up to 100,000 searches, that they were not

10:01:11AM 16   candid or responsible in terms of the key facts in that

10:01:16AM 17   probable cause assessment, which was the homepage.

10:01:20AM 18       So what you ended up with is a warrant that allowed

10:01:25AM 19   tens of thousands, possibly hundreds of thousands, of

10:01:29AM 20   searches anywhere in the world based on people signing

10:01:33AM 21   into a website that does not even advertise itself as

10:01:36AM 22   having illegal content.  And, frankly, the scope of that

10:01:41AM 23   is unprecedented.

10:01:43AM 24       And we haven't even gotten to the Rule 41 violations,

10:01:49AM 25   your Honor, which I will not address, because that is a

10:01:51AM 1     separate matter.

10:01:52AM 2         And all this time, while this is going on, the FBI

10:01:56AM 3     itself is aiding and abetting the uploading and

10:02:00AM 4     distribution of massive amounts of child pornography.  I

10:02:05AM 5     don't want to sound at all self-righteous about this, your

10:02:11AM 6     Honor, because I understand the nuances of criminal cases,

10:02:13AM 7     and I defend people who are charged with distributing or

10:02:18AM 8     possessing child pornography, most obviously.  But those

10:02:22AM 9     people face criminal charges.  All we are asking is that

10:02:26AM 10    the government face judicial oversight.

10:02:32AM 11        So, your Honor, we believe that we have strong grounds

10:02:36AM 12    for dismissal of the indictment.  We invite the court to

10:02:42AM 13    choose the lesser remedy that courts have approved for

10:02:46AM 14    outrageous government conduct, of suppression.  We

10:02:50AM 15    believe, your Honor, that this is a pivotal moment for

10:02:55AM 16    privacy and constitutional rights in the digital age.

10:02:59AM 17    That is a lot for Mr. Michaud to bear, and we don't want

10:03:03AM 18    to lose sight of the man that is sitting here, and the

10:03:06AM 19    court has had a chance to assess.

10:03:08AM 20        But the core of it is this:  Even if the government

10:03:11AM 21    believes that it was perfectly allowed to do what it did,

10:03:16AM 22    then why did they not tell Judge Buchanan what they were

10:03:21AM 23    doing about running a child pornography site?  Why didn't

10:03:23AM 24    they draft a warrant that clearly stated that they would

10:03:27AM 25    execute it outside the Eastern District of Virginia?  Why

10:03:32AM 1    take those steps if this is all legal and appropriate?

10:03:36AM 2       Your Honor, I come back to the same argument.  I

10:03:39AM 3    believe the court can dispose of all these issues based

10:03:42AM 4    simply on the face of the warrant, the government's

10:03:44AM 5    failure to explain the discrepancy between the warrant

10:03:47AM 6    itself and the scope that they claim allowed them for the

10:03:53AM 7    searches, and the discrepancy also, your Honor, between

10:03:56AM 8    the fact that now we know up to 100,000 people accessed

10:04:01AM 9    this supposedly dedicated child pornography site, and yet

10:04:05AM 10   we see no evidence, when we look at the homepage itself,

10:04:10AM 11   that was not presented to the magistrate in the Eastern

10:04:13AM 12   District of Virginia accurately, that in fact this is a

10:04:16AM 13   very ambiguous location.  Thank you, your Honor.

10:04:43AM 14        MR. BECKER:  Your Honor, I would start by, again,

10:05:00AM 15   bringing us back to, as I think I have before here, the

10:05:05AM 16   legal standards and principles that apply.  Because what

10:05:09AM 17   you don't hear in the defendant's argument are any

10:05:13AM 18   applications of them whatsoever.

10:05:15AM 19       And there is a standard that the Ninth Circuit has

10:05:18AM 20   laid out in determining whether or not government conduct

10:05:22AM 21   is quote-unquote outrageous.  It is an extremely high bar.

10:05:30AM 22   We believe there is no question that that bar is nowhere

10:05:32AM 23   near met in this case.

10:05:35AM 24       We are dealing with actions by law enforcement that

10:05:41AM 25   were necessitated by the actions of the offenders choosing

10:05:44AM 1     to use, and in fact misuse, technology in order to hide

10:05:49AM 2     their identity while they sought to exploit and abuse

10:05:53AM 3     children online.

10:05:55AM 4         And law enforcement responded to that enormous

10:05:58AM 5     problem -- The enormity of that problem, your Honor, is

10:06:02AM 6     borne out by the active use of this site.  The fact that

10:06:07AM 7     there were so many thousands of users and so much child

10:06:10AM 8     pornography being distributed long before law enforcement

10:06:15AM 9     ever seized it is an indication of the scope of the

10:06:17AM 10    problem that law enforcement faced.

10:06:21AM 11        In the face of that, what actions did law enforcement

10:06:24AM 12    take?  They went to the court.  I can't figure out what

10:06:29AM 13    warrant the defense -- what NIT warrant the defense is

10:06:33AM 14    reading and what Title III application the defense is

10:06:36AM 15    reading when they say that the government, the FBI, took

10:06:41AM 16    these actions without judicial oversight.  That is simply

10:06:45AM 17    wrong.  It is incorrect.

10:06:49AM 18        The affidavit in support of the network investigative

10:06:52AM 19    technique unmistakably advised the magistrate that the

10:06:57AM 20    child pornography website involved here was going to

10:07:00AM 21    remain operating at a government facility in order for

10:07:04AM 22    that then court-authorized investigative technique to be

10:07:09AM 23    deployed.

10:07:09AM 24        That warrant articulated to Magistrate Judge Buchanan

10:07:14AM 25    why that technique was necessary, because we were dealing

10:07:17AM 1   with a website that operated on the anonymous Tor network.

10:07:23AM 2   That changes the game in terms of what law enforcement has

10:07:26AM 3   available to them in order to identify users.  That is

10:07:30AM 4   laid out in detail in the NIT warrant affidavit.  And no

10:07:35AM 5   reasonable reading of that affidavit would show that the

10:07:39AM 6   magistrate would not have known that the site was going to

10:07:42AM 7   continue to operate at a government facility.  It is

10:07:45AM 8   directly stated.

10:07:46AM 9       The Title III affidavit and application approved by a

10:07:51AM 10  United States District Court judge also articulated that

10:07:55AM 11  the website would remain operating at a government

10:07:58AM 12  facility, and that the United States, the FBI, was going

10:08:01AM 13  to seek and obtain authorization to deploy a network

10:08:05AM 14  investigative technique on its users.  It discussed the

10:08:08AM 15  reasons why, again, the necessity of the site having to

10:08:12AM 16  remain operating in order to deploy that sort of

10:08:15AM 17  technique.

10:08:15AM 18      So I just don't understand the argument that there was

10:08:20AM 19  not judicial oversight involved here when the actions that

10:08:25AM 20  law enforcement took were judicially approved.  That is

10:08:29AM 21  judicial oversight.

10:08:31AM 22      So bringing us back to the standards here, your Honor,

10:08:35AM 23  in terms of the dismissal issue:  Again, extremely high

10:08:43AM 24  standard according to the Ninth Circuit.  So high in fact

10:08:48AM 25  that the Ninth Circuit has consistently refused to find

10:08:52AM 1   outrageous government conduct where the government used

10:08:55AM 2   so-called reverse stings; that is, where there was no

10:08:59AM 3   criminal enterprise that was going on, the government

10:09:03AM 4   created or came up with sort of a fake scheme in which

10:09:08AM 5   defendants participated and were charged.  Even in those

10:09:11AM 6   sorts of scenarios, which is vastly different than this

10:09:15AM 7   scenario, the Ninth Circuit has not found outrageous

10:09:19AM 8   conduct.

10:09:20AM 9       But the standards here, as laid down by the circuit,

10:09:23AM 10  involve a six-factor analysis.  It involves the known

10:09:30AM 11  criminal characteristics of the defendant; whether there

10:09:33AM 12  was individualized suspicion of the defendant; the

10:09:36AM 13  government's role in creating, if at all, the crime of

10:09:40AM 14  conviction; the government's encouragement, if at all, of

10:09:47AM 15  the defendant to commit the particular conduct; the nature

10:09:49AM 16  of the government's participation in the conduct; and the

10:09:51AM 17  nature of the crime being pursued; the necessity for the

10:09:55AM 18  actions taken in light of the criminal enterprise at

10:09:57AM 19  issue.

10:09:58AM 20      Your Honor, as we have argued in our briefing, all of

10:10:01AM 21  those factors weigh heavily in favor of the government's

10:10:04AM 22  conduct being reasonable in this case -- in this

10:10:10AM 23  investigation in response to the particular concerns

10:10:12AM 24  involved.  And the crime does matter.  It is not -- it is

10:10:17AM 25  important that we are talking about the online sexual

10:10:23AM 1    exploitation of children.  That does substantively matter

10:10:26AM 2    in terms of the public safety and interests at stake.  It

10:10:30AM 3    does matter that these offenders were acting online,

10:10:35AM 4    misusing a Tor technology for their own criminal aims,

10:10:38AM 5    making it extremely difficult for them to be identified.

10:10:42AM 6    That absolutely matters.

10:10:46AM 7        The suggestion that somehow the standards would be

10:10:49AM 8    different or apply differently because of the subject

10:10:51AM 9    matter of the crime --  I think the defense sort of wants

10:10:56AM 10   to imply that because this crime involves children that

10:11:01AM 11   somehow we will give more latitude to the government in

10:11:06AM 12   some ways.  And that is certainly not --  I don't believe

10:11:09AM 13   that is the case at all.

10:11:11AM 14       The fact that the crimes do involve children, though,

10:11:14AM 15   means there is a compelling interest and need to

10:11:17AM 16   investigate the perpetrators, to identify them and to

10:11:20AM 17   apprehend them, not just to shut down the facilities

10:11:26AM 18   through which they facilitate and distribute unlawful

10:11:31AM 19   contraband.

10:11:32AM 20       I would like to go through on a more individual basis

10:11:35AM 21   the particular factors, your Honor.  The first two

10:11:39AM 22   characteristics, the known criminal characteristics of

10:11:41AM 23   users, individualized suspicion of the defendant:

10:11:46AM 24   Certainly at the outset of the investigation here the

10:11:49AM 25   government wasn't aware of any conduct by Michaud.  That

10:11:53AM  1   is because he was acting anonymously on the Tor network.

10:11:56AM  2   We know that he joined this website long before the

10:12:01AM  3   government ever took actions to take it over.

10:12:04AM  4       But there was certainly good reason to suspect the

10:12:08AM  5   criminal users of this website of engaging in the

10:12:11AM  6   trafficking of child pornography:  Access, distribution,

10:12:14AM  7   and receipt.  And that is borne out by the investigation,

10:12:17AM  8   the way the site works.

10:12:19AM  9       As the defense concedes -- at least in the context of

10:12:22AM 10   their dismissal motions, the defense concedes and in fact

10:12:27AM 11   affirmatively argues that this website facilitated child

10:12:32AM 12   pornography on a massive scale.  It is only when they are

10:12:34AM 13   on the suppression side of things that they want to shift

10:12:37AM 14   their argument to this website being merely a discussion

10:12:41AM 15   forum and nothing else.  Well, they can't have it both

10:12:43AM 16   ways, your Honor.

10:12:44AM 17       The fact is, this was a child pornography website,

10:12:48AM 18   through which substantial amounts of child pornography

10:12:49AM 19   were trafficked and distributed long before the government

10:12:52AM 20   took specific actions against the site.

10:12:55AM 21       And so the individual -- the users of this site,

10:12:58AM 22   clearly legitimate targets of government investigation.

10:13:01AM 23   And that had nothing to do with anything the government

10:13:03AM 24   created in terms of the criminal scheme.  That was those

10:13:07AM 25   users' criminal scheme.

10:13:09AM 1     That leads into the next factor, your Honor.  And that

10:13:13AM 2   is, again, did the government play a role in the creation

10:13:16AM 3   of the crime in which this defendant, Mr. Michaud, is

10:13:20AM 4   accused?  Here, and the law bears this out, the government

10:13:26AM 5   merely attached itself to one that was already established

10:13:29AM 6   and ongoing.  That weighs against any finding of

10:13:32AM 7   outrageous government conduct.  The United States, the

10:13:35AM 8   FBI, didn't create this website.  It was created by its

10:13:39AM 9   users and its administrators, and existed and

10:13:44AM 10  substantially distributed child pornography long before

10:13:46AM 11  the government ever took it over in an effort to actually

10:13:49AM 12  identify its criminal users.

10:13:52AM 13    Did the government encourage the defendant to

10:13:56AM 14  participate in the crimes at issue?  We know that is

10:13:59AM 15  absolutely not the case.  The defendant, his user account

10:14:05AM 16  Pewter, joined the website on October 31st, 2014, long

10:14:09AM 17  before law enforcement ever received the website.  The

10:14:13AM 18  government had nothing to do with his independent decision

10:14:15AM 19  to associate himself with this criminal enterprise.

10:14:18AM 20    The nature of the government's participation, and was

10:14:22AM 21  it responsible --  Was the nature of what the government

10:14:24AM 22  did responsible for Michaud's crimes?  Again, weighs

10:14:29AM 23  against a finding of outrageous conduct here.

10:14:31AM 24    Did the government act as a partner in the criminal

10:14:34AM 25  activity, or more of an observer in the defendant's

10:14:38AM 1    criminal conduct?  Well, here, again, the site was already

10:14:42AM 2    operating, had operated for six months.  For 14 brief days

10:14:47AM 3    the government allowed it to continue to operate on a

10:14:49AM 4    government server in order to take specific

10:14:52AM 5    court-authorized actions to attempt to identify users and

10:14:55AM 6    monitor user communications.

10:14:58AM 7         The government, the FBI, did not post any links,

10:15:03AM 8    videos -- any images, videos, or links to images, or

10:15:07AM 9    videos of child pornography.  The FBI conducted

10:15:11AM 10   court-authorized monitoring, conducted court-authorized

10:15:15AM 11   deployment of the NIT in order to collect information that

10:15:18AM 12   would help identify the people who were actually

10:15:20AM 13   perpetrating the crimes.

10:15:22AM 14        Another factor in this part is whether the defendant

10:15:26AM 15   would have the technical expertise or resources necessary

10:15:31AM 16   to commit such a crime without the government's

10:15:34AM 17   intervention.  Undoubtedly that is the case with

10:15:37AM 18   Mr. Michaud.  He is charged with counts of possessing and

10:15:39AM 19   receiving child pornography that have nothing to do with

10:15:42AM 20   the website at issue, based on images that were found on

10:15:45AM 21   his devices that were seized from his home, or pursuant to

10:15:50AM 22   other residential search warrants.  He clearly had the

10:15:54AM 23   technical ability to navigate Tor and get to this website,

10:15:58AM 24   because he joined it long before law enforcement took it

10:16:02AM 25   over.

10:16:02AM 1      This is another area where the defense focuses on --

10:16:06AM 2  away from Mr. Michaud, the actual defendant here in this

10:16:09AM 3  case, and more on the other users of the website.  This

10:16:12AM 4  case is about Mr. Michaud, what is he charged with, what

10:16:16AM 5  was his conduct, and was the government responsible for

10:16:20AM 6  that conduct?  And the answer is just no.  There wasn't

10:16:23AM 7  any direct contact with Mr. Michaud during the operation.

10:16:31AM 8  The defense doesn't allege that, and neither does the

10:16:34AM 9  government.

10:16:34AM 10      The fact is he made an independent choice to associate

10:16:37AM 11  himself with a criminal enterprise that was later taken

10:16:39AM 12  over.  And because the government did that, we eventually

10:16:43AM 13  got information to help identify him, and nothing more.

10:16:47AM 14      So that comes around to the last factor, which is the

10:16:50AM 15  need for the investigative technique used in light of the

10:16:53AM 16  challenges of investigating and prosecuting the type of

10:16:56AM 17  crime being investigated.  This factor, your Honor,

10:16:59AM 18  absolutely weighs in favor of the government's conduct

10:17:03AM 19  being reasonable in light of the circumstances, the

10:17:08AM 20  government going to courts -- not just one court, but

10:17:11AM 21  courts, for approval for the investigative technique that

10:17:15AM 22  was used, for the Title III monitoring that was used,

10:17:18AM 23  disclosing to those courts the necessity for this

10:17:22AM 24  technique, the fact that this site had to continue to

10:17:24AM 25  operate in order to give law enforcement an opportunity to

10:17:27AM 1   identify the perpetrators.  It was a brief continued

10:17:32AM 2   operation, again, an enterprise that had existed for six

10:17:36AM 3   months, rather than shut it down the date of seizure, 14

10:17:39AM 4   more days, and that's all, in an effort to use

10:17:42AM 5   court-authorized techniques to monitor users in the hope

10:17:46AM 6   of identifying them.

10:17:47AM 7        Now, it is certainly the case, your Honor, that law

10:17:56AM 8   enforcement could have made the decision of shuttering the

10:17:58AM 9   website on the date that it was seized.  In many other

10:18:01AM 10  contexts of investigation that is also the case.  In

10:18:04AM 11  long-term fraud investigations, in long-term narcotics

10:18:08AM 12  investigations, there are innumerable points in which law

10:18:13AM 13  enforcement can decide to take an action which would

10:18:16AM 14  shutter the organization.  This is not the only context in

10:18:19AM 15  which law enforcement faces those sorts of choices.

10:18:25AM 16       So here, the shutting down that website undoubtedly

10:18:29AM 17  would have stopped criminals from being able to use that

10:18:32AM 18  website in order to traffic child pornography images and

10:18:37AM 19  videos on Tor.  It would have taken away that one

10:18:40AM 20  particular facility.  But it certainly would not and did

10:18:43AM 21  not put an end to the users' ability to continue

10:18:48AM 22  committing those crimes, to the users' ability to continue

10:18:51AM 23  to abuse children, produce images, and then share them

10:18:55AM 24  with others, and to the users' ability to traffic in those

10:18:59AM 25  images.  And that is because without taking action to

10:19:01AM  1   identify the perpetrators, those perpetrators go on and

10:19:06AM  2   continue with their criminal conduct, and as we have

10:19:08AM  3   articulated in our filings, simply create new websites

10:19:13AM  4   that operate the same or similarly.

10:19:15AM  5       As of today, on the Tor network, there are child

10:19:18AM  6   pornography websites that operate similarly to this

10:19:21AM  7   particular site, users who can remain anonymous while

10:19:26AM  8   trafficking in child pornography, and users who remain

10:19:29AM  9   unidentified, criminals who remained unidentified.

10:19:31AM 10       Just shutting down the website is not enough.  The

10:19:34AM 11   obligation of law enforcement for the government is to

10:19:37AM 12   take some action to identify the perpetrators, and

10:19:41AM 13   identify the victims, and to get those children away,

10:19:44AM 14   where we can, from those abusers.  That's the purpose.

10:19:48AM 15   That's the necessity behind a site like this continuing to

10:19:52AM 16   operate, so that crucial IP address information, which

10:19:58AM 17   ultimately leads to being able to identify a perpetrator,

10:20:02AM 18   being able to use further investigation and legal

10:20:06AM 19   processes, to then take that IP information and translate

10:20:09AM 20   it into identifying a person who is trafficking in child

10:20:12AM 21   pornography, or abusing a child and trafficking in child

10:20:14AM 22   pornography.

10:20:15AM 23       So it is in that context that the court has to view

10:20:20AM 24   the government's actions here.  And viewed in that light,

10:20:23AM 25   the necessity of identifying the perpetrators, not just

10:20:28AM 1    taking away one particular place where they can

10:20:31AM 2    perpetrate, but taking action -- where they had the

10:20:33AM 3    opportunity and the court authorization to do so, taking

10:20:38AM 4    that action to take that step to identify the victims,

10:20:45AM 5    justifies the -- again, combined with the court

10:20:48AM 6    authorization here, your Honor, justifies the actions

10:20:49AM 7    taken by law enforcement.  These are not --  It is not

10:20:53AM 8    outrageous conduct by law enforcement.  This is conduct by

10:20:55AM 9    law enforcement that is necessary to enforce the law.

10:21:00AM 10       In terms of the --  The defense has raised some issues

10:21:03AM 11   about the -- at times, about the legality of the actions

10:21:07AM 12   in terms of law enforcement taking enforcement actions

10:21:12AM 13   that when committed by a private citizen would be

10:21:15AM 14   otherwise illegal.

10:21:16AM 15       That is something that, of course, courts have

10:21:18AM 16   recognized, and have recognized for a long time that that

10:21:21AM 17   occurs, that in the course of enforcing laws, law

10:21:25AM 18   enforcement often commits actions that when committed by a

10:21:28AM 19   private citizen would otherwise be unlawful.  But that

10:21:32AM 20   doesn't mean that law enforcement is not permitted to take

10:21:34AM 21   those sorts of actions during the course of enforcing the

10:21:37AM 22   law.  And that is the context that we operated in here.

10:21:43AM 23       For the legal principle on that, your Honor, I would

10:21:46AM 24   point the court to United States versus Mack, that is 164

10:21:51AM 25   F.3d 467, particularly Page 472.  That is a 1999 Ninth

10:21:59AM 1    Circuit opinion.  Mack assessed a situation where local

10:22:03AM 2    law enforcement agencies were found to be able, without

10:22:07AM 3    committing crimes against other -- without committing

10:22:10AM 4    crimes against -- possession of prohibited weapons, that

10:22:15AM 5    in order to enforce the law they were permitted to possess

10:22:19AM 6    those, even where possession would be unlawful if done by

10:22:21AM 7    a private citizen, and then take action to prosecute

10:22:25AM 8    defendants.

10:22:27AM 9         The court recognized the longstanding principle, "The

10:22:31AM 10   law has long recognized the reach of a

10:22:33AM 11   strictly-constructed statute stops short of nonsensical

10:22:37AM 12   consequences.  The Supreme Court has recognized that a

10:22:40AM 13   statute shall be construed to exempt the government if

10:22:43AM 14   application of the statute to the government would create

10:22:45AM 15   an absurdity."

10:22:47AM 16        Here, in the context of the investigation of online

10:22:49AM 17   child pornography crimes, it is obviously necessary for

10:22:52AM 18   law enforcement to engage in actions that would -- when

10:22:56AM 19   performed by a private individual, would otherwise be

10:22:59AM 20   illegal.

10:23:00AM 21        For example, in order to review and document a

10:23:02AM 22   website, such as the one in this case, law enforcement has

10:23:05AM 23   to access it in an undercover capacity, and access child

10:23:09AM 24   pornography in an undercover capacity.  That would be a

10:23:12AM 25   violation of law if done by a private individual.  We

10:23:16AM 1   certainly don't look at that as a violation of the law

10:23:19AM 2   when done by an agent who is investigating a crime, and

10:23:21AM 3   taking that action during the course of the investigation.

10:23:23AM 4   Law enforcement has to document child pornography, receive

10:23:26AM 5   it, download it, possess it.  And all of those actions and

10:23:30AM 6   those federal statutes, if done -- all of those actions if

10:23:34AM 7   done by a private individual would be a violation of law.

10:23:37AM 8   But that is not the case where done under color of law by

10:23:40AM 9   a law enforcement agent during the course of an

10:23:43AM 10  investigation in order to investigate and to identify

10:23:48AM 11  particular criminals.  I did want to make that point, your

10:23:53AM 12  Honor.

10:23:54AM 13      On the necessity principle, and the defense has sort

10:24:00AM 14  of alluded to -- without really putting any particular

10:24:03AM 15  facts in the record, alluded to other actions short of

10:24:07AM 16  running the website that law enforcement could have taken.

10:24:10AM 17      And there is a common-sense principle here regarding

10:24:13AM 18  that, your Honor.  And so the defense suggests, you know,

10:24:16AM 19  if the government had just made all of the child

10:24:19AM 20  pornography on the website inaccessible, it could have

10:24:22AM 21  then gone on with the enforcement there.  Well, a common

10:24:25AM 22  sense principle, your Honor, says where users for months

10:24:29AM 23  upon months have been able to freely access and distribute

10:24:33AM 24  child pornography through the site, and then one day that

10:24:35AM 25  site has all of a sudden completely different

10:24:38AM 1    functionality and no longer presents any ability to access

10:24:41AM 2    those sorts of materials, well, that would be a tip-off,

10:24:44AM 3    and a tip-off to law enforcement infiltration.  And so I

10:24:49AM 4    don't believe it is a reasonable --  Just from a

10:24:51AM 5    common-sense principle, it is certainly understandable

10:24:53AM 6    that the functionality of a site like this would need to

10:24:56AM 7    remain intact in order to give law enforcement the

10:25:00AM 8    opportunity to identify the perpetrators, who would be

10:25:02AM 9    likely scared away or would stop using the facility if it

10:25:07AM 10   turned into something that it wasn't before.

10:25:11AM 11       That's the heart of the reason why it needed to remain

10:25:14AM 12   operating in a similar manner, and in the manner in which

10:25:19AM 13   it had been operating for months and months and months, in

10:25:23AM 14   order to give law enforcement the opportunity to take the

10:25:25AM 15   court-authorized actions to actually identify the

10:25:28AM 16   end-users who were involved in the crimes that were being

10:25:32AM 17   investigated.

10:25:33AM 18       Just a couple of points in terms of specific arguments

10:25:40AM 19   by the defendant.  There was a statement that the defense

10:25:48AM 20   was not -- was not aware, or might not have been aware,

10:25:51AM 21   that law enforcement in prior cases has in fact taken

10:25:54AM 22   these sorts of actions on websites -- on child pornography

10:25:58AM 23   websites and on the Tor network.  And it is correct -- it

10:26:01AM 24   is in fact a matter of public record that law enforcement

10:26:04AM 25   has in the past seized child pornography websites, allowed

10:26:08AM 1   them to continue to operate in a government facility,

10:26:12AM 2   gotten court authority to deploy a network investigative

10:26:16AM 3   technique, and gotten court authority to conduct Title III

10:26:20AM 4   monitoring.

10:26:21AM 5        The defense has been aware of this for some time.  I

10:26:23AM 6   am not sure of the source of the confusion.  But the

10:26:25AM 7   defense actually attached a warrant authorizing just that

10:26:28AM 8   from the Nebraska case that both parties have cited a

10:26:32AM 9   number of times.  And that warrant authorized a network

10:26:35AM 10  investigative technique involving a website takeover,

10:26:38AM 11  disclosed to the court that law enforcement was going to

10:26:41AM 12  operate that site in order to conduct the monitoring and

10:26:44AM 13  deploy the NIT.  I am not sure where the confusion comes

10:26:47AM 14  from.

10:26:49AM 15       But it is certainly the case that law enforcement has

10:26:52AM 16  taken actions like this in the past.  And, again, done it

10:26:55AM 17  with court approval.  Court approval to deploy the

10:26:59AM 18  investigative technique, court approval to conduct T III

10:27:02AM 19  monitoring to monitor users' communications.

10:27:06AM 20       And those cases -- the Omaha cases have been publicly

10:27:11AM 21  reported.  There have been trials that are held in public

10:27:13AM 22  regarding those investigations and a number of individuals

10:27:17AM 23  convicted in the District of Nebraska regarding those

10:27:20AM 24  cases.  Again, a matter of public record.  And one that

10:27:25AM 25  the defense has cited to a number of times through the

10:27:28AM 1    course of our various pleadings in this case.

10:27:30AM 2        As to the interplay of probable cause to the motion to

10:27:48AM 3    dismiss, your Honor, I am not sure exactly how that really

10:27:53AM 4    comes into play, other than to say that certainly the

10:27:57AM 5    magistrate who issued the NIT warrant found probable

10:28:02AM 6    cause.  The district judge who issued the wiretap warrant

10:28:05AM 7    found cause to issue that and to allow that technique.

10:28:11AM 8        And I can tell your Honor, and I have disclosed this

10:28:14AM 9    to the defense, there is and will be issued, I believe

10:28:17AM 10   today, in the Eastern District of Wisconsin, a report and

10:28:21AM 11   recommendation by a magistrate judge regarding a motion to

10:28:24AM 12   suppress involving the NIT warrant in this case, in which

10:28:28AM 13   that magistrate judge, reviewing a probable cause

10:28:31AM 14   challenge to this NIT warrant, found that the warrant

10:28:34AM 15   sufficiently established probable cause.  We will provide

10:28:38AM 16   a copy to counsel and to the court as soon as that becomes

10:28:40AM 17   available on the docket.

10:28:43AM 18       But that court reviewing this same NIT warrant came to

10:28:46AM 19   the conclusion that it did articulate probable cause to

10:28:49AM 20   deploy the technique, sufficiently established probable

10:28:53AM 21   cause.  It also found, with respect to a Rule 41 argument,

10:28:57AM 22   that suppression was unwarranted in the case based on the

10:29:01AM 23   government's conduct, which it found to be reasonable.  We

10:29:04AM 24   will present that to the court, again, once it is

10:29:07AM 25   available.

10:29:07AM 1      To the extent we are talking about probable cause and

10:29:11AM 2  findings of probable cause based on what is articulated in

10:29:14AM 3  the NIT warrant here, that is such a finding by another

10:29:16AM 4  magistrate, in addition to, of course, the issuing

10:29:19AM 5  magistrate who found so here.

10:29:24AM 6      So I gather, your Honor, just in terms of the rest of

10:29:35AM 7  the argument, we will be addressing the particular

10:29:39AM 8  suppression issues separately --

10:29:41AM 9           THE COURT:  It is a different issue.

10:29:43AM 10          MR. BECKER:  Very well.  If I could have the

10:29:52AM 11 court's indulgence to just consult briefly with colleagues

10:29:55AM 12 before I conclude?

10:29:56AM 13          THE COURT:  You know, I asked in my order setting

10:30:00AM 14 this hearing up for brief argument on the motion to

10:30:03AM 15 dismiss.  I haven't heard anything brief from either side

10:30:06AM 16 on this motion yet.

10:30:11AM 17          MR. BECKER:  Very well.  I will conclude, your

10:30:13AM 18 Honor.

10:30:13AM 19          THE COURT:  I have heard what you have said.  You

10:30:16AM 20 guys have to bear in mind I read your briefs, you know.  I

10:30:20AM 21 have read them twice.  You don't have to repeat what's in

10:30:24AM 22 your briefs.

10:30:24AM 23      Mr. Fieman, do you have any response?

10:30:27AM 24          MR. FIEMAN:  Not without repeating myself, your

10:30:30AM 25 Honor.  One brief point.  Two brief points.  One is this,

10:30:34AM 1    your Honor:  You can search in vain every one of those

10:30:38AM 2    Nebraska warrants, the NIT warrant, any of the warrants,

10:30:41AM 3    and you will not find a single reference to the government

10:30:44AM 4    continuing to distribute pornography as part of their

10:30:47AM 5    investigation.

10:30:48AM 6        It has been routine --  And we do not dispute that the

10:30:51AM 7    government can take over websites and collect identifying

10:30:54AM 8    data in that process.  In fact, that's what they asked

10:30:57AM 9    Judge Buchanan to do, to collect the IP address at log-in.

10:31:03AM 10   Nowhere in any of these cases have they disclosed in their

10:31:06AM 11   warrants that they intended to continue to actively

10:31:08AM 12   distribute child pornography.  That is a revelation, and

10:31:11AM 13   it is appalling, because there is in fact no investigatory

10:31:14AM 14   need.  It is a false choice between shuttering down this

10:31:18AM 15   site and the extra step of allowing people to post and

10:31:22AM 16   distribute.

10:31:23AM 17       The other very brief thing I would say, your Honor,

10:31:29AM 18   that really goes to the crux of both the PC and outrageous

10:31:34AM 19   conduct, because if the government is alleging that they

10:31:37AM 20   have probable cause to collect the IP address at log-in,

10:31:41AM 21   they have accomplished their investigatory goal.  Now it

10:31:45AM 22   is a separate issue whether PC is in fact established, and

10:31:48AM 23   we will further address that during the course of the

10:31:50AM 24   later arguments, your Honor.

10:31:52AM 25               THE COURT:  This is a motion to dismiss based on

10:31:56AM 1     outrageous government conduct, as moved in Docket 50 by

10:32:07AM 2     the defense.  This does not require an analysis of whether

10:32:11AM 3     the government did the right thing or whether the

10:32:19AM 4     government made errors, or whether the showing was

10:32:24AM 5     sufficient on the warrants, or whether evidence collected

10:32:28AM 6     on the basis of the warrant should be suppressed.  It is a

10:32:32AM 7     question of whether the government's conduct in this whole

10:32:36AM 8     process is so grossly shocking and so outrageous as to

10:32:41AM 9     violate the universal sense of justice, and offend canons

10:32:51AM 10    of decency and fairness, violate notions of justice.  This

10:32:58AM 11    motion has not reached that standard that the defense

10:33:07AM 12    would have to show.

10:33:09AM 13        I just have a couple of comments about it.  First, the

10:33:15AM 14    government did, from what I have read here, seize and

10:33:23AM 15    control a website that contained child pornography, and

10:33:25AM 16    kept it alive.  Arguably that was under the government's

10:33:33AM 17    control, as the statute requires that they handle evidence

10:33:37AM 18    of child pornography.  I mean, you can argue about that,

10:33:41AM 19    but it is arguable, and a reasonable position to take,

10:33:46AM 20    that they controlled that site consistent with that

10:33:49AM 21    statute.

10:33:53AM 22        We will investigate further today the motion to

10:34:06AM 23    suppress.  But in the government's seeking of warrants and

10:34:16AM 24    seizing of evidence, the evidence shows that they were

10:34:24AM 25    trying to catch the bad guys, so to speak, that they were

10:34:30AM 1   doing their work as law enforcement agents.  Whether they

10:34:34AM 2   did it right is a different thing.  But they didn't do it

10:34:38AM 3   so wrong as to be grossly shocking or outrageous to

10:34:44AM 4   violate the universal sense of justice.

10:34:48AM 5       It is easy to argue, and, my gosh, we hear it in all

10:34:54AM 6   kinds of cases, that the other side's position is

10:34:57AM 7   outrageous.  Well, you know, that's a high standard.  From

10:35:08AM 8   the standpoint of one who stands between the defendant and

10:35:11AM 9   the government, and represents neither side, you look at

10:35:18AM 10  what happened and look inward.  I am not shocked by this.

10:35:26AM 11  I did not find it outrageous.

10:35:32AM 12      Whether there are grounds to suppress evidence here is

10:35:35AM 13  an entirely different issue, but there is no basis to

10:35:43AM 14  dismiss the indictment based on outrageous conduct.  That

10:35:46AM 15  motion made in Docket 50 is denied.

10:35:57AM 16      I guess the next issue to address is the evidentiary

10:36:13AM 17  hearing, if necessary, and argument on the motions to

10:36:17AM 18  suppress.  Those motions are made in three separate

10:36:23AM 19  documents, Dockets 26, 50, and 65.

10:36:36AM 20      The government has the burden of going forward on this

10:36:39AM 21  issue.  I guess I would like to know what you anticipate

10:36:44AM 22  showing, and would ask you for a brief, brief, like five

10:36:52AM 23  minutes, opening statement.  You can bear in mind that I

10:37:04AM 24  am mindful of the issues that I anticipate you will be

10:37:08AM 25  generally addressing.  I am more curious as to how you

10:37:12AM 1    propose to proceed and what you propose to show.

10:37:15AM 2            MR. BECKER:  Understood, your Honor.  It appears

10:37:18AM 3    that we are in a scenario where the court has denied the

10:37:21AM 4    request for a Franks hearing, and the defense, I believe,

10:37:24AM 5    is taking the position that the issues related to

10:37:28AM 6    suppression can be decided based upon the paper record.

10:37:32AM 7    So I think that would be our intent in proceeding.

10:37:35AM 8        Now, this is a bit of a shift in the footing.  We

10:37:39AM 9    certainly are available to present testimony, but at this

10:37:44AM 10   point I think we would intend to proceed on the paper

10:37:47AM 11   record.  There are exhibits that I think both parties will

10:37:51AM 12   agree can be entered as a part of the proceeding

10:37:54AM 13   pertaining to warrant documents and the like, and perhaps

10:38:00AM 14   some others that I think we agreed on that can be put into

10:38:05AM 15   the record.

10:38:06AM 16           THE COURT:  I have some questions for somebody,

10:38:08AM 17   maybe counsel can answer them, about how this worked.  I

10:38:14AM 18   am not asking for an evidentiary showing.  I just want you

10:38:18AM 19   to have the opportunity to make whatever showing you feel

10:38:20AM 20   is necessary.

10:38:25AM 21           MR. BECKER:  In terms of the suppression issues, I

10:38:29AM 22   think we intend to stand on the paper record and argue

10:38:34AM 23   from the documents.

10:38:37AM 24           THE COURT:  Okay.

10:38:39AM 25           MR. FIEMAN:  Unless there are questions that I

10:38:41AM 1    can't answer and our expert can, your Honor, I would ask

10:38:45AM 2    the court to proceed on the paper record.  I will alert

10:38:48AM 3    the court if there is something beyond that scope.

10:38:52AM 4          THE COURT:  Let me ask these questions preliminary

10:38:55AM 5    to anything else.  Not the questions that I raised in my

10:39:05AM 6    order setting up this hearing.  When the government got

10:39:24AM 7    the authority to attach this NIT to the website, how do

10:39:34AM 8    you do that?  Does somebody sit down on a computer and

10:39:38AM 9    make keystrokes to make that happen?  How is that done?

10:39:43AM 10         MR. FIEMAN:  Your Honor, I can tell you, based on

10:39:45AM 11   that question alone, we will need testimony from

10:39:50AM 12   Mr. Soghoian on the part of the defense.  He is quite

10:39:52AM 13   capable of saying this in layman terms, but I do not want

10:39:56AM 14   him to state the process.

10:39:58AM 15         THE COURT:  Anyway, I am curious about that.  And

10:40:04AM 16   then once it is attached to the website, and it goes

10:40:16AM 17   out -- as I understand it, then it goes out to users of

10:40:23AM 18   the website who have to sign in.  When they sign in, does

10:40:26AM 19   it pick up whatever information it is going to pick up

10:40:29AM 20   automatically, or when they enter into that website are

10:40:40AM 21   they directed to enter some other information by this NIT,

10:40:49AM 22   or does it happen automatically without any additional

10:40:55AM 23   entries?

10:40:57AM 24         MR. FIEMAN:  I can give you a brief response to

10:40:59AM 25   all three, your Honor.  The first question is how is the

10:41:14AM 1   NIT programmed.  That is part of what we don't know.  But

10:41:16AM 2   typically in NIT cases, what it is is a set of code

10:41:20AM 3   components that work in conjunction to do really a very

10:41:23AM 4   simple thing.  When a user signs -- is signed into the

10:41:30AM 5   homepage, that activity triggers -- either automatically

10:41:34AM 6   or by an agent monitoring the log-in, we do not know yet,

10:41:39AM 7   but, regardless, at the point of sign-in this code is sent

10:41:45AM 8   from the Virginia server to the target computer, in this

10:41:50AM 9   case allegedly Mr. Michaud's.  And that is what it is, it

10:41:54AM 10  is code, it is data.

10:41:57AM 11     That code breaks through any security barriers that

10:42:01AM 12  might impede it --

10:42:01AM 13        THE COURT:  You know, I know that.  What does

10:42:05AM 14  Mr. Michaud do?

10:42:07AM 15        MR. FIEMAN:  What he is alleged to have done is

10:42:10AM 16  signed into the website.

10:42:11AM 17        THE COURT:  As always, or per usual, or does he

10:42:14AM 18  have to enter in some other information?

10:42:17AM 19        MR. FIEMAN:  No.

10:42:18AM 20        THE COURT:  Does it tell him, to get in, you have

10:42:20AM 21  to do one, two, three?

10:42:22AM 22        MR. FIEMAN:  The homepage has like a user name, as

10:42:25AM 23  you log into anything, like email.  So there are about a

10:42:29AM 24  hundred thousand people who are logging in.  At the moment

10:42:32AM 25  they are typing in their log-in at that homepage, the NIT

10:42:36AM 1    is sent to the target computer and begins extracting data

10:42:40AM 2    here in Washington.

10:42:41AM 3              THE COURT:  Without any additional action on the

10:42:45AM 4    part of the user?

10:42:46AM 5              MR. FIEMAN:  None whatsoever.  Did I address your

10:42:57AM 6    questions so far?

10:42:59AM 7              THE COURT:  Yes.  Do the FBI experts have any way

10:43:14AM 8    to look at the NIT information other than going to the

10:43:24AM 9    server?

10:43:28AM 10             MR. FIEMAN:  Your Honor, they don't go to the

10:43:29AM 11   server.

10:43:30AM 12             THE COURT:  Where do they go?  How do they get the

10:43:33AM 13   information?

10:43:35AM 14             MR. FIEMAN:  They get it from Mr. Michaud's

10:43:38AM 15   computer.

10:43:38AM 16             THE COURT:  They don't have his computer.

10:43:41AM 17             MR. FIEMAN:  That's what the NIT is for.

10:43:43AM 18             THE COURT:  His information --  You see, this is

10:43:45AM 19   what is confusing to me.  It has a lot to do with where

10:43:50AM 20   the search occurred.  How do they find information?  Maybe

10:44:00AM 21   you need to call a witness on these things.

10:44:03AM 22             MR. BECKER:  Our lawyer argument is one thing, in

10:44:08AM 23   terms of explaining the network investigative technique.

10:44:13AM 24   I do think we need to be clear on the record the footing

10:44:16AM 25   and how, if at all, these questions play into the court

10:44:21AM 1    authorization and the particular -- any particular

10:44:26AM 2    challenges to it, so that, I guess, we know -- actually,

10:44:30AM 3    the government knows what footing we are on so we can

10:44:33AM 4    elect to present testimony and what that is pertinent to.

10:44:37AM 5        Certainly the warrant itself and the affidavit does

10:44:45AM 6    give an explanation of how the NIT will work and operate.

10:44:49AM 7            THE COURT:  It doesn't explain the things I am

10:44:53AM 8    asking about.

10:44:54AM 9            MR. BECKER:  Some of them are addressed, your

10:44:56AM 10   Honor.  If I could just have --  Your Honor, I would point

10:45:32AM 11   to Paragraph 33 on Page 24 of the NIT warrant.

10:45:39AM 12           THE COURT:  That is the Rule 41 application?

10:45:46AM 13           MR. BECKER:  Correct.  This is Exhibit 1 to

10:45:48AM 14   Government Docket No. 47.

10:45:50AM 15           THE COURT:  Page and line again.

10:45:52AM 16           MR. BECKER:  Page 24, Paragraph 33.

10:45:57AM 17           THE COURT:  24 at the top, the docket pages, or 24

10:46:01AM 18   at the bottom?

10:46:03AM 19           MR. BECKER:  Sorry.  24 at the bottom, your Honor.

10:46:15AM 20           THE COURT:  Paragraph 33.

10:46:17AM 21           MR. BECKER:  Yes, your Honor.  And that does give

10:46:19AM 22   a description of how the process of the NIT operates.  And

10:46:25AM 23   that is, "In the normal course of operation websites sent

10:46:28AM 24   content to visitors."

10:46:29AM 25           THE COURT:  Just a minute.  Let me read it.

10:46:32AM 1      MR. BECKER:  Yes, your Honor.

10:47:01AM 2      THE COURT:  You see, that is the kind of paragraph

10:47:03AM 3  I don't understand fully.  And I am trying to understand.

10:47:13AM 4  Under the NIT authorization the website would augment that

10:47:20AM 5  content with additional computer instructions.  When a

10:47:27AM 6  user's computer successfully downloads those instructions

10:47:33AM 7  it causes the computer -- the activating computer to

10:47:41AM 8  transmit certain information.  That sounds like the user

10:47:43AM 9  has to download some instructions in addition to just

10:47:47AM 10 signing into the website.

10:47:50AM 11     MR. BECKER:  The warrant specifically authorized

10:47:52AM 12 the government to deploy the NIT to any user who did log

10:47:59AM 13 into the website with a user name and a password.  And so

10:48:02AM 14 the authorization permitted the government to deploy the

10:48:06AM 15 NIT to any user who went that far.

10:48:07AM 16     THE COURT:  I know that.  I am trying to find out

10:48:09AM 17 how this works.

10:48:11AM 18     MR. BECKER:  Understood.

10:48:12AM 19     THE COURT:  So what does the user do?  Are there

10:48:16AM 20 new instructions when he signs into the website?

10:48:20AM 21     MR. BECKER:  Yes, your Honor.  That's what the

10:48:25AM 22 word "augment" references, is that in addition to the

10:48:28AM 23 instructions --

10:48:28AM 24     THE COURT:  What do the instructions say?

10:48:31AM 25     MR. BECKER:  The use of the word "augment" means

10:48:37AM 1    that these are additional instructions beyond the normal

10:48:40AM 2    instructions that would be on the website.  We do think --

10:48:45AM 3    That is articulated.

10:48:47AM 4       The specific instructions -- what the instructions

10:48:50AM 5    are, what the code is, is not articulated in the warrant,

10:48:53AM 6    that is correct.  The computer code is not.  What is

10:48:56AM 7    articulated in the warrant is that there are computer

10:48:59AM 8    instructions that are sent to the user's computer, the

10:49:03AM 9    activating computer, and that causes, as articulated in

10:49:06AM 10   the warrant, the activating computer to send the specified

10:49:09AM 11   information --

10:49:11AM 12           THE COURT:  Let's talk about what the user does.

10:49:13AM 13   He signs into the website?

10:49:16AM 14           MR. BECKER:  Yes.

10:49:18AM 15           THE COURT:  Now, does the website send him these

10:49:21AM 16   instructions that he has to enter more things in

10:49:26AM 17   compliance with those instructions?  I am talking to the

10:49:30AM 18   wrong guys here.

10:49:32AM 19           MR. FIEMAN:  I can't answer this question, your

10:49:34AM 20   Honor.  It is just that I don't think Mr. Becker wants to.

10:49:37AM 21           MR. BECKER:  Your Honor, at this point I want to

10:49:41AM 22   make argument from the warrant itself.  I do think that is

10:49:44AM 23   important.  And I do believe --

10:49:45AM 24           THE COURT:  We are not to argument from the

10:49:47AM 25   warrant yet.  We are still at the point of trying to find

10:49:50AM  1   out what happened.  I want to know what happened, how it

10:49:56AM  2   works.

10:50:04AM  3          MR. BECKER:  Can I have a quick moment to confer

10:50:09AM  4   with counsel?

10:50:09AM  5          THE COURT:  It is time we took a break anyway.  I

10:50:11AM  6   want to know what the user has to do to trigger this NIT,

10:50:19AM  7   if anything.  Then I want to know what does the FBI guy do

10:50:28AM  8   to find out where -- the information that the NIT

10:50:34AM  9   provides, how does he get that?  I suppose there is

10:50:37AM 10   somebody sitting in a cubicle somewhere with a keyboard

10:50:42AM 11   doing this stuff.  I don't know that.  It may be they seed

10:50:51AM 12   the clouds, and the clouds rain information.  I don't

10:50:55AM 13   know.

10:50:56AM 14          MR. BECKER:  Understood, your Honor.  While we are

10:50:58AM 15   breaking, are there other questions that your Honor has?

10:51:03AM 16   I can confer --

10:51:03AM 17          THE COURT:  Those are the main ones.  There may be

10:51:06AM 18   others that come to mind as we argue this matter.

10:51:09AM 19          MR. BECKER:  Thank you, your Honor.

10:51:15AM 20          THE COURT:  We will reconvene shortly after 11:00.

11:10:21AM 21      (Break.)

11:10:21AM 22          THE COURT:  My staff says they think these

11:10:23AM 23   instructions are computers talking to each other, and that

11:10:28AM 24   the information is sent from the user's computer back

11:10:38AM 25   without the user making any additional computer

```
11:10:41AM  1    keystrokes.  Right?
11:10:44AM  2             MR. BECKER:  That's correct, your Honor.
11:10:46AM  3             THE COURT:  Do you agree?
11:10:47AM  4             MR. FIEMAN:  Yes, your Honor.
11:10:51AM  5             THE COURT:  My next question then is, what happens
11:10:56AM  6    when Mr. FBI Agent wants to see if anybody signed in?  So
11:11:07AM  7    they put the NIT on here, he goes home for the night, some
11:11:12AM  8    FBI agents sleep, but not much, and he comes in in the
11:11:18AM  9    morning.  What does he do to see if there is any
11:11:23AM 10    information on there?
11:11:23AM 11             MR. BECKER:  Let me first articulate, your Honor,
11:11:26AM 12    as we have articulated in our filing in response to the
11:11:29AM 13    motion to compel, the site was monitored 24 hours a day,
11:11:34AM 14    seven days a week, while it was in FBI control.  There was
11:11:36AM 15    not a point where this site was being operated --
11:11:40AM 16    administered by the FBI that it was not being monitored by
11:11:44AM 17    the FBI.
11:11:45AM 18             THE COURT:  You mean they don't even get up and go
11:11:47AM 19    to the restroom?  Regardless, what happens on the FBI end?
11:12:00AM 20             MR. BECKER:  The information that is returned by
11:12:02AM 21    the NIT is delivered to an FBI computer.
11:12:05AM 22             THE COURT:  And how does the FBI agent get that
11:12:08AM 23    information?
11:12:09AM 24             MR. BECKER:  That information is loaded into a
11:12:12AM 25    system that turns it into a report, and then those reports
```

11:12:16AM 1   are generated.  That report --  Actually, I can proffer

11:12:20AM 2   into evidence Exhibit 15.  That report contains for a

11:12:26AM 3   particular user all of the actions that the user took on

11:12:29AM 4   the website.

11:12:30AM 5         THE COURT:  How does the FBI agent get that

11:12:33AM 6   information?

11:12:36AM 7         MR. BECKER:  From the FBI computer on which it is

11:12:38AM 8   stored.

11:12:38AM 9         THE COURT:  So he has to sit at his computer and

11:12:41AM 10  make some keystrokes for this to come up, or open his

11:12:47AM 11  computer, or something?

11:12:52AM 12        MR. BECKER:  In order to access the data that is

11:12:55AM 13  stored on the computer, yes, you would have to go on to

11:12:58AM 14  that computer and see, okay, what information was

11:13:00AM 15  returned.  And that is generated into reports that we have

11:13:03AM 16  provided.

11:13:03AM 17        THE COURT:  Where is that information that he or

11:13:08AM 18  she is now looking?

11:13:17AM 19        MR. BECKER:  At the time the data is returned it

11:13:19AM 20  is on the government's computer in Virginia, the computer

11:13:22AM 21  to which that information is returned.

11:13:24AM 22        THE COURT:  Does he have any ability to go back to

11:13:29AM 23  the user's computer and look in there, see what else he

11:13:33AM 24  can find?

11:13:39AM 25        MR. BECKER:  No, your Honor.  We can put on

11:13:44AM 1    testimony regarding these questions.  As the warrant makes

11:13:52AM 2    clear, this was not something that sat on the user's

11:13:55AM 3    computer.  Let me --  We can put on testimony to clarify

11:13:59AM 4    some of these questions, your Honor.  I think that is

11:14:01AM 5    probably the best way forward.

11:14:02AM 6            THE COURT:  If you want to, I would like to know

11:14:05AM 7    how this works.

11:14:06AM 8            MR. BECKER:  Indeed.  Understood, your Honor.

11:14:09AM 9    Just for the court's benefit, and I don't mean for us to

11:14:12AM 10   be obstreperous at all, there may be questions or areas

11:14:16AM 11   where if it involves a level of detail about information

11:14:20AM 12   pertaining to the network --

11:14:22AM 13           THE COURT:  I don't want the detail.  It wouldn't

11:14:24AM 14   mean anything to me anyway.  But I understand enough to

11:14:30AM 15   know that if you want to see something on your computer,

11:14:34AM 16   you have to turn it on and hit the right strokes, or else

11:14:39AM 17   you are just in there playing solitaire or something.  I

11:14:46AM 18   don't care what the strokes are.  I don't care about that.

11:14:51AM 19   I just want to know what's available and how they would do

11:14:55AM 20   it.

11:14:55AM 21           MR. BECKER:  At this time we would call Special

11:15:00AM 22   Agent Dan Alfin to the stand.

           23                      DANIEL ALFIN

11:15:40AM 24       Having been sworn under oath, testified as follows:

11:15:40AM 25                   DIRECT EXAMINATION

11:15:42AM 1    By Mr. Becker:

11:15:43AM 2    Q.   Please state and spell your full name for the record.

11:15:45AM 3    A.   My name is Daniel Alfin, D-A-N-I-E-L, A-L-F-I-N.

11:15:54AM 4    Q.   What do you do for a living?

11:15:55AM 5    A.   I am a special agent with the FBI.  I am currently

11:15:59AM 6    assigned to FBI headquarters, criminal investigative

11:16:04AM 7    division, violent crimes against children section, major

11:16:07AM 8    case coordination unit, located in Linthicum, Maryland.

11:16:12AM 9    Q.   And how long have you been with the FBI?

11:16:15AM 10   A.   I have been employed with the FBI for approximately

11:16:18AM 11   six years.

11:16:18AM 12   Q.   What are the responsibilities of your unit, the major

11:16:24AM 13   case coordination unit?

11:16:26AM 14   A.   The major case coordination unit conducts large-scale

11:16:30AM 15   investigations of online child exploitation offenders that

11:16:34AM 16   typically have a nationwide or international nexus.

11:16:37AM 17   Q.   For how long have you been in that particular unit of

11:16:41AM 18   the FBI?

11:16:42AM 19   A.   I have been assigned to the major case coordination

11:16:45AM 20   unit since approximately July 2014.

11:16:49AM 21   Q.   What sorts of roles and responsibilities do you have

11:16:52AM 22   within that unit?

11:16:53AM 23   A.   In my role as a special agent at the major case

11:16:57AM 24   coordination unit I routinely conduct investigations of

11:17:01AM 25   offenders who utilize sophisticated technology to

11:17:06AM 1   obfuscate or cover up their child exploitation activities.

11:17:11AM 2   A significant amount of my time at the major case

11:17:14AM 3   coordination unit has been dedicated to investigating

11:17:17AM 4   child sex offenders who utilize the Tor network to engage

11:17:22AM 5   in the advertisement, distribution, and production of

11:17:25AM 6   child pornography.

11:17:25AM 7   Q.   Have you accessed websites -- child pornography

11:17:30AM 8   websites on the Tor network in an undercover capacity?

11:17:34AM 9   A.   I have.  I have accessed, documented, and reviewed

11:17:37AM 10  numerous websites that exist and have existed on the Tor

11:17:41AM 11  network, whose primary purposes were the advertisement and

11:17:45AM 12  distribution of child pornography.

11:17:46AM 13  Q.   Special Agent Alfin, did you participate in the

11:17:51AM 14  investigation of the website that is pertinent to this

11:17:55AM 15  case, that we have referred to as Website A?

11:17:58AM 16  A.   I did.

11:17:58AM 17  Q.   Can you just go back and just describe --  How did

11:18:04AM 18  you become aware of Website A, initially?

11:18:06AM 19  A.   I became aware of Website A approximately August 2014

11:18:11AM 20  when it came online.  At that point in time links to

11:18:16AM 21  Website A were advertised on multiple websites, whose

11:18:20AM 22  purposes were the advertisement of websites dedicated to

11:18:25AM 23  the advertisement and distribution of child pornography.

11:18:28AM 24      After I saw the link to Website A come online, I

11:18:35AM 25  accessed it and observed that it was in fact a website

11:18:37AM 1    whose primary purpose was the advertisement and

11:18:40AM 2    distribution of child pornography.  I reviewed the website

11:18:42AM 3    on multiple occasions between August 2014 and March 2015.

11:19:11AM 4         MR. BECKER:  Your Honor, I believe the court has

11:19:13AM 5    an evidence binder available.  There are a couple of

11:19:16AM 6    exhibits that we will present.  I want to make sure the

11:19:18AM 7    court has that in front of him.

11:19:28AM 8    By Mr. Becker:

11:19:28AM 9    Q.   Special Agent Alfin, I would direct your attention to

11:19:31AM 10   Exhibit 12A.  Do you have the book in front of you?

11:19:35AM 11   A.   I do.

11:19:36AM 12   Q.   What does Exhibit 12A depict?

11:19:50AM 13   A.   In early February 2015 an FBI agent at the major case

11:19:55AM 14   coordination unit accessed Website A in an undercover

11:20:00AM 15   capacity.  That agent took multiple screen captures of

11:20:03AM 16   Website A as it appeared during that time.  This is one of

11:20:07AM 17   those screen captures.  And it depicts the front page of

11:20:10AM 18   Website A prior to logging into the website.

11:20:16AM 19        MR. BECKER:  Your Honor, with the court's

11:20:17AM 20   indulgence --  Well, first, I would move to admit

11:20:20AM 21   Exhibit 12A, and then to publish via the computer a copy

11:20:24AM 22   of that exhibit.

11:20:26AM 23        MR. FIEMAN:  No objection, your Honor.

11:20:27AM 24        THE COURT:  All right.  It may be admitted.

11:20:41AM 25      (Exhibit No. 12A was admitted.)

11:20:41AM 1    By Mr. Becker:

11:20:42AM 2    Q.   Special Agent Alfin, can you see 12A on your screen?

11:20:50AM 3    A.   I can.

11:20:50AM 4    Q.   How would the user go about logging into the website?

11:20:54AM 5    A.   A user who wanted to log into Website A would have to

11:20:59AM 6    either log into Website A with a previously established

11:21:04AM 7    user name and password, or they would have to click on the

11:21:09AM 8    words that say "register an account."  At that point they

11:21:14AM 9    would be taken to the registration screen, where they

11:21:17AM 10   would have to create a user name and password in order to

11:21:20AM 11   log into the website.

11:21:21AM 12   Q.   If you can turn in your book to Exhibit 12B?

11:21:38AM 13   A.   I have the exhibit in front of me.

11:21:40AM 14   Q.   What is Exhibit 12B?

11:21:41AM 15   A.   Exhibit 12B shows the index that a user would be

11:21:47AM 16   directed to after logging into Website A with a user name

11:21:52AM 17   and password.  The index displays all of the forums

11:21:56AM 18   available within Website A for users to access and

11:22:01AM 19   distribute content.

11:22:04AM 20        MR. BECKER:  Your Honor, I move to admit 12B and

11:22:07AM 21   to publish.

11:22:08AM 22        MR. FIEMAN:  No objection.

11:22:09AM 23        THE COURT:  It may be admitted.

11:22:10AM 24     (Exhibit No. 12B was admitted.)

11:22:10AM 25   By Mr. Becker:

11:22:24AM 1   Q.   Special Agent Alfin, on Exhibit 12B, there are a
11:22:30AM 2   number of words in purple type.  What are those called?
11:22:34AM 3   A.   Those are the various forums available on Website A.
11:22:42AM 4   If a user were to click on one of those purple words they
11:22:46AM 5   would be directed to that particular forum on Website A.
11:22:52AM 6   For example, referring to this exhibit, one of the links
11:22:59AM 7   is under the heading "Preteen Photos," and it is titled,
11:23:05AM 8   "Girls HC."
11:23:07AM 9   Q.   Scroll down on the digital version.  Do you see the
11:23:20AM 10  particular forum you just mentioned, "Girls HC"?
11:23:24AM 11  A.   I do.
11:23:25AM 12  Q.   Can you point it out on the monitor?
11:23:29AM 13  A.   (Indicating.)
11:23:40AM 14  Q.   First, the designation "HC," what does that
11:23:45AM 15  reference?
11:23:45AM 16  A.   In the context of a website, such as Website A, HC is
11:23:51AM 17  a common abbreviation for hardcore, which refers to
11:23:56AM 18  penatrative sexual activity.
11:24:00AM 19  Q.   And what broader set of forums is that "Girls HC"
11:24:10AM 20  within?
11:24:10AM 21  A.   That is under the heading of, "Preteen Videos,"
11:24:13AM 22  indicating that these forums purport to advertise and
11:24:17AM 23  distribute images and videos of prepubescent children
11:24:23AM 24  engaged in hardcore sexual activity.
11:24:25AM 25  Q.   If a user clicked on the word -- clicked on that word

11:24:35AM 1    "Girls HC" on the website, what would happen?

11:24:37AM 2    A.   At that point the user would be directed to the

11:24:44AM 3    Preteen Videos - Girls Hardcore forum, and they would see

11:24:47AM 4    a listing on their screen all of the topics currently

11:24:49AM 5    available in that forum.

11:24:51AM 6    Q.   When you say "topics," what does that mean?

11:24:53AM 7    A.   An individual topic within the forum would contain

11:24:59AM 8    links to images and videos of a particular set of images

11:25:03AM 9    of child pornography.  In addition to being able to access

11:25:07AM 10   one of these posts, after entering the forum a user would

11:25:10AM 11   also have the option to create a new post and share links

11:25:14AM 12   to images and videos of child pornography.

11:25:23AM 13           THE COURT:  It seems to me this is all stuff that

11:25:26AM 14   I have read about.

11:25:29AM 15           MR. BECKER:  Indeed, your Honor.  We were just

11:25:31AM 16   trying to present some background to get to the questions

11:25:35AM 17   that your Honor had, just in terms of how the site

11:25:38AM 18   functioned.

11:25:38AM 19           THE COURT:  Move right along, counsel.

11:25:41AM 20           MR. BECKER:  Indeed, your Honor.

11:25:42AM 21   By Mr. Becker:

11:25:45AM 22   Q.   Special Agent Alfin, were you familiar with the

11:25:48AM 23   general operation of the network investigative technique

11:25:52AM 24   that was deployed on this website between February 20th

11:25:55AM 25   and March 4th?

11:25:56AM 1    A.   I am.

11:25:57AM 2    Q.   Were reports generated regarding users, including

11:26:04AM 3    their activity, and information that was collected by the

11:26:07AM 4    NIT?

11:26:08AM 5    A.   Yes.

11:26:09AM 6    Q.   Was such a report mailed for the user Pewter,

11:26:14AM 7    P-E-W-T-E-R?

11:26:20AM 8    A.   Yes.

11:26:20AM 9    Q.   Your Honor --

11:26:22AM 10        Special Agent Alfin, can you look at Government's

11:26:26AM 11   Exhibit 15?

11:26:27AM 12        MR. BECKER:  Your Honor, I think that is a DVD

11:26:30AM 13   disk that might be in your Honor's binder.

11:26:41AM 14        THE COURT:  There is a disk here.

11:26:42AM 15   By Mr. Becker:

11:26:42AM 16   Q.   Are you familiar with Government's Exhibit 15?

11:26:45AM 17   A.   I am.  That is a disk that I created that contains a

11:26:48AM 18   copy of the user accounts for the user Pewter.

11:26:55AM 19   Q.   If you can turn to Exhibit 15A in your book.

11:27:02AM 20        MR. BECKER:  First, I would move to admit

11:27:04AM 21   Exhibit 15.

11:27:11AM 22        MR. FIEMAN:  No objection.

11:27:13AM 23        MR. BECKER:  We would move to admit that under

11:27:15AM 24   seal, because it does contain contraband child

11:27:19AM 25   pornography.  We would move to admit that under seal.

11:27:22AM 1          MR. FIEMAN:  No objection, your Honor.

11:27:23AM 2          THE COURT:  It may be admitted under seal.

11:27:26AM 3       (Exhibit No. 15 was admitted.)

11:27:27AM 4   By Mr. Becker:

11:27:28AM 5   Q.   Special Agent Alfin, do you have 15A in front of you?

11:27:32AM 6   A.   I do.

11:27:32AM 7   Q.   What is Exhibit 15A?

11:27:34AM 8   A.   Exhibit 15A is a screenshot from the user account --

11:27:40AM 9   that is contained from the report of the Pewter user

11:27:44AM 10  account that is contained on Exhibit 15.  This particular

11:27:48AM 11  screenshot contains information about the Pewter user

11:27:51AM 12  account, including that it was logged into Website A for

11:27:56AM 13  approximately 99 hours and 37 minutes over the course of

11:28:00AM 14  the Pewter user account's existence.

11:28:05AM 15  Q.   Can you turn to Exhibit 15B?

11:28:12AM 16  A.   I have it in front of me.

11:28:15AM 17  Q.   What is 15B?

11:28:16AM 18  A.   15B is another screenshot from the Pewter user

11:28:22AM 19  report.  This screenshot includes the information that was

11:28:25AM 20  generated by the NIT when it was deployed against the

11:28:29AM 21  Pewter user account.

11:28:33AM 22          MR. FIEMAN:  Objection, your Honor.  That is a

11:28:36AM 23  misstatement of the report.  It is not deployed --

11:28:38AM 24          THE COURT:  Speak through the mic.

11:28:41AM 25          MR. FIEMAN:  The NIT is not deployed against the

11:28:45AM  1    user account.  It is deployed against the target computer.

11:28:49AM  2    That is a statement in the record.

11:28:51AM  3            THE COURT:  I guess that is a suggestion to you.

11:28:55AM  4    Is that an objection?

11:28:57AM  5            MR. FIEMAN:  Yes, your Honor.  It misstates the

11:28:59AM  6    facts already in evidence.

11:29:04AM  7            THE COURT:  I am not going to judge that right

11:29:06AM  8    now.

11:29:07AM  9            MR. BECKER:  It seems like a semantic argument,

11:29:10AM 10    your Honor.  I don't think it would weigh on the

11:29:12AM 11    admissibility of the exhibit.

11:29:14AM 12            THE COURT:  Go ahead.

11:29:20AM 13            MR. BECKER:  Has 15B been admitted, your Honor?  I

11:29:23AM 14    would move to admit 15B.

11:29:26AM 15            MR. FIEMAN:  No objection, your Honor.

11:29:27AM 16            THE COURT:  It may be admitted.

11:29:34AM 17        (Exhibit No. 15B was admitted.)

11:29:34AM 18            MR. BECKER:  Permission to publish.

11:29:36AM 19    By Mr. Becker:

11:29:42AM 20    Q.  Special Agent Alfin, just going from left to right on

11:29:45AM 21    Exhibit 15B, can you just indicate what information is

11:29:48AM 22    contained here?

11:29:52AM 23    A.  This information shows information that was generated

11:29:55AM 24    by the NIT.  The first column is the date and time that

11:30:00AM 25    the NIT collected the information.  It indicates that the

64

11:30:03AM 1   information was collected on or about February 28th, 2015.

11:30:09AM 2   The second column, titled "URL," indicates the specific

11:30:15AM 3   page within Website A that the Pewter user account

11:30:20AM 4   accessed when the NIT collected the information from the

11:30:23AM 5   user account.  "Site user name" indicates that the site

11:30:30AM 6   user name was Pewter.  "IP address" indicates the IP

11:30:36AM 7   address that was utilized by the Pewter user account on

11:30:41AM 8   that specific date and time.  "MAC" refers to MAC address.

11:30:48AM 9   A MAC address is a unique identifier on a network card

11:30:53AM 10   that a user can utilize to connect to the internet.  This

11:30:58AM 11   unique identifier is the identifier that was in use by the

11:31:02AM 12   user of the Pewter account on the date and time that the

11:31:06AM 13   NIT collected this information.  "Host name" refers to the

11:31:11AM 14   Windows computer name that was in use by the user of the

11:31:16AM 15   Pewter user account on this date and time.  "Log on name"

11:31:21AM 16   indicates the Windows user name of the computer that was

11:31:27AM 17   actively using the Pewter user account on this date and

11:31:31AM 18   time.  The "user name" column is blank.  "OS" refers to

11:31:38AM 19   the operating system of the computer that was utilizing

11:31:42AM 20   the Pewter user account on this date and time.

11:31:48AM 21   Q.  And then the column, "IP geo location," was that a

11:31:52AM 22   function of the NIT, or something else?

11:31:53AM 23   A.  It was not.  The IP geo location fields were

11:32:00AM 24   generated afterwards, not as a function of the NIT.

11:32:05AM 25   Utilizing the IP address that was identified by the NIT,

11:32:08AM 1   publicly available databases were searched to indicate

11:32:11AM 2   that IP address on that given date and time was assigned

11:32:17AM 3   to a Comcast internet -- excuse me, Comcast cable account,

11:32:24AM 4   located approximately in the area of Vancouver,

11:32:27AM 5   Washington.

11:32:28AM 6   Q.   Special Agent Alfin, what does this record indicate

11:32:36AM 7   was the action that triggered the deployment of the NIT to

11:32:39AM 8   this user?

11:32:40AM 9   A.   In the case of the Pewter user account, this

11:32:44AM 10   information indicates that an individual logged into

11:32:47AM 11   Website A with a user name and password, and then

11:32:51AM 12   navigated to a section of the website that I previously

11:32:54AM 13   pointed out, entitled, "Preteen Videos - Girls Hardcore,"

11:33:01AM 14   again, an abbreviation for hardcore.   The user accessed

11:33:06AM 15   this forum, and then they opened a specific post within

11:33:10AM 16   that forum that purported to advertise images and videos

11:33:15AM 17   of child pornography.   After accessing that particular

11:33:18AM 18   page on Website A, the NIT collected the information

11:33:23AM 19   associated with the Pewter user account.

11:33:26AM 20   Q.   And in order to access that particular page, what

11:33:29AM 21   action would the user take?   What would the user

11:33:32AM 22   physically do?

11:33:32AM 23   A.   The user would have clicked on the title of that

11:33:37AM 24   post, which was a post indicative of advertising child

11:33:43AM 25   pornography.   After clicking on that post, the NIT would

11:33:45AM 1   have collected the information without anything being

11:33:49AM 2   apparent to the user.  The user did not have to take any

11:33:52AM 3   additional actions.  Nothing appeared on their screen.

11:33:57AM 4   There was no pop-up message.  The activity occurred in the

11:34:01AM 5   background.

11:34:03AM 6   Q.  Can you pull up Exhibit 13B?

11:34:12AM 7   A.  That exhibit is not in my binder.

11:34:38AM 8        MR. BECKER:  Your Honor, Exhibit 13B, because it

11:34:43AM 9   contains contraband images is only in your Honor's binder.

11:34:47AM 10       THE COURT:  I didn't hear all of that.

11:34:49AM 11       MR. BECKER:  Exhibit 13B is only in your Honor's

11:34:52AM 12  binder, because it contains contraband.

11:34:56AM 13       MR. FIEMAN:  We do need to see it.

11:35:01AM 14       MR. BECKER:  Can I ask that we turn our monitors

11:35:04AM 15  just so it is not visible to the gallery?  First, I would

11:35:18AM 16  move to admit 13B.

11:35:22AM 17       THE COURT:  What is 13B?  Agent Alfin, what is

11:35:33AM 18  13B?

11:35:36AM 19       THE WITNESS:  I'm sorry, your Honor, I don't

11:35:38AM 20  recall off the top of my head.  I can take a quick look at

11:35:40AM 21  your binder if you want me to.

11:35:56AM 22       MR. FIEMAN:  Your Honor, I have had an opportunity

11:35:58AM 23  to look at it.  I have no objection to its admission.

11:36:06AM 24  By Mr. Becker:

11:36:07AM 25  Q.  Sorry, Special Agent Alfin.  Are you able to see

11:36:11AM 1    Exhibit 13B?

11:36:13AM 2    A.   I am now.

11:36:13AM 3    Q.   What is it?

11:36:14AM 4    A.   After the Website A was taken off line in March 2015,

11:36:21AM 5    an off-line version of the website was created, which is

11:36:24AM 6    available for review at an FBI facility.  That website

11:36:29AM 7    depicts Website A as it appears when it was taken off

11:36:32AM 8    line.  This is a screenshot from that recreated version of

11:36:36AM 9    Website A that depicts the specific post that the Pewter

11:36:42AM 10   user account accessed when the NIT collected the

11:36:45AM 11   information associated with the Pewter user account.  It

11:36:49AM 12   shows a posting in the Preteen Videos - Girls Hardcore

11:36:55AM 13   section of Website A.  And it contains --

11:36:58AM 14   Q.   Sorry.  What is the posting title?

11:37:00AM 15   A.   The posting title is, "Girl 12ish eats other girls

11:37:06AM 16   slash dirty talk."

11:37:36AM 17   Q.   Special Agent Alfin, to where was the data collected

11:37:41AM 18   by the NIT?  Where was that returned to when it was

11:37:44AM 19   collected?

11:37:44AM 20   A.   That data was returned to a computer controlled by

11:37:49AM 21   the FBI in the Eastern District of Virginia.  A copy of

11:37:54AM 22   that data was then made available to me in my offices, as

11:37:57AM 23   well as my squad mates, in Linthicum, Maryland.

11:38:02AM 24   Q.   Was that data then used to create the report that you

11:38:06AM 25   have testified to, Exhibit 15?

11:38:08AM 1   A.   It was.

11:38:09AM 2   Q.   And where was the website server of the website

11:38:25AM 3   located at the time that all of this activity was

11:38:27AM 4   occurring?

11:38:28AM 5   A.   It was located on a government-controlled server --

11:38:31AM 6   computer server in the Eastern District of Virginia.

11:38:47AM 7          MR. BECKER:   The court's brief indulgence, your

11:38:49AM 8   Honor.

11:39:26AM 9   By Mr. Becker:

11:39:29AM 10  Q.   Special Agent Alfin, once the information was

11:39:32AM 11  returned -- the NIT information was returned to a

11:39:34AM 12  government computer, how, if at all, were agents able to

11:39:37AM 13  access it?

11:39:39AM 14  A.   During the course of operating and monitoring

11:39:43AM 15  Website A, the information returned by the NIT was first

11:39:49AM 16  sent directly to a government computer in the Eastern

11:39:52AM 17  District of Virginia.   That information was then

11:39:56AM 18  replicated to another server located at the major case

11:40:00AM 19  coordination unit in Linthicum, Maryland.   That

11:40:04AM 20  information was there, available for review by the agents

11:40:06AM 21  who were monitoring the website 24 hours a day, seven days

11:40:10AM 22  a week, until the website was taken off line.

11:40:23AM 23  Q.   In terms of the deployment of the NIT, was that --

11:40:28AM 24  you stated it occurred when the user clicked on that

11:40:31AM 25  particular message thread that you described.   Was that an

11:40:35AM 1   active or passive process?

11:40:37AM 2   A.  It was a passive process.  The NIT was configured

11:40:41AM 3   such that when one user accessed the post, as the Pewter

11:40:47AM 4   account did, that the NIT would then be triggered and then

11:40:51AM 5   deployed.  The FBI agents monitoring the website did not

11:40:55AM 6   need to take additional actions to deploy the NIT against

11:41:02AM 7   individual users.

11:41:03AM 8   Q.  And why was that the case for the particular forum

11:41:07AM 9   that was navigated to by Pewter?

11:41:11AM 10  A.  The NIT was deployed against users who accessed posts

11:41:18AM 11  in the Preteen Videos - Girls Hardcore forum because users

11:41:23AM 12  accessing posts in that forum were attempting to access or

11:41:29AM 13  distribute or advertise child pornography.  At the point

11:41:35AM 14  where a user in that forum accessed a post, we can

11:41:40AM 15  affirmatively state that a user has attempted to access

11:41:44AM 16  child pornography.

11:41:50AM 17  Q.  In terms of the information that was collected by the

11:41:52AM 18  NIT, was that ultimately --

11:41:54AM 19        THE COURT:  The NIT did not just go to anyone that

11:41:59AM 20  logged into the website?

11:42:02AM 21        THE WITNESS:  No, your Honor.  The warrant did

11:42:04AM 22  authorize us to deploy the NIT in that fashion.  And then

11:42:09AM 23  the FBI, as noted in the warrant, that we may further

11:42:15AM 24  restrict how we deploy the NIT, deployed it in such a

11:42:19AM 25  fashion that the NIT was deployed against users who

11:42:22AM 1    attempted to access illicit content.

11:42:28AM 2            THE COURT:  So it was only attached to a

11:42:36AM 3    particular forum?

11:42:38AM 4            THE WITNESS:  It was only deployed within certain

11:42:40AM 5    forums on the website, yes, your Honor.

11:42:43AM 6            THE COURT:  Okay.

11:42:45AM 7            MR. BECKER:  Your Honor, I can point to the

11:42:47AM 8    warrant affidavit.  I will have an opportunity for that.

11:42:52AM 9    By Mr. Becker:

11:42:53AM 10   Q.   Was the information collected by the NIT ultimately

11:42:55AM 11   provided to FBI in the Vancouver, Washington area?

11:43:00AM 12   A.   It was.

11:43:00AM 13   Q.   And just in summary, what actions were taken by FBI

11:43:13AM 14   in this area based on that information?

11:43:15AM 15   A.   The major case coordination unit, after receiving the

11:43:19AM 16   information that was collected by the NIT, served a

11:43:25AM 17   subpoena to Comcast cable, which identified a residence in

11:43:32AM 18   Vancouver, Washington.  That information, along with a

11:43:37AM 19   user report for the Pewter account, and other information

11:43:40AM 20   about the investigation, was provided to the Seattle FBI

11:43:44AM 21   office, which covers the Vancouver, Washington area.

11:43:48AM 22   Using that information, a search warrant was executed at

11:43:52AM 23   the defendant's residence.

11:43:54AM 24   Q.   Was information pertaining to the -- information

11:43:59AM 25   collected by the NIT recovered from the home of the

11:44:02AM 1    defendant, Mr. Michaud?

11:44:03AM 2    A.   Yes.  Specifically the unique MAC address that was

11:44:08AM 3    identified by the NIT was found to be associated with a

11:44:13AM 4    particular network adapter that was recovered from the

11:44:16AM 5    defendant's residence.

11:44:19AM 6    Q.   To your knowledge, was child pornography evidence

11:44:23AM 7    also recovered during that search?

11:44:24AM 8    A.   Yes.  I have read reports indicating that a large

11:44:29AM 9    quantity of child pornography, images, and videos were

11:44:35AM 10   recovered from digital devices in the defendant's

11:44:37AM 11   residence.

11:44:43AM 12        MR. BECKER:  Your Honor, for the record, I think I

11:44:45AM 13   neglected to ask that 13B be filed under seal because of

11:44:49AM 14   contraband.  I would make that request at this time.

11:44:51AM 15        THE COURT:  Yeah, it should be under seal.  If I

11:44:55AM 16   didn't say so, it may be admitted.

11:44:58AM 17      (Exhibit No. 13B was admitted.)

11:45:03AM 18        MR. BECKER:  Does your Honor have further

11:45:04AM 19   questions for the government at this point?

11:45:09AM 20        THE COURT:  Yeah, I do have one question, Agent

11:45:14AM 21   Alfin, and then the defense may have some questions for

11:45:16AM 22   you.

11:45:18AM 23      Is there any way for the FBI to go back down this NIT

11:45:30AM 24   to get into the subject computer, the user's computer?

11:45:37AM 25        THE WITNESS:  No, your Honor.  After the NIT

11:45:39AM 1    collected the limited amount of information that it was

11:45:43AM 2    permitted to collect, there was nothing that resided on

11:45:46AM 3    the subject's computer that would allow the government to

11:45:49AM 4    go back and further access that computer.

11:45:56AM 5            THE COURT:  That answers my question, I guess.

11:46:03AM 6            MR. BECKER:  Your Honor, I just want to -- before

11:46:13AM 7    I yield to the defense, your Honor, I did want to point

11:46:16AM 8    your Honor to the NIT search warrant.  This is, again,

11:46:22AM 9    Exhibit 1 to Docket 47.  It is Exhibit 1 in our exhibit

11:46:26AM 10   book.

11:46:27AM 11           THE COURT:  What exhibit?

11:46:33AM 12           MR. BECKER:  Exhibit 1 in the exhibit book.

11:46:35AM 13           THE COURT:  What page?

11:46:37AM 14           MR. BECKER:  Page 24, Footnote 8.  I would point

11:46:59AM 15   the court to Footnote 8.  Footnote 8 indicates, although

11:47:03AM 16   the application and affidavit, as it did, requests

11:47:06AM 17   authority to deploy to any user who logged in with a user

11:47:09AM 18   name and a password --

11:47:11AM 19           THE COURT:  You are dropping your voice.

11:47:12AM 20           MR. BECKER:  Sorry, your Honor.  Just to make the

11:47:14AM 21   point that this footnote indicated that, although the

11:47:16AM 22   application was to deploy to any user who logged in with a

11:47:22AM 23   user name and a password, the affidavit does articulate

11:47:25AM 24   that the FBI may deploy in a more limited sort of fashion,

11:47:30AM 25   including in particular areas of the target website, such

11:47:34AM 1    as the target website sub-forums described in

11:47:39AM 2    Paragraph 27.   And if your Honor looks at Paragraph 27,

11:47:49AM 3    and that is on Page 20 and Page 21, that includes the

11:48:05AM 4    sub-forum that we saw earlier, that is, Preteen Videos -

11:48:09AM 5    Girls Hardcore, the forum in which the defendant was

11:48:10AM 6    operating at the time that the NIT was deployed.

11:48:18AM 7        There is no question the warrant requested and was

11:48:22AM 8    granted authority to deploy to anyone who logged in with a

11:48:23AM 9    user name and password.   In this instance that is how the

11:48:26AM 10   deployment occurred.   Nothing further at this point, your

11:48:38AM 11   Honor.

11:48:39AM 12              THE COURT:   Mr. Fieman.

11:48:44AM 13                      CROSS-EXAMINATION

11:48:46AM 14   By Mr. Fieman:

11:48:56AM 15   Q.   Good morning, Agent Alfin.

11:48:57AM 16   A.   Good morning.

11:48:58AM 17   Q.   I am Colin Fieman.   I am one of Mr. Michaud's defense

11:49:02AM 18   attorneys.   We haven't met before, have we?

11:49:04AM 19   A.   Not formally.

11:49:06AM 20   Q.   If there is anything I ask that isn't clear, and we

11:49:10AM 21   are in some confusing territory, please just ask me to

11:49:14AM 22   restate the question, okay?

11:49:16AM 23   A.   Understood.

11:49:16AM 24   Q.   Now, we have been going actually a couple of hours

11:49:19AM 25   now trying to sort out exactly what this NIT does, for

11:49:23AM 1   Judge Bryan.  Do you know if Judge Buchanan had any

11:49:29AM 2   information or questions beyond what is in the warrant

11:49:31AM 3   about how this thing worked when the warrant was approved?

11:49:34AM 4   A.   I am not aware whether or not Judge Buchanan asked

11:49:39AM 5   for any additional information beyond what was stated in

11:49:41AM 6   the warrant affidavit.

11:49:42AM 7   Q.   Now, please bear with me, because we are all trying

11:49:45AM 8   to figure this out.  I want to kind of go

11:49:48AM 9   step-through-step with kind of concrete imagery how a NIT

11:49:52AM 10  works.  If you can guide me through that process, it will

11:49:56AM 11  be easier.  Okay?

11:49:57AM 12  A.   I will answer your questions.

11:49:58AM 13  Q.   Now, the problem that the FBI faced when it was

11:50:06AM 14  investigating users of Site A was that you couldn't tell

11:50:14AM 15  who was signing into this site, because their identifying

11:50:19AM 16  information was masked, right?

11:50:20AM 17  A.   That's correct.

11:50:21AM 18  Q.   And that's because that is what the Tor browser or

11:50:23AM 19  the Tor network does, it strips out that IP address,

11:50:28AM 20  something like a phone number or an address, that would

11:50:31AM 21  normally be transmitted with the user accessing the site?

11:50:36AM 22  A.   I would not agree with the statement that that

11:50:39AM 23  information is stripped out.  I would agree that the Tor

11:50:43AM 24  network does obfuscate and make that information

11:50:47AM 25  difficult, if not impossible, to identify.

11:50:49AM  1   Q.   So the problem you were trying to solve -- I say

11:50:54AM  2   "you," the FBI, was, how do we get the IP information when

11:50:59AM  3   it isn't sent to the website?

11:51:04AM  4   A.   Some IP information is sent to the website, but that

11:51:09AM  5   IP information is not IP information that can be used to

11:51:12AM  6   identify the end-user.

11:51:14AM  7   Q.   So basically people are calling into the website on

11:51:20AM  8   the Tor network, but you really can't see their telephone

11:51:23AM  9   numbers; is that fair?

11:51:25AM 10   A.   I believe that's a fair analogy.

11:51:27AM 11   Q.   So it is like a private caller.  You want to know who

11:51:30AM 12   is calling the website, but you can't tell because the

11:51:32AM 13   number is not coming up?  I understand that is loose.

11:51:38AM 14   A.   I would agree with that characterization.

11:51:42AM 15   Q.   So the point of the NIT then was that when -- at

11:51:47AM 16   least as far as the warrant authorized, somebody signed

11:51:49AM 17   into the website, somebody in Virginia could activate the

11:51:52AM 18   NIT, correct?

11:51:56AM 19   A.   The NIT was not activated manually by an individual

11:52:01AM 20   in Virginia.

11:52:02AM 21   Q.   Okay.  So it was set up to activate automatically?

11:52:06AM 22   A.   When certain conditions that were described in the

11:52:09AM 23   affidavit were met, yes.

11:52:11AM 24   Q.   Such as signing into the website?

11:52:13AM 25   A.   Yes.

11:52:13AM 1    Q.   So at some point some FBI agent or tech specialist

11:52:18AM 2    set up the NIT to be activated when somebody signed in,

11:52:23AM 3    correct?

11:52:24AM 4    A.   That's correct.

11:52:25AM 5    Q.   And at the point that the person is signing in, and

11:52:30AM 6    the NIT is being activated, you don't have that telephone

11:52:33AM 7    number or complete IP address, correct?  That's what you

11:52:36AM 8    want to get?

11:52:37AM 9    A.   Prior to a user logging into the website, and prior

11:52:40AM 10   to the NIT being activated, we do not have any identifying

11:52:44AM 11   information, including an IP address, for that user.

11:52:48AM 12   Q.   Correct.  And the way the NIT works is that it is

11:52:53AM 13   then sent, without the user's knowledge, from the site in

11:52:57AM 14   Virginia to the user's computer, wherever that may be,

11:53:02AM 15   correct?

11:53:02AM 16   A.   The user after certain conditions are met --

11:53:05AM 17   Q.   Such as signing in?

11:53:06AM 18   A.   Correct.  As articulated in the warrant.

           19   Q.   Yes.

11:53:10AM 20   A.   And in the case of this defendant, accessing a

11:53:13AM 21   particular post on the website.  By accessing that post on

11:53:18AM 22   the website, that user has triggered actions that causes

11:53:21AM 23   his computer to download certain information from the

11:53:23AM 24   website.  We configured the NIT to supplement the

11:53:26AM 25   information being downloaded by the user with the NIT

11:53:30AM 1     instructions.

11:53:31AM 2     Q.   Okay.   And, again, I need to go really slowly because

11:53:35AM 3     already we are using words like "supplement" that are a

11:53:37AM 4     little confusing.   Just step-by-step.   The user has signed

11:53:41AM 5     in, the FBI has set it up so the NIT will be deployed at

11:53:47AM 6     sign in, or at some other point, correct?

11:53:50AM 7     A.   After certain conditions are met, yes.

11:53:53AM 8     Q.   Then that NIT is really like a package of code or

11:53:56AM 9     data, right?

11:53:57AM 10    A.   Yes.

11:53:58AM 11    Q.   And when the user is signing in, they don't know that

11:54:03AM 12    they are getting that package of code or data sent to

11:54:06AM 13    them, right?   The whole point is it is in the background,

11:54:09AM 14    and secret?

11:54:10AM 15    A.   When the user downloads the NIT instructions to their

11:54:13AM 16    computer, it is intended to be invisible to the user.

11:54:16AM 17    Q.   It is invisible.   Okay.   They are signing in and then

11:54:19AM 18    all of a sudden this thing in the background --

11:54:22AM 19    information is being sent from Virginia, to, in this case,

11:54:24AM 20    a Washington computer, by the FBI?

11:54:26AM 21    A.   It is being downloaded from the server in the Eastern

11:54:30AM 22    District of Virginia by the user who has accessed the

11:54:33AM 23    website.

11:54:33AM 24    Q.   How does the NIT code get from Virginia to

11:54:39AM 25    Washington?   It travels, right?

11:54:41AM 1   A.   Yes.   It is downloaded to the user's computer after

11:54:45AM 2   logging into the website when they are using the password

11:54:47AM 3   and after certain conditions are met.

11:54:49AM 4   Q.   So the NIT code travels from Virginia to the

11:54:52AM 5   Washington computer in this case, correct?

11:54:53AM 6   A.   It does.

11:54:54AM 7   Q.   And the user does not know that is happening.   The

11:54:58AM 8   whole point is that is secret, correct?

11:55:00AM 9   A.   Correct.

11:55:00AM 10   Q.   So then when the NIT lands on the Washington

11:55:05AM 11   computer, it does certain things that the user is not

11:55:08AM 12   aware of, correct?

11:55:09AM 13   A.   That's correct.

11:55:11AM 14   Q.   What it does is it searches the user's computer, in

11:55:16AM 15   this case the Washington computer, to find that

11:55:20AM 16   identifying information, like the IP address, correct?

11:55:22AM 17   A.   It instructs the user's computer to send the

11:55:25AM 18   information identified in the NIT warrant attachment to

11:55:30AM 19   the government-controlled computer, in addition to the

11:55:33AM 20   information that the user's computer was already sending

11:55:36AM 21   to the government-controlled computer.

11:55:38AM 22   Q.   But we know the IP address, the identifying

11:55:40AM 23   information, is not being sent without that NIT, right?

11:55:43AM 24   A.   The user's IP address is being transmitted across the

11:55:48AM 25   internet.   But given the function of the Tor network, the

11:55:53AM 1  user's IP address during the normal course of operation of

11:55:57AM 2  a website that operates on the Tor network does not make

11:56:00AM 3  it to the government computer.

11:56:01AM 4  Q.   Just to try and picture this.  It is a little bit

11:56:05AM 5  like you have a police station -- FBI headquarters -- or,

11:56:08AM 6  excuse me, the FBI server in Virginia where the NIT is

11:56:13AM 7  stored and ready to go, right?

11:56:15AM 8  A.   Our server that hosted Website A was in Virginia,

11:56:18AM 9  yes.

11:56:18AM 10  Q.   And then somebody calls into that server, but he

11:56:24AM 11  can't see the number, so you send the NIT, like a police

11:56:28AM 12  officer or agent, out of Virginia, to the computer, to

11:56:31AM 13  find the IP address, correct?

11:56:32AM 14  A.   I don't necessarily agree with the phone call

11:56:37AM 15  analogy, because anyone can call any phone number at any

11:56:40AM 16  given time.  For the deployment of our NIT, you had to do

11:56:44AM 17  more than just call the website.  Anyone could access the

11:56:47AM 18  front page of the website, and at that point the NIT would

11:56:50AM 19  not be deployed.  They had to then log into the website

11:56:53AM 20  with a user name and password.  So I want to make sure

11:56:56AM 21  that we are distinguishing the differences in the

11:56:59AM 22  analogies.

11:56:59AM 23  Q.   I think that is a fair distinction.  They have to

11:57:02AM 24  type in their user name and password on the homepage to

11:57:05AM 25  get that process?

11:57:06AM  1    A.    Correct.

11:57:07AM  2    Q.    Fair enough.  So once that police officer, or in this

11:57:11AM  3    case the NIT, the undercover code, reaches Mr. Michaud's

11:57:16AM  4    home and his computer, it lands on his computer, and then

11:57:19AM  5    finds the IP address, and says send it back to Virginia,

11:57:22AM  6    correct?

11:57:22AM  7    A.    I don't agree with the characterization of the NIT

11:57:27AM  8    code as being a police officer or undercover code.  But I

11:57:32AM  9    can clarify anything that I have already stated about how

11:57:35AM 10    the NIT is delivered.

11:57:36AM 11    Q.    So we know it is delivered to the computer in

11:57:39AM 12    Washington.  And then when the IP address is sent back to

11:57:44AM 13    Washington --  It is stored there, right?

11:57:47AM 14    A.    It is sent to Virginia.

11:57:48AM 15    Q.    Sent to Virginia.

11:57:50AM 16    A.    Where the NIT warrant was authorized.

11:57:52AM 17    Q.    That is a little bit like an evidence room, right?

11:57:56AM 18    That data is securely stored and then agents can go in

11:57:59AM 19    later and retrieve it, look at it, and create all of these

11:58:03AM 20    spreadsheets that we have seen, correct?

11:58:04AM 21    A.    The information was sent to a government-controlled

11:58:07AM 22    computer in the Eastern District of Virginia, and that

11:58:09AM 23    information was preserved as evidence.

11:58:11AM 24    Q.    Now, Agent Alfin, just so we understand, you know, we

11:58:18AM 25    are talking about searches -- the search and the seizure,

11:58:22AM 1    exactly where the information -- the evidence is taken

11:58:24AM 2    from, correct?  That is an issue that we are kind of

11:58:27AM 3    struggling with here, right?

11:58:29AM 4    A.   I believe that is one of the questions that is being

11:58:32AM 5    answered today.

11:58:34AM 6    Q.   Yes.  Would you agree or disagree with various

11:58:38AM 7    statements in the government's pleading when it

11:58:40AM 8    characterizes the IP information as information seized

11:58:46AM 9    from Michaud's computer?

11:58:49AM 10        MR. BECKER:  Objection.  It is irrelevant.  It is

11:58:53AM 11   asking for a legal conclusion, your Honor.

11:58:58AM 12        MR. FIEMAN:  I am just asking if he agrees or

11:58:59AM 13   disagrees with that characterization.

11:58:59AM 14        THE COURT:  Rephrase the question.

11:59:01AM 15   By Mr. Fieman:

11:59:02AM 16   Q.   Do you agree or disagree with the statement that the

11:59:04AM 17   IP address, and all that they were talking about,

11:59:07AM 18   constitutes information seized from Michaud's computer?

11:59:12AM 19        MR. BECKER:  Objection.  Again, calling for a

11:59:13AM 20   legal conclusion.

11:59:14AM 21        THE COURT:  I think you may answer.

11:59:16AM 22        THE WITNESS:  Could you restate the question?

23   By Mr. Fieman:

11:59:19AM 24   Q.   Do you agree or disagree with the statement that the

11:59:25AM 25   Department of Justice itself has made characterizing the

11:59:28AM 1   IP address and all this evidence as information seized

11:59:32AM 2   from Michaud's computer?

11:59:45AM 3   A.   The information was reported by Mr. Michaud's

11:59:51AM 4   computer.  My hesitation in giving a flat yes to that is

11:59:58AM 5   that an IP address is not necessarily assigned directly to

12:00:03PM 6   a computer, but it utilizes that IP address.  I just want

12:00:07PM 7   to make sure that my answer is not misconstruing how the

12:00:11PM 8   internet and IP addresses work.

12:00:13PM 9   Q.   Let me put it this way:  If somebody --  Let's use

12:00:20PM 10  the telephone analogy.  I know it is not perfect.  If

12:00:23PM 11  somebody makes a phone call, and you have caller ID, you

12:00:25PM 12  can see their telephone number come up on your cellphone,

12:00:29PM 13  correct?

12:00:29PM 14  A.   Correct.

12:00:29PM 15  Q.   If you can't see the telephone number, because they

12:00:31PM 16  have a private caller or a number-blocking device, then

12:00:34PM 17  you can't see the telephone number just looking at your

12:00:36PM 18  phone, right?

12:00:37PM 19  A.   Generally, yes.

12:00:38PM 20  Q.   So what you might do, one alternative is, you might

12:00:40PM 21  say, well, we believe this person is engaged in criminal

12:00:42PM 22  activity, so we are going to go to his house, and we are

12:00:45PM 23  going to open the door and go inside and look at the

12:00:49PM 24  telephone number that he has written down in his address

12:00:51PM 25  book?  That would be one way to get the telephone number,

12:00:54PM 1   correct?

12:00:54PM 2   **A.**   I am not tracking in your example on how we have gone

12:00:58PM 3   from not knowing a person's phone number to being inside

12:01:01PM 4   their house.

12:01:03PM 5   **Q.**   Withdrawn.

12:01:04PM 6        THE COURT:  It is lunchtime, counsel.  Let's just

12:01:07PM 7   take one hour.  We have a ceremony at 4:00, the induction

12:01:17PM 8   of a new magistrate judge here.  We are going to have to

12:01:23PM 9   stop at 3:30, 3:45 at the latest, this afternoon.  Keep

12:01:30PM 10   your eye on the clock.  You guys probably want to stay

12:01:34PM 11   here over the weekend, from what I understand about the

12:01:38PM 12   weather back east.

12:01:39PM 13        MR. BECKER:  There is not going to be an option.

12:01:43PM 14        MR. FIEMAN:  Dr. Soghoian is here.  As I

15   indicated, he was supposed to be in Europe, and

12:01:49PM 16   rescheduled.  He is supposed to be in Europe on Monday.

12:01:51PM 17   What we would ask is, if maybe we could avail other

12:01:57PM 18   witnesses, I could finish with Agent Alfin, that will take

12:01:59PM 19   about 15 minutes --

12:02:00PM 20        THE COURT:  Talk to counsel about that.  It

12:02:02PM 21   doesn't matter to me whether you take witnesses out of

12:02:05PM 22   order.  I am not sure that we have a lot more witnesses.

12:02:11PM 23   I understand this better now.

12:02:12PM 24        MR. FIEMAN:  Thank you, your Honor.

01:06:50PM 25     (Lunch break.)

01:06:50PM  1          THE COURT:  Agent Alfin, do you want to resume the

01:06:56PM  2  witness stand?

01:06:56PM  3          THE WITNESS:  Yes, your Honor.

01:06:59PM  4  By Mr. Fieman:

01:07:05PM  5  Q.   Agent Alfin, I just have one more quick question

01:07:09PM  6  about the NIT, and then I am going to wrap up with a few

01:07:11PM  7  questions about one other matter.  Okay?

01:07:16PM  8  A.   Okay.

01:07:17PM  9  Q.   I just wanted to clarify, after the IP address and

01:07:20PM 10  other identifying information was sent to the FBI, you

01:07:24PM 11  then used that information to go to Comcast and get an

01:07:28PM 12  address and all that stuff that would help you locate

01:07:32PM 13  physical addresses from the IP address, correct?

01:07:35PM 14  A.   That is correct.  The IP address itself alerts us to

01:07:39PM 15  the fact that the subscriber is likely in the Vancouver,

01:07:45PM 16  Washington area, and you can use publicly available

01:07:48PM 17  databases to check that information, but we do serve a

01:07:51PM 18  subpoena to Comcast to identify the actual subscriber.

01:07:53PM 19  Q.   So why didn't you just go to Comcast originally when

01:07:56PM 20  you saw Pewter signing into the website?

01:08:01PM 21  A.   During the normal course of operation, the website

01:08:05PM 22  that operates on the Tor network, the user's true IP

01:08:08PM 23  address is not visible to the website.

01:08:10PM 24  Q.   It is only after the IP address was sent to Virginia

01:08:13PM 25  from the computer that you were able to go to Comcast,

01:08:16PM  1    correct?

01:08:16PM  2    A.   That's correct.

01:08:17PM  3    Q.   Now, previously --  Now, we are moving on to a little

01:08:24PM  4    bit, briefly, about the website itself.  You looked

01:08:27PM  5    previously at Government Exhibit 12A.  Do you have that in

01:08:30PM  6    front of you?

01:08:30PM  7    A.   I am pulling it up now.  I have it in front of me.

01:08:42PM  8    Q.   You have seen that photograph before.  You are

01:08:46PM  9    familiar with the record in this case, correct?

01:08:47PM 10    A.   I am.

01:08:48PM 11    Q.   And that 12A is a shot of the website's homepage, the

01:08:55PM 12    log-in page; is that correct?

01:08:56PM 13    A.   Yes.

01:08:57PM 14    Q.   And do you notice down somewhere in the lower right

01:09:05PM 15    corner there is a date?

01:09:06PM 16    A.   Yes.

01:09:06PM 17    Q.   And what is the date?

01:09:07PM 18    A.   February 3rd, 2015.

01:09:09PM 19    Q.   So that Government 12A depicts the homepage as it

01:09:17PM 20    appeared approximately 17 days before the search warrant

01:09:21PM 21    application, correct?

01:09:22PM 22    A.   That's correct.

01:09:22PM 23    Q.   Because the search warrant was obtained on

01:09:27PM 24    February 20th, 2015?

01:09:28PM 25    A.   The NIT search warrant?

01:09:29PM 1  Q.   The NIT search warrant, yes.

01:09:31PM 2  A.   Correct.

01:09:32PM 3  Q.   Can you now turn to --  I am going to show you what

01:09:41PM 4  has been marked as Defense Exhibits A15 and A16.

01:09:46PM 5       If I may approach, your Honor?  We just supplied

01:09:54PM 6  these exhibits to you.

01:09:59PM 7       Agent Alfin, I believe those are just additional

01:10:01PM 8  copies of what is already in Government Exhibit 14, just

01:10:04PM 9  so the record is clear.  Is that right?

01:10:06PM 10 A.   Let me verify what is in Government 14.  Yes, these

01:10:17PM 11 appear to be the same images.

01:10:19PM 12 Q.   Now, it is correct that --  Actually, these two

01:10:22PM 13 pictures depict a laptop that I believe was seized in

01:10:29PM 14 Naples, Florida, on February 19th, 2015; is that correct?

01:10:32PM 15 A.   I believe the search warrant record reflects that the

01:10:37PM 16 laptop was actually seized on February 20th.

01:10:40PM 17 Q.   We will look for the search --  That is in the search

01:10:44PM 18 warrant application, correct?  Would that refresh your

01:10:47PM 19 recollection on the date that the Naples, Florida search

01:10:52PM 20 was executed?  Could you take a look at that?

01:10:54PM 21 A.   The beginning of the execution of the warrant did

01:10:56PM 22 occur on the 19th.  I just want to clarify that we exited

01:11:00PM 23 the residence on February 20th.  That would be the time

01:11:03PM 24 the actual laptop would have been seized.

01:11:05PM 25 Q.   Okay.  And when we are talking about the Naples,

01:11:08PM 1   Florida residence, we are talking about the residence of

01:11:11PM 2   the original operator or administrator of this site, or

01:11:15PM 3   one of the operators; is that correct?

01:11:17PM 4   A.   That's correct.

01:11:18PM 5   Q.   And what was his name, do you recall?

01:11:22PM 6        MR. BECKER:   Objection to relevance.

01:11:28PM 7   By Mr. Fieman:

01:11:30PM 8   Q.   You are familiar with the photographs that were taken

01:11:33PM 9   in Naples, Florida, correct?

01:11:34PM 10  A.   Yes, I was present for the execution of that search

01:11:36PM 11  warrant.

01:11:37PM 12  Q.   So you were present.   Now, I would like you to turn

01:11:39PM 13  to Government 14.   It is the second picture that shows a

01:11:47PM 14  banner in a little bit of detail for Playpen; is that

01:11:52PM 15  correct?   It says in the upper left-hand corner, "Playpen

01:11:55PM 16  welcomes you"?

01:11:56PM 17  A.   It does.

01:11:57PM 18       MR. FIEMAN:   Your Honor, do you have that exhibit?

01:11:58PM 19       THE COURT:   I don't know what you are talking

01:12:00PM 20  about.   Are you talking about A14?

01:12:03PM 21       MR. FIEMAN:   Government 14, your Honor.

01:12:10PM 22       THE COURT:   That is the, "Use of cell-site

01:12:14PM 23  simulator technology"?

01:12:17PM 24       MR. FIEMAN:   Government 14 should be two pictures

01:12:19PM 25  of a laptop, your Honor.

01:12:20PM 1         THE COURT:  That is 15 and 16.

01:12:27PM 2         THE CLERK:  He is in the government's.

01:12:27PM 3         MR. FIEMAN:  That's fine.  The defense exhibits

01:12:29PM 4  are the same.

01:12:31PM 5  By Mr. Fieman:

01:12:31PM 6  Q.  Let me refer then to A15 and 16 -- Defense A15 and

01:12:37PM 7  A16.  Those show the website as it appeared on

01:12:44PM 8  February 19th or on the morning of February 20th; is that

01:12:48PM 9  correct?

01:12:48PM 10  A.  That's correct.

01:12:49PM 11  Q.  And those pictures were taken as you were -- the FBI

01:12:53PM 12  was in fact in the process of seizing the control of the

01:12:57PM 13  website, correct?

01:12:59PM 14  A.  It happened in a similar -- closely-related

01:13:02PM 15  timeframe, yes.

01:13:02PM 16  Q.  And then shortly afterwards, on the 20th, the NIT

01:13:06PM 17  warrant application was completed and presented to the

01:13:09PM 18  judge in Virginia, correct?

01:13:11PM 19  A.  That is correct.

01:13:11PM 20  Q.  So now you can see in the upper left-hand corner that

01:13:15PM 21  there is a logo that appears there?

01:13:17PM 22  A.  Yes, there is.

01:13:18PM 23  Q.  And do you see any lascivious display of prepubescent

01:13:24PM 24  girls in that left corner?

01:13:26PM 25  A.  The logo depicted in this image depicts what appears

01:13:30PM 1   to be a prepubescent female posed in a sexually suggestive

01:13:35PM 2   manner.

01:13:36PM 3   Q.   Do you see any nudity or --   Do you see two females

01:13:41PM 4   anywhere there?

01:13:41PM 5   A.   I do not.

01:13:42PM 6   Q.   Do you see their legs spread apart?

01:13:45PM 7   A.   I do not.

01:13:46PM 8   Q.   It is fair to say that the February 3rd logo that we

01:13:50PM 9   saw earlier did not exactly match what you seized on the

01:13:53PM 10  19th, correct?

01:13:54PM 11  A.   The logo did change.

01:13:56PM 12  Q.   At any point is the warrant application amended or

01:14:02PM 13  corrected to change the description of the images that

01:14:08PM 14  appeared with the logo?

01:14:09PM 15  A.   The warrant for the NIT reflected a specific period

01:14:14PM 16  of review, and it was not updated to include my

01:14:17PM 17  observations from the night of February 19th and morning

01:14:20PM 18  of February 20th.

01:14:23PM 19          MR. FIEMAN:   Thank you.   That is all the questions

01:14:24PM 20  I have.

01:14:36PM 21          MR. BECKER:   Your Honor, may I redirect Special

01:15:02PM 22  Agent Alfin pertaining to this issue, which was --   Thank

01:15:04PM 23  you.

01:15:04PM 24                    REDIRECT EXAMINATION

01:15:05PM 25  By Mr. Becker:

01:15:06PM 1   Q.   Special Agent Alfin, did there come a point in time

01:15:09PM 2   where the administrator changed, as you testified about,

01:15:11PM 3   the logo of the website?

01:15:13PM 4   A.   Yes.

01:15:13PM 5   Q.   And when did that occur, based on examination of the

01:15:17PM 6   website?

01:15:17PM 7   A.   It occurred approximately in the early evening hours

01:15:21PM 8   of February 19th, several hours before his arrest.

01:15:25PM 9   Q.   Was there a posting on the website that reflected

01:15:28PM 10  that?

01:15:28PM 11  A.   There was a posting in the administration section of

01:15:32PM 12  the website, indicating that the administrator had changed

01:15:35PM 13  the logo.

01:15:36PM 14  Q.   Can I refer you and ask you to review Exhibit 12D?

01:15:56PM 15  A.   I have the exhibit in front of me.

01:15:58PM 16  Q.   What is Exhibit 12D?  Excuse me.  I'm sorry.  Please

01:16:11PM 17  review Exhibit 13A.  My apologies.

01:16:17PM 18  A.   I have the exhibit in front of me.

01:16:20PM 19  Q.   What is Exhibit 13A?

01:16:22PM 20  A.   Exhibit 13A is a posting from the administration

01:16:28PM 21  section of Website A.  The post is entitled, "Logo

01:16:33PM 22  Contest."  And it has a discussion between various

01:16:37PM 23  administrators and moderators of Website A about changing

01:16:40PM 24  the logo of Website A.

01:16:46PM 25          MR. BECKER:  Move Exhibit 13A into evidence, your

01:16:50PM 1    Honor.

01:16:50PM 2            MR. FIEMAN:  No objection.

01:16:50PM 3            THE COURT:  It may be admitted.

01:16:52PM 4        (Exhibit No. 13A was admitted.)

01:16:52PM 5    By Mr. Becker:

01:16:52PM 6    Q.   If I can direct your attention to the last page of

01:16:56PM 7    Exhibit 13A?

01:16:59PM 8    A.   I have it in front of me.

01:17:01PM 9    Q.   And is there a posting that indicates when the

01:17:05PM 10   administrator put the new logo onto the website?

01:17:08PM 11   A.   There is.  There is a posting in this thread created

01:17:11PM 12   by the primary administrative account that states, "I just

01:17:15PM 13   put it up."  That posting, according to the website, is

01:17:19PM 14   dated February 20th, 2015.  In actuality, that occurred

01:17:25PM 15   sometime on February 19th, 2015.  The time discrepancy is

01:17:30PM 16   because the time zone of the website was several hours

01:17:33PM 17   ahead of eastern time.

01:17:35PM 18   Q.   In terms of the --  You reviewed the two images on

01:17:47PM 19   the initial logo just a few moments ago; is that right?

01:17:49PM 20   A.   Yes.

01:17:50PM 21   Q.   When was the first time that you reviewed, to your

01:17:56PM 22   recollection, the website in question?

01:17:57PM 23   A.   The first time that I reviewed the website in

01:18:01PM 24   question would have been approximately August 2014, after

01:18:06PM 25   it came online.

01:18:07PM 1    Q.   And at that time what images were present on the logo

01:18:10PM 2    of the site?

01:18:11PM 3    A.   Every time that I reviewed the website, between my

01:18:16PM 4    first viewing of it up until the execution of the search

01:18:20PM 5    warrant at the administrator's residence, it featured the

01:18:26PM 6    original logo, the one that was described in the warrant

01:18:29PM 7    affidavit, that featured what appeared to be two

01:18:34PM 8    prepubescent females.

01:18:36PM 9    Q.   At the time you were in the home of the

01:18:38PM 10   administrator, do you recall taking particular notice of

01:18:41PM 11   any change to the website's logo?

01:18:44PM 12   A.   No.   At the time, while I would have clearly seen the

01:18:47PM 13   website and would have seen the new logo, it did not jump

01:18:50PM 14   out to me as a significant change to the website or a

01:18:52PM 15   material change to the website, given the content of the

01:18:55PM 16   logo and its similarity to the previous logo.

01:18:58PM 17   Q.   Was it your intent that the change to the logo be

01:19:03PM 18   omitted from the NIT warrant in any way?

01:19:05PM 19   A.   Absolutely not.

01:19:06PM 20   Q.   Special Agent Alfin, just a few brief questions about

01:19:31PM 21   how a user communicates with a website, to go briefly back

01:19:35PM 22   to that topic.   When a user communicates with a website,

01:19:39PM 23   such as the one in this case, what sort of information

01:19:42PM 24   does that user send to the website?

01:19:47PM 25   A.   During the normal course of operation of a website,

01:19:50PM 1    such as Website A, when a user accesses the website, and

01:19:55PM 2    then logs into the website, they are sending various

01:19:59PM 3    pieces of information to that website.   That information

01:20:02PM 4    includes information about processes running on the user's

01:20:06PM 5    computer.   It also includes requests for information from

01:20:10PM 6    the website.   During the normal course of operation, that

01:20:13PM 7    website responds by sending information back to the user's

01:20:18PM 8    computer, and that user can view that information inside

01:20:21PM 9    of a web browser.   That information is typically displayed

01:20:25PM 10   as text information or graphical information.   And while

01:20:29PM 11   the user remains connected to the website, that ongoing

01:20:32PM 12   exchange of information continues between the user's

01:20:35PM 13   computer and the website.

01:20:36PM 14   Q.   So the user's computer is sending information to the

01:20:39PM 15   website, and the website is sending information back to

01:20:41PM 16   the user?

01:20:42PM 17   A.   That is correct.

01:20:42PM 18   Q.   Whether or not there has been any sort of NIT

01:20:46PM 19   installed on the website?

01:20:46PM 20   A.   Correct.

01:20:47PM 21   Q.   And is that the case for websites on Tor as well as

01:20:50PM 22   websites on the regular internet?

01:20:52PM 23   A.   That's correct.

01:20:52PM 24   Q.   And when a user clicks on a link on a website, what

01:20:59PM 25   is happening in the background in order for the user to

01:21:02PM 1    then go to the next part of that site?

01:21:05PM 2    A.   When a user clicks on a link within a website, the

01:21:09PM 3    user's computer sends a request to the website to send

01:21:14PM 4    that particular page of the website back to the user's

01:21:17PM 5    computer.  Typically the website -- the computer server

01:21:21PM 6    hosting the website will respond to that request by

01:21:23PM 7    sending the requested information to the user's computer.

01:21:37PM 8            MR. BECKER:  Thank you, your Honor.  No further

01:21:38PM 9    questions.

01:21:39PM 10           MR. FIEMAN:  Some very brief follow-up on this

01:21:41PM 11   issue.

01:21:43PM 12                   RECROSS-EXAMINATION

01:21:45PM 13   By Mr. Fieman:

01:21:45PM 14   Q.   Agent Alfin, could you turn to Defense Exhibit A8?

01:21:49PM 15   Do you have that defense binder in front of you?

01:21:51PM 16   A.   I will pull it up now.  I have it in front of me.

01:21:59PM 17   Q.   And that reflects an email chain between myself,

01:22:06PM 18   Assistant United States Attorney Kate Vaughan, Sam Mautz,

01:22:12PM 19   who is an FBI agent, correct?

01:22:14PM 20   A.   That's correct.

01:22:14PM 21   Q.   And yourself?

01:22:15PM 22   A.   That's correct.

01:22:17PM 23   Q.   You may not have been aware at the time, but at some

01:22:21PM 24   point you became aware that the defense and the United

01:22:25PM 25   States Attorney's Office had a discovery conference in

01:22:27PM  1    Seattle in early November; is that correct?

01:22:29PM  2    A.   I am aware that discovery material was turned over to

01:22:32PM  3    defense at various points in time.

01:22:34PM  4    Q.   And you are aware that, according to this email chain

01:22:39PM  5    that you received and recollect, there was initially a

01:22:45PM  6    communication from me to Kate Vaughan regarding the

01:22:49PM  7    homepage and screenshots -- or just the pictures that we

01:22:53PM  8    are showing of the homepage; is that correct?

01:22:56PM  9          MR. BECKER:   Object to relevance and personal

01:22:58PM 10    knowledge, your Honor.

           11          MR. FIEMAN:   Your Honor, he said that he is

01:23:02PM 12    familiar with the picture.

01:23:02PM 13          THE COURT:   It is a fair objection.   I don't know

01:23:04PM 14    what you're asking him here.

01:23:08PM 15    By Mr. Fieman:

01:23:09PM 16    Q.   At some point on November 10th did Agent Mautz

01:23:14PM 17    contact you about producing a copy of the screen page --

01:23:17PM 18    the homepage -- a screenshot of the homepage?   If you look

01:23:23PM 19    on the first page of A08?

01:23:25PM 20    A.   Yes, he did contact me.

01:23:26PM 21    Q.   And he asked you to send a new or different copy of

01:23:32PM 22    the homepage than had originally been produced for the

01:23:36PM 23    defense; is that correct?

01:23:37PM 24    A.   This email chain doesn't specify exactly which images

01:23:43PM 25    that I sent to Special Agent Mautz, but I did send him

01:23:50PM 1    images.

01:23:51PM 2    Q.   And Agent Mautz was following up with you on

01:23:54PM 3    November 10th, according to the 6:30 p.m. message,

01:23:58PM 4    because, as you can see below, "Defense is taking note of

01:24:05PM 5    the capture dates."  Do you see that communication?

01:24:07PM 6    A.   Just to clarify, you said that Agent Mautz was

01:24:10PM 7    following up with me, but that appears to be the first

01:24:12PM 8    time that he contacted me in this chain of email

01:24:15PM 9    communications.

01:24:15PM 10   Q.   Okay.  Had he contacted you previously about

01:24:18PM 11   obtaining a screenshot of the homepage?

01:24:21PM 12   A.   Not that I recall.

01:24:22PM 13   Q.   So at this point he is contacting you for the first

01:24:27PM 14   time to get a copy of the screen -- of the homepage, is

01:24:30PM 15   that correct, to the best of your recollection?

01:24:31PM 16   A.   To the best of my recollection, yes.

01:24:33PM 17   Q.   And he is doing that, he indicates, because "Defense

01:24:36PM 18   is taking note of the capture dates"?

01:24:40PM 19   A.   Yes, he says that in his email.

01:24:42PM 20   Q.   And when we refer to the capture dates, we are

01:24:46PM 21   talking about the date that particular homepage or image

01:24:50PM 22   was actually posted or appeared, correct?

01:24:52PM 23   A.   I assume he was referring to material that was

01:24:54PM 24   provided to defense in earlier discovery reviews.

01:24:58PM 25              MR. FIEMAN:  Thank you very much.  No further

01:25:00PM  1    questions, your Honor.

01:25:00PM  2          THE COURT:  Thank you, Agent Alfin.  You may be

01:25:06PM  3    excused.

01:25:21PM  4          MR. BECKER:  Your Honor, other than to ask the

01:25:23PM  5    admission of some exhibits just to clarify the record, we

01:25:26PM  6    don't have other witnesses to present, unless your Honor

01:25:28PM  7    has further questions to be addressed.

01:25:29PM  8          THE COURT:  No, I don't.

01:25:31PM  9          MR. FIEMAN:  No objection, your Honor, to

01:25:33PM 10    admission of everything that has been offered.

01:25:35PM 11          THE COURT:  What now?

01:25:36PM 12          MR. FIEMAN:  No objection to the admission of

01:25:39PM 13    everything that has been offered.

01:25:39PM 14          THE COURT:  I don't know what has been offered.

01:25:50PM 15          MR. BECKER:  Your Honor, for purposes of the

01:25:52PM 16    record, first we would offer Exhibits 1 through 9 on our

01:25:57PM 17    exhibit list.  Each one of those exhibits is attached as

01:26:01PM 18    an exhibit to our previous filings.  I just wanted to do

01:26:05PM 19    so for completion of the record.

01:26:08PM 20          MR. FIEMAN:  No objection, your Honor.

01:26:09PM 21          THE COURT:  They may be admitted.

01:26:15PM 22       (Exhibit Nos. 1 - 9 were admitted.)

01:26:15PM 23          MR. BECKER:  And we would move for the admission

01:26:17PM 24    of the following:  12A, 12B, 13A, 13B, which we would ask

01:26:26PM 25    under seal because of contraband, 15, 15A, 15B.  At this

01:26:42PM 1  time we would move for the admission of those for the

01:26:44PM 2  record.

01:26:46PM 3          MR. FIEMAN:  Your Honor, I have no objection.  But

01:26:47PM 4  we should also move in 14, which is the same as Defense

01:26:52PM 5  Exhibit A15 and A16.  I would move for the admission of

01:26:56PM 6  all of those --

01:26:56PM 7          THE COURT:  What numbers now?  A15 and A16?

01:27:03PM 8          MR. FIEMAN:  Yes, your Honor.

01:27:04PM 9          THE COURT:  Do you have any objection to those?

01:27:05PM 10         MR. BECKER:  No, your Honor.

01:27:07PM 11         THE COURT:  All of those exhibits may be admitted.

01:27:13PM 12      (Exhibit Nos. A15 & A16 were admitted.)

01:27:13PM 13         MR. BECKER:  One other issue, your Honor.

01:27:21PM 14 Exhibits 1 through 5 are all documents that are currently

01:27:24PM 15 under seal.  We haven't had an opportunity to conference

01:27:26PM 16 with the defense in order to work out those issues, which

01:27:29PM 17 we will.

01:27:29PM 18         THE COURT:  They should remain under seal until we

01:27:31PM 19 resolve that issue.

01:27:33PM 20         MR. BECKER:  That would be our request.  We will

01:27:34PM 21 confer on that issue.

01:27:41PM 22         MR. FIEMAN:  Your Honor, if the government is

01:27:43PM 23 complete, we would call Dr. Chris Soghoian.

           24                     CHRIS SOGHOIAN

01:28:11PM 25    Having been sworn under oath, testified as follows:

01:28:11PM 1          **DIRECT EXAMINATION**

01:28:13PM 2   By Mr. Fieman:

01:28:14PM 3   Q.   Dr. Soghoian, please spell your name for the record.

01:28:16PM 4   A.   Sure.  My name is Christopher Soghoian.  That is

01:28:20PM 5   C-H-R-I-S-T-O-P-H-E-R, Soghoian, S-O-G-H-O-I-A-N.

01:28:28PM 6   Q.   And where do you work?

01:28:30PM 7   A.   I am the principal technologist for the Speech

01:28:34PM 8   Privacy and Technology Project at the American Civil

01:28:38PM 9   Liberties Union.  Although I should clarify, I am actually

01:28:40PM 10  volunteering here in my personal capacity.

01:28:43PM 11  Q.   Correct.  We retained you as a technology expert in

01:28:47PM 12  this case some time ago, correct?

01:28:48PM 13  A.   That's correct.

01:28:48PM 14  Q.   And are you being paid for your assistance?

01:28:51PM 15  A.   I am being reimbursed for my flights, and my hotel,

01:28:54PM 16  and a per diem for food, but that's it.

01:28:56PM 17  Q.   What is your training and qualifications?

01:28:58PM 18  A.   I have a bachelor's degree in computer science from

01:29:02PM 19  James Madison University.  I have a master's degree in

01:29:06PM 20  computer security from Johns Hopkins University.  I have a

01:29:10PM 21  Ph.D. in informatics, which is like a mix of computer

01:29:14PM 22  science and law, from Indiana University.  And I

01:29:17PM 23  specialized there in studying the role that the telephone

01:29:22PM 24  companies play in enabling government surveillance.

01:29:24PM 25  Q.   And have you testified in other court proceedings?

01:29:27PM 1    **A.    This is my first appearance in court, but I have**

01:29:31PM 2    **acted as a defense expert for the public defender in**

01:29:34PM 3    **Spokane, Washington.   I have also -- I also have quite a**

01:29:38PM 4    **bit of experience in training judges and explaining things**

01:29:41PM 5    **to judges.   I appeared at an event organized by the**

01:29:45PM 6    **Federal Judicial Center in Washington, D.C. last year,**

01:29:48PM 7    **explaining surveillance technology to judges.   I also**

01:29:51PM 8    **spoke to 60 Article III judges last year at an event**

01:29:56PM 9    **organized by Georgetown Law School.**

01:29:59PM 10   **Q.   Slow down a little bit so the court reporter can get**

01:30:02PM 11   **everything.   You have also testified before the advisory**

01:30:05PM 12   **committee on the Federal Rules of Criminal Procedure?**

01:30:07PM 13   **A.   I have, yes, sir.**

01:30:09PM 14   **Q.   And when did you do that?**

01:30:10PM 15   **A.   I think that was in the fall of 2014.**

01:30:14PM 16   **Q.   And have you ever had your publications or scholarly**

01:30:17PM 17   **work cited by a court?**

01:30:19PM 18   **A.   Yes.   My research and scholarship has been cited by**

01:30:24PM 19   **several federal courts, including the dissent by the Chief**

01:30:28PM 20   **Judge of the Ninth Circuit, Alex Kozinski.   My research**

01:30:32PM 21   **has also been cited by the state supreme court of**

01:30:35PM 22   **New Jersey and the state supreme court of Massachusetts.**

01:30:37PM 23   **Q.   Now, as a consultant in this case, have you reviewed**

01:30:41PM 24   **the discovery and materials that relate to Mr. Michaud's**

01:30:46PM 25   **case?**

01:30:46PM 1    A.   I have reviewed all documents you have sent to me,

01:30:49PM 2    yes.

01:30:49PM 3    Q.   Did that, for example, include the NIT warrant

01:30:52PM 4    application?

01:30:53PM 5    A.   I have reviewed the NIT warrant application, yes.

01:30:56PM 6    Q.   Let me just cut to the chase.  Would you please

01:30:58PM 7    explain to the judge what an NIT is and how it works?

01:31:01PM 8    A.   Sure.

01:31:02PM 9         MR. BECKER:  Objection, your Honor.

01:31:03PM 10        THE COURT:  Wait a minute.  I didn't get the

01:31:05PM 11   question.

01:31:06PM 12        MR. FIEMAN:  I asked him to explain to the court

01:31:07PM 13   what an NIT is and how does it work.

01:31:12PM 14        MR. BECKER:  I would object to the foundation and

01:31:15PM 15   speculation, your Honor.  If this isn't based on any

01:31:17PM 16   analysis of a network investigative technique in this

01:31:20PM 17   case, i.e., the NIT in this case --

01:31:23PM 18        THE COURT:  A little more foundation is

01:31:24PM 19   appropriate.

01:31:25PM 20   By Mr. Fieman:

01:31:25PM 21   Q.   Dr. Soghoian, in the course of reviewing the

01:31:29PM 22   discovery, have you, for example, reviewed all of the

01:31:33PM 23   government's descriptions of the NIT that was deployed in

01:31:38PM 24   this case?

01:31:39PM 25   A.   I have read the description of the NIT in this

01:31:42PM 1   warrant, and I have also read the description of the NIT

01:31:44PM 2   in every public NIT application that is available -- that

01:31:49PM 3   has become available over the last five or six years.

01:31:52PM 4   Q.   When you talk about NIT, that is a kind of term of

01:31:57PM 5   art.   It refers in the technology world to a specific type

01:32:01PM 6   of code or technique; is that correct?

01:32:02PM 7   A.   The government describes this technology as a NIT.

01:32:06PM 8   In the computer security community, which I am part of,

01:32:09PM 9   this is generally described as malware or malicious

01:32:13PM 10  software.

01:32:13PM 11  Q.   Can you explain what those are and why you describe

01:32:18PM 12  it as malware?

01:32:20PM 13        MR. BECKER:   Objection, again, to the relevance of

01:32:23PM 14  the characterization, your Honor.   We are not talking

01:32:25PM 15  about review of anything that actually happened in this

01:32:27PM 16  case, the NIT in this case.   We are talking now based on

01:32:31PM 17  the witness' opinion and characterizations of how things

01:32:35PM 18  can be labeled.   I don't see how this has any weight or

01:32:39PM 19  pertinence to the issues the court has to decide here.   If

01:32:41PM 20  the witness has examined something that was used in this

01:32:44PM 21  case, as opposed to reading the documents, I might not

01:32:48PM 22  object.

01:32:48PM 23        THE COURT:   I take this to be preliminary.

01:32:51PM 24  Obviously, it needs to be tied up with the evidence in

01:32:55PM 25  this case.

01:32:56PM 1    **By Mr. Fieman:**

01:32:56PM 2    **Q.   Let's use the word NIT.   Does NIT have a meaning in**

01:33:00PM 3    **the technology and cybersecurity world?**

01:33:03PM 4    **A.   I have been studying the government's use of what we**

01:33:09PM 5    **now know to be NITs for several years.   We did not know**

01:33:12PM 6    **they called them NITs until we found one of the warrant**

01:33:17PM 7    **applications a couple of years ago.   But this general**

01:33:19PM 8    **category of technology --**

01:33:21PM 9        **Let me pause and say the FBI is not the only**

01:33:24PM 10   **government agency in the world that seeks to use**

01:33:28PM 11   **investigative techniques of this kind.   There are many**

01:33:31PM 12   **governments around the world that use techniques like**

01:33:33PM 13   **this, and there are many companies that create**

01:33:36PM 14   **special-purpose technology like this for these**

01:33:40PM 15   **governments.   These companies advertise these products,**

01:33:42PM 16   **they advertise their features, they describe it in quite**

01:33:45PM 17   **extensive detail.**

01:33:46PM 18       **And so I have been researching this general category**

01:33:49PM 19   **of technology for a number of years, and I can describe,**

01:33:53PM 20   **again, in general terms, how it works.   There are --**

01:33:57PM 21   **Within the class of what the government calls NITs, there**

01:34:00PM 22   **might be different kinds of NITs.   Some NITs might do a**

01:34:03PM 23   **very small subset of things, some might do more things.**

01:34:06PM 24   **But I can tell you generally how these things work.**

01:34:09PM 25       **The reason that people in the computer security**

01:34:12PM 1   community describe this as malware is that --  Computers

01:34:15PM 2   are built with cybersecurity protections within them.

01:34:18PM 3   When you are browsing around on the internet, and you

01:34:21PM 4   visit a website, under normal circumstances that website

01:34:24PM 5   is only allowed to get your computer to do certain things.

01:34:29PM 6   Malicious software, known as malware, tries to get your

01:34:32PM 7   computer to do things that it would not ordinarily do.

01:34:36PM 8       And in the case of this Tor software that we are

01:34:40PM 9   discussing here in this case --  I have been

01:34:44PM 10  researching --  I know the people who are behind the Tor

01:34:46PM 11  Project.  They are academics.  They go to the same

01:34:49PM 12  conferences -- the same academic conferences that I do.

01:34:53PM 13  This is a ten-year-old project that has received millions

01:34:55PM 14  of dollars of research funds to build a very secure piece

01:34:59PM 15  of software that has one primary purpose, which is to hide

01:35:02PM 16  the identity of people using it.

01:35:05PM 17  Q.   Let's slow down.  Now you are talking about the Tor

18  network, in general, correct?

19  A.   Yes.

01:35:09PM 20  Q.   Let's stop there.  So you have been studying NITs for

01:35:13PM 21  a considerable period of time, you have done research on

01:35:16PM 22  it, and you have also reviewed all of the discovery in

01:35:18PM 23  this case, correct?

01:35:19PM 24  A.   That's correct.

01:35:19PM 25  Q.   Now, you have also seen the various pleadings that

01:35:22PM 1    the government has filed where they describe the NIT as

01:35:27PM 2    seizing information from Mr. Michaud's computer?

01:35:29PM 3    A.   I have read that, yes, sir.

01:35:30PM 4    Q.   Can you just describe for the judge the process of

01:35:34PM 5    how a NIT goes about doing that, in general layman's

01:35:38PM 6    terms, without getting into any technical features, just

01:35:43PM 7    in a bread-and-butter way how does that work?

01:35:45PM 8          MR. BECKER:  Objection, your Honor.  I would renew

01:35:48PM 9    my objection, your Honor.  This is a lay witness'

01:35:51PM 10   interpretation of the words and warrants in discovery.  It

01:35:55PM 11   is not based on any actual analysis of anything in this

01:35:58PM 12   case.  This is testimony that is of no value to this court

01:36:00PM 13   in determining any of the issues here.  We have made

01:36:03PM 14   disclosure of certain technical information about the

01:36:06PM 15   network investigative technique.  If that's what the

01:36:10PM 16   witness has reviewed, then fine.  But right now we are

01:36:13PM 17   just talking about looking at the legal documents.  This

01:36:17PM 18   witness' opinion about what legal terms mean -- or what

01:36:20PM 19   terms in legal documents mean, again, I think this is

01:36:24PM 20   irrelevant information that does nothing in order to

01:36:26PM 21   illuminate any of the issues before the court.

01:36:28PM 22          THE COURT:  I think your objection goes to the

01:36:31PM 23   weight to be attached.  Go ahead.

01:36:35PM 24   By Mr. Fieman:

01:36:35PM 25   Q.   Let's take up that objection for a moment.  Have you

01:36:37PM 1    consulted with another expert retained by the defense

01:36:40PM 2    called Vlad Cirkovic?

01:36:44PM 3    A.   I have spoken to Vlad.

01:36:46PM 4    Q.   You are aware that we had actually requested from the

01:36:48PM 5    government the entire NIT code, so you could do exactly

01:36:52PM 6    the type of analysis that Mr. Becker says you have not

01:36:55PM 7    done?

01:36:56PM 8    A.   It is true that if we had the complete code, that we

01:36:59PM 9    would know a lot more than we know right now.

01:37:01PM 10   Q.   But based upon your consultations with Mr. Cirkovic

01:37:07PM 11   as to the limited code that has been turned over by the

01:37:09PM 12   government, and your extensive ten years of research into

01:37:12PM 13   NITs and technology, have you formed an educated opinion

01:37:16PM 14   about how both NITs in general and this NIT worked?

01:37:20PM 15   A.   I think I have a pretty good idea of how NITs work,

01:37:24PM 16   in general.  And then in both by reading the report that

01:37:26PM 17   Vlad has prepared, and talking and exchanging emails with

01:37:29PM 18   him, I think I have a good idea of what happened here.

01:37:33PM 19   Q.   Can you just describe that to the judge, to the best

01:37:35PM 20   of your knowledge?

01:37:35PM 21   A.   As I was sort of explaining before, computers are

01:37:40PM 22   programmed to have a certain basic level of cybersecurity.

01:37:45PM 23   They only will allow websites to instruct them to do a

01:37:48PM 24   limited subset of things.  The NIT in this case targeted

01:37:52PM 25   people who were using the Tor browser, and so it is

01:37:55PM 1   necessary just for this moment to say that the Tor browser

01:37:59PM 2   is programmed to protect even more information than your

01:38:02PM 3   normal web browser would protect.

01:38:05PM 4   Q.  Let's just stop there.  So if you have a Tor browser,

01:38:08PM 5   and you are working on the Tor network, it is like you

01:38:10PM 6   have added firewalls or security provisions in your

01:38:14PM 7   computer to protect your privacy; is that correct?

01:38:16PM 8   A.  Yes.  And not only do you have these additional

01:38:19PM 9   protections, but in fact they slow down your experience.

01:38:22PM 10  So people who are using Tor are experiencing a less rich,

01:38:26PM 11  less fast internet, in exchange for these additional

01:38:30PM 12  protections, which protect their privacy, both information

01:38:33PM 13  about where they are going and information about -- and

01:38:37PM 14  also protecting information about the websites themselves.

01:38:40PM 15  Q.  And those protections are on the user's computer; in

01:38:45PM 16  this case it would be Mr. Michaud's computer, correct?

01:38:47PM 17  A.   Yes.  There is a special web browser that runs within

01:38:51PM 18  the Tor software, and it has been specially configured to

01:38:54PM 19  protect itself from things that websites might try and do

01:38:58PM 20  to force it to reveal identifying information, like an IP

01:39:02PM 21  address.

01:39:02PM 22  Q.  When you say "force it to reveal," what is that

01:39:06PM 23  process?

01:39:07PM 24  A.  So the Tor software has sort of two separate privacy

01:39:14PM 25  protecting components.  The first is the Tor network

01:39:18PM 1   itself.   There is a diagram in the book that the

01:39:22PM 2   prosecution provided that sort of shows how things go

01:39:25PM 3   through the Tor network.   But, generally, instead of your

01:39:29PM 4   computer contacting the website that you are visiting,

01:39:31PM 5   with Tor your computer bounces the connection through a

01:39:34PM 6   bunch of servers along the way.

01:39:36PM 7        And the purpose of that is to hide the trail.   So

01:39:38PM 8   instead of passing a note directly to the judge, I would

01:39:41PM 9   instead pass a note to the lawyer over there, and then the

01:39:45PM 10  lawyer over there would pass the note to someone else in

01:39:46PM 11  the back, and then eventually it would reach you.   It gets

01:39:49PM 12  there in the end, but it might take a bit more time to get

01:39:52PM 13  there because of all these people passing it along.   That

01:39:54PM 14  is one of the privacy preserving features in Tor, which is

01:39:58PM 15  that it hides the trail through the use of these servers.

01:40:02PM 16       Secondly, the Tor browser --   It is a web browser --

01:40:06PM 17  It is actually a variant of Firefox, which is a very

01:40:08PM 18  popular piece of web browsing software that has been --

          19  Q.   Slow it down a little.

01:40:13PM 20  A.   Sorry.   So there is a special customized version of

01:40:17PM 21  the Firefox web browser that has been modified to be even

01:40:22PM 22  more secure.

01:40:23PM 23       Essentially there are tradeoffs on the internet.

01:40:26PM 24  There are some features that make websites more

01:40:29PM 25  interactive, that allow you to have rich media, video,

01:40:32PM 1   sound, an immersive experience.  But those futures can

01:40:36PM 2   also be exploited by malicious parties to learn private

01:40:41PM 3   information about you.

01:40:42PM 4   Q.   When you say "malicious parties," you don't mean

01:40:45PM 5   their intentions, but you are talking in code sense in

01:40:48PM 6   terms of they are trying to get your computer to do things

01:40:50PM 7   that you would not otherwise do?

01:40:52PM 8   A.   I'm sorry.  "Malicious" is a term of art in the

01:40:58PM 9   computer security community.  When we say "malicious," we

01:41:01PM 10  mean someone that is trying to do something without the

01:41:02PM 11  knowledge or consent of the computer of the person that it

01:41:05PM 12  is being done to.

01:41:07PM 13      And so the Tor browser has been specially modified to

01:41:10PM 14  turn off many features that regular web browsers have

01:41:15PM 15  enabled.  And by turning these features off, it reduces

01:41:19PM 16  the number of ways that a website might try and learn

01:41:22PM 17  private information about the person using the Tor

01:41:24PM 18  software.

01:41:25PM 19  Q.   When you say it is private, it is information that

01:41:27PM 20  the person, the user, at their computer, is not otherwise

01:41:30PM 21  transmitting or wanting to make public; is that correct?

01:41:33PM 22  A.   Well, regular people don't transmit this information

01:41:37PM 23  anyway.  This is stuff that is being transmitted by your

01:41:41PM 24  computer without your knowledge or consent to begin with.

01:41:44PM 25  The Tor browser transmits less information to websites

01:41:47PM 1   than a normal website -- than a normal web browser

01:41:51PM 2   transmits.

01:41:52PM 3      And then in addition to that, the Tor browser will

01:41:54PM 4   refuse requests by websites to reveal information that a

01:41:58PM 5   normal web browser would otherwise reveal.

01:42:01PM 6   Q.   So that is background.  Now, based on your review of

01:42:04PM 7   the discovery, your consultation, Agent Alfin's testimony

01:42:07PM 8   today about the NIT and how it worked, can you just

01:42:10PM 9   explain to the judge --  And really what we want to

01:42:13PM 10  clarify is the locations at which various things happened.

01:42:18PM 11  Can you do that step-by-step from where the NIT is first

01:42:22PM 12  programmed through the capture of data?

01:42:25PM 13  A.   I will do the best that I can.

01:42:27PM 14  Q.   And go slowly.

01:42:28PM 15  A.   Remember, there is one big piece that we don't know

01:42:31PM 16  the answer to, where we don't have some of the code that

01:42:34PM 17  the government hasn't turned over.  With the pieces that

01:42:36PM 18  we do have, when someone browses to a website using the

01:42:42PM 19  Tor browser, their computer requests a page.  So if you

01:42:47PM 20  are using the Tor browser, your computer asks a website,

01:42:50PM 21  "Please give me this page."  That website will then make

01:42:54PM 22  it available and your browser will then go and take it and

01:42:58PM 23  bring it back to your computer.

01:43:01PM 24     In some cases that web page will contain text, and so

01:43:05PM 25  the text will be displayed.  In some cases there will be

01:43:08PM  1   images, and the images will be displayed.  In some cases

01:43:11PM  2   there is computer programming contained within that

01:43:14PM  3   website, and it will cause your computer to do some action

01:43:17PM  4   before additional text might be displayed.

01:43:20PM  5   Q.   When Agent Alfin testified about the NIT running in

01:43:25PM  6   the background, can you just clarify what that means in

01:43:29PM  7   terms of what is being received on the computer in

01:43:32PM  8   Washington?

01:43:33PM  9   A.   Sure.  From what we understand, from what has become

01:43:40PM 10   public, the web browser -- the Tor web browser in this

01:43:46PM 11   case would have requested information about a particular

01:43:49PM 12   page on this forum, one of these threads.

01:43:52PM 13   Q.   So the homepage of this website?

01:43:58PM 14   A.   The defendant would have logged in -- is alleged to

01:44:01PM 15   have logged into the homepage, entered a user name and

01:44:05PM 16   password.  After that they would have clicked on a link to

01:44:08PM 17   one of these forums.  And every time there is a click that

01:44:12PM 18   is happening -- every time someone is clicking on one of

01:44:15PM 19   these links, their browser is requesting new

01:44:18PM 20   information -- a new web page.

01:44:21PM 21       According to what the special agent said, the NIT was

01:44:24PM 22   only delivered after someone went into a thread and then

01:44:27PM 23   clicked on a specific post.  So at the point that the

01:44:31PM 24   defendant is accused of clicking on that post, the website

01:44:36PM 25   would have given his Tor browser a web page.  Contained

01:44:40PM 1    within that web page would have been an instruction for

01:44:43PM 2    the Tor browser -- not for the defendant, but for the Tor

01:44:47PM 3    browser.

01:44:47PM 4    Q.   Let's stop there.   When you say "contained," can you

01:44:50PM 5    see that on the web page?

01:44:52PM 6    A.   Can a human see it?

01:44:54PM 7    Q.   Would the user who is looking for, say, a picture on

01:44:58PM 8    the internet, would they see those instructions?

01:45:01PM 9    A.   No, there wouldn't have been any instructions visible

01:45:03PM 10   to a regular user.   A high-tech sophisticated person might

01:45:08PM 11   be able to figure that out, but a regular person just

01:45:11PM 12   clicking around is not going to know there has been this

01:45:14PM 13   new special code added to the web page.

01:45:17PM 14   Q.   So it is hidden code running in the background.   When

01:45:20PM 15   you say "sending instructions," it is not instructions to

01:45:22PM 16   the user, in this case allegedly Mr. Michaud, it is

01:45:26PM 17   instructions to the target computer?

01:45:28PM 18   A.   I want to pause on that word "running."   The code

01:45:31PM 19   does not run on the website.   The code always runs on your

01:45:36PM 20   web browser.   So the website tells the web browser, "Do

01:45:39PM 21   this."   The code is downloaded to the web browser, the Tor

01:45:42PM 22   browser in this case, in this case in the state of

01:45:45PM 23   Washington.   And it is only when the instructions are

01:45:47PM 24   received by the Tor browser here in the state of

01:45:50PM 25   Washington that they are run on that computer, and then do

01:45:54PM 1    whatever the NIT is supposed to do.

01:45:56PM 2    Q.   And in this case, from the testimony you have heard,

01:45:58PM 3    what exactly was the NIT supposed to do when it was

01:46:01PM 4    inserted into the Washington computer?

01:46:04PM 5    A.   Okay.  So this is where it gets a little bit

01:46:08PM 6    complicated.

01:46:09PM 7    Q.   Go slowly.

01:46:10PM 8    A.   We don't know one of the important bits of

01:46:14PM 9    information.  The Tor browser is not supposed to give up

01:46:18PM 10   its real IP address to anyone.  That is the one reason

01:46:21PM 11   that you use Tor.

01:46:22PM 12   Q.   And that Tor browser --  That is a program that is

01:46:25PM 13   running on the Washington computer?

01:46:26PM 14   A.   On the computer of the defendant.  The Tor browser

01:46:30PM 15   would have been running there.  The one thing the Tor is

01:46:32PM 16   not supposed to do is give up your IP address.  And if a

01:46:36PM 17   website that you are visiting with a Tor browser asks for

01:46:38PM 18   your IP address, the Tor browser will say no.

01:46:42PM 19       If you think --  I know you have said think of the Tor

01:46:45PM 20   browser like a firewall.  Think of it more like a guard

01:46:48PM 21   dog, a guard dog around a house.  If the guard dog is

01:46:51PM 22   trained to bark at every person who approaches the house,

01:46:55PM 23   and someone approaches and the guard dog doesn't bark,

01:46:59PM 24   well, you have to ask, what happened?  Why didn't the

01:47:02PM 25   guard dog bark?  So something mysterious happened in this

01:47:07PM 1    case that caused the Tor browser to even let the NIT do

01:47:10PM 2    what it wanted to do, which was to collect this

01:47:13PM 3    information that the Tor browser would never ordinarily

01:47:16PM 4    give up.

01:47:16PM 5    Q.   So we don't know exactly the process because we don't

01:47:19PM 6    have all the code.  But just to clarify, the NIT is hidden

01:47:23PM 7    code that is sent to the computer in Washington, correct?

01:47:26PM 8    A.   It is hidden code that is sent to the computer in

01:47:29PM 9    Washington State that somehow causes the computer in

01:47:31PM 10   Washington state to do something that it would not

01:47:35PM 11   normally do.

01:47:35PM 12   Q.   So not only is the NIT going to Washington State, it

01:47:39PM 13   is now giving instructions or overriding instructions on

01:47:43PM 14   that Washington computer?

01:47:46PM 15   A.   Yes.  If you want to use the guard dog analogy, you

01:47:49PM 16   could think of it as maybe putting a sleeping pill in the

01:47:52PM 17   dog food.

01:47:53PM 18   Q.   Now, once those override instructions are executed on

01:47:58PM 19   the Washington computer after this delivery, I guess from

01:48:02PM 20   Virginia, what is the next step in what the NIT, from all

01:48:05PM 21   of your research and review of discovery, did?

01:48:08PM 22   A.   So once the NIT had bypassed the security controls

01:48:12PM 23   within the Tor browser, it then had to collect information

01:48:16PM 24   from the computer that it wished to send back.  In this

01:48:19PM 25   case it would be the IP address, which is an address that

01:48:22PM 1    links the computer to a residential internet account.  It
01:48:25PM 2    would be what is called the MAC address, which is a unique
01:48:29PM 3    serial number associated with your wi-fi card, programmed
01:48:33PM 4    in the factory of the wi-fi card manufacturer.  There
01:48:37PM 5    would be some other information about the operating system
01:48:39PM 6    that the special agent read out when he was on the stand,
01:48:43PM 7    the user name on the computer, which version of Windows
01:48:46PM 8    you are running, some basic information.
01:48:49PM 9        But to learn that information, before the NIT could
01:48:51PM 10   transmit that information back to the computer in
01:48:54PM 11   Virginia, it would first have to go and collect it.  So if
01:48:58PM 12   you think of this as information that is in a house, well,
01:49:00PM 13   maybe one piece of it is in the bedroom, and another piece
01:49:04PM 14   is in the living room, one piece of it is in the drawer.
01:49:06PM 15   The NIT first has to go and collect the information from
01:49:09PM 16   different parts of the computer.  And then once it has
01:49:13PM 17   that information, then it would transmit it back to the
01:49:16PM 18   server in Virginia.
01:49:18PM 19   Q.   So if I understand the process, the NIT bypasses
01:49:24PM 20   security or overrides security features on the Washington
01:49:27PM 21   computer.  First step, right?  And then second, it
01:49:30PM 22   actually collects data or evidence on that computer.  And
01:49:34PM 23   then the third step, after it has seized the Washington
01:49:37PM 24   data in this case, it then wraps it up in like a little
01:49:42PM 25   evidence bag and delivers it to the FBI in Virginia?

01:49:45PM 1   A.   That sounds right.   Although I'm not sure about the

01:49:49PM 2   evidence bag.   It transmits it back to the computer in

01:49:52PM 3   Virginia.

01:49:52PM 4   Q.   And then once that data has been transmitted back, it

01:49:57PM 5   is stored, apparently, on an FBI server; is that correct?

01:50:01PM 6   A.   The special agent said that the server is under the

01:50:06PM 7   government's control.   I am not sure how much I can say in

01:50:10PM 8   this room about where we think the server is or which

01:50:13PM 9   company we think might have been running the server.

01:50:15PM 10  Q.   I don't want you to --

01:50:17PM 11  A.   A computer in Virginia.

01:50:20PM 12  Q.   Is it then fair to say after this search and seizure

01:50:24PM 13  in Washington, then really what is going on is it is in

01:50:26PM 14  like an evidence room in Virginia where they keep that

01:50:28PM 15  evidence until they need it?

01:50:31PM 16          MR. BECKER:   Object to leading at this point, your

01:50:33PM 17  Honor.   I think we are just reiterating testimony.

01:50:34PM 18          THE COURT:   That is a fair objection.

01:50:36PM 19  By Mr. Fieman:

01:50:36PM 20  Q.   Describe then what the storage in Virginia is about.

01:50:38PM 21  A.   Once the data has been transmitted by the NIT, I have

01:50:43PM 22  no idea what the government would do with it.   We know

01:50:46PM 23  that it was transmitted to a computer in Virginia.   At

01:50:49PM 24  that point we have no --   They haven't turned over

01:50:51PM 25  information about how it is stored, or who has access to

01:50:54PM 1    it, or whether it is printed on paper or stored live in a

01:50:58PM 2    computer.  We don't know how it is maintained.

01:51:01PM 3    Q.  Now, you had just briefly mentioned that there are

01:51:08PM 4    parts of the code that are missing data, and so you have

01:51:12PM 5    to be a little reserved about your opinions, correct?

01:51:14PM 6    A.  I do not know how the NIT was able to get the Tor

01:51:21PM 7    browser to do this thing that the Tor browser would never

01:51:25PM 8    normally do.  The general way that one does this -- the

01:51:29PM 9    general way of describing this is to exploit security

01:51:35PM 10   flaws in software.

01:51:36PM 11       In fact, when I started testifying here I used the

01:51:39PM 12   term "malware."  And in the computer security community

01:51:44PM 13   the term "malware" really describes software that is doing

01:51:48PM 14   things that the person whose computer it is running on

01:51:54PM 15   doesn't know it is doing or doesn't want it to do.  In

01:51:58PM 16   many, many cases malware, to effectively function, first

01:52:01PM 17   must exploit some security flaw in the software that is

01:52:05PM 18   running on your computer, whether that is your web

01:52:07PM 19   browser, a piece of email software, or PowerPoint, or

01:52:11PM 20   Microsoft Word.

01:52:12PM 21       All of these programs that we run on our computer, the

01:52:15PM 22   engineers who write them do the best job they can, but

01:52:19PM 23   sometimes they make mistakes.  There are a lot of people

01:52:21PM 24   out there that are looking to find these flaws.  If you

01:52:24PM 25   can find one of these flaws, you can write special code

01:52:27PM 1    that takes advantage of the flaw, and then lets you run

01:52:30PM 2    code on a computer that the computer probably shouldn't

01:52:33PM 3    run normally, or obtain information that you wouldn't

01:52:36PM 4    normally be able to get.

01:52:37PM 5    Q.   And you say not normally be able to get.  Let me ask

01:52:41PM 6    you this:  Based on all your review of the discovery and

01:52:44PM 7    the testimony, if the NIT had not been delivered to the

01:52:47PM 8    Washington computer, and collected the data for the

01:52:51PM 9    Washington computer, would the website otherwise have the

01:52:56PM 10   IP address and other identifying data in the normal course

01:52:59PM 11   of events?

01:53:00PM 12   A.   No.  The Tor browser is programmed to protect those

01:53:03PM 13   pieces of information.

01:53:11PM 14        MR. FIEMAN:  Your Honor, I just have one other

01:53:13PM 15   brief area and then I will be able to wrap up.

01:53:14PM 16   By Mr. Fieman:

01:53:14PM 17   Q.   From a technical standpoint, I want to ask you about

01:53:17PM 18   when the NIT was sent to Washington, how it was deployed.

01:53:20PM 19   You have reviewed the warrant application in this case --

01:53:24PM 20   the NIT warrant application?

01:53:26PM 21   A.   Yes, sir.

01:53:26PM 22   Q.   You are aware the warrant application, I think,

01:53:29PM 23   allowed for the FBI to deploy -- to send the NIT

01:53:35PM 24   anywhere at the time people logged into the homepage; is

01:53:37PM 25   that correct?

01:53:37PM 1  **A.   I am aware of what the warrant authorized, as far as**

01:53:41PM 2  **one can be aware as a non-lawyer.**

01:53:43PM 3  **Q.   As of that point, the NIT could be deployed and**

01:53:48PM 4  **collect all this information from anywhere in the world,**

01:53:50PM 5  **correct?**

01:53:50PM 6  **A.   At the time that the NIT is delivered to the**

01:53:56PM 7  **computer, the government doesn't know where the computers**

01:53:58PM 8  **are.   The computer could be in the state of Washington, it**

01:54:01PM 9  **could be in Utah, it could also be in France or Spain.**

01:54:05PM 10  **Again, the Tor network is a global network with hundreds**

01:54:09PM 11  **of thousands of users located around the world.   There is**

01:54:13PM 12  **no way of knowing ahead of time where any one of those**

01:54:16PM 13  **users of Tor might be.**

01:54:18PM 14  **Q.   Now, just from a technical standpoint, if the NIT**

01:54:21PM 15  **could be deployed at the homepage, was there any technical**

01:54:26PM 16  **reason that you are aware of why the website would have to**

01:54:31PM 17  **retain, and publish, and distribute child pornography**

01:54:37PM 18  **inside the website in order to accomplish the NIT**

01:54:40PM 19  **deployment?**

01:54:40PM 20  **MR. BECKER:   Objection, your Honor.   You have**

01:54:42PM 21  **already ruled on this issue.   This is not relevant to any**

01:54:45PM 22  **of the suppression issues here.**

01:54:49PM 23  **MR. FIEMAN:   Your Honor, I just want to talk about**

01:54:50PM 24  **the point of deployment, and that the point of deployment**

01:54:54PM 25  **could have occurred from the homepage in all cases.**

01:54:56PM 1          THE COURT:  I'm not sure I understand the question

01:54:59PM 2     here.

01:55:00PM 3     By Mr. Fieman:

01:55:00PM 4     Q.   Is there any reason why all of the NITs, in order to

01:55:03PM 5     collect IP addresses pursuant to this warrant, could not

01:55:06PM 6     have been deployed simply from the homepage, that you are

01:55:10PM 7     aware of?

01:55:11PM 8     A.   You can deliver a NIT from any web page on that site.

01:55:17PM 9     The fact that the government chose to deliver it on a few

01:55:22PM 10    select pages after people logged in or after people had

01:55:24PM 11    clicked a few links, that seems, from a technical

01:55:26PM 12    standpoint, arbitrary.  They could have even put it on the

01:55:28PM 13    homepage before people logged in or after people logged

01:55:42PM 14    in.

01:55:46PM 15    Q.   Slow down.  That's okay.  You are an east coaster

01:55:51PM 16    like me, Dr. Soghoian.  Is there any point in sort of the

01:55:58PM 17    physical process of the NIT search that you believe we

01:56:02PM 18    have not covered that the court should be aware of?

01:56:06PM 19    A.   I am just thinking.  For the issues that you guys

01:56:21PM 20    have been litigating today, no.

01:56:26PM 21          MR. FIEMAN:  Your Honor, do you have any questions

01:56:27PM 22    that we have not addressed at this point?

01:56:29PM 23          THE COURT:  No.  Go ahead.

01:56:31PM 24          MR. FIEMAN:  Thank you, your Honor.

01:56:35PM 25                    CROSS-EXAMINATION

01:56:38PM 1   **By Mr. Becker:**

01:56:45PM 2   **Q.   Good afternoon, Dr. Soghoian.**

01:56:47PM 3   **A.   Hi.**

01:56:48PM 4   **Q.   Would you agree that the Tor Project does not**

01:56:56PM 5   **guarantee perfect anonymity to its users?**

01:56:59PM 6   **A.   My understanding is that the homepage of the Tor**

01:57:02PM 7   **Project tells people that it cannot deliver perfect**

01:57:05PM 8   **security.**

01:57:05PM 9   **Q.   Right from the homepage of the Tor Project it advises**

01:57:08PM 10  **its users that it cannot deliver, as you said, perfect**

01:57:11PM 11  **security; is that correct?**

01:57:12PM 12  **A.   What I will say, though, is that the Tor Project is**

01:57:16PM 13  **about ten years old.   It has received millions of dollars**

01:57:20PM 14  **of grants.   It is the best thing that the computer**

01:57:22PM 15  **security research community has come up with thus far.**

01:57:25PM 16  **Q.   It has some great uses, is that fair to say?**

01:57:28PM 17  **A.   The Tor Project is being used by Facebook, it is**

01:57:33PM 18  **being used by newspapers, ProPublica, and many newspapers**

01:57:38PM 19  **that now run whistle blowing websites.   As I'm sure you**

01:57:41PM 20  **know, the Tor Project was originally -- the technology was**

01:57:44PM 21  **created by the U.S. Navy, the Naval Research Lab, and the**

01:57:47PM 22  **U.S. government has been and continues to be the biggest**

01:57:51PM 23  **funder of Tor.**

01:57:51PM 24  **Q.   As we said, it can be used for many laudable,**

01:57:55PM 25  **positive purposes, correct?**

01:57:56PM 1   A.   That is correct.  And my understanding is it is also

01:58:00PM 2   used by many law enforcement agencies so that they can

01:58:03PM 3   conduct covert investigations online.

01:58:05PM 4   Q.   Do you agree it can also be misused for illicit

01:58:09PM 5   purposes?

01:58:09PM 6   A.   That is a complicated question.

01:58:11PM 7   Q.   Is it?

01:58:12PM 8   A.   Yes.  Because the original creators of Tor --  When

01:58:16PM 9   the Navy created Tor, the purpose was to allow naval

01:58:20PM 10  investigators to research people online so that they could

01:58:23PM 11  investigate whatever crimes the Navy is researching

01:58:26PM 12  without tipping off the world with the fact that the Navy

01:58:30PM 13  is researching them.  Now, if you have this technology

01:58:32PM 14  that is protecting the privacy of naval investigators, and

01:58:35PM 15  the only people who are using it are naval investigators,

01:58:38PM 16  well, then you are not anonymous.

01:58:40PM 17  Q.   Are they the only people using Tor?

01:58:42PM 18  A.   No.

01:58:42PM 19  Q.   Would you agree that criminals use Tor?

01:58:45PM 20  A.   That is by design.

01:58:46PM 21  Q.   Criminals use Tor by design?

01:58:49PM 22  A.   When the Navy created Tor, and put the technology out

01:58:52PM 23  there, they knew that they would have both good and bad

01:58:55PM 24  users.  If you only have one --

01:58:57PM 25  Q.   So you agree there are good --

01:58:59PM 1           MR. FIEMAN:  Your Honor, if Dr. Soghoian could

01:59:01PM 2    finish his answer.

01:59:02PM 3           THE COURT:  You interrupted the witness.

01:59:05PM 4           THE WITNESS:  If you only have naval investigators

01:59:08PM 5    using Tor, then the moment a website receives someone

01:59:11PM 6    coming from Tor -- receives a request from someone using

01:59:15PM 7    Tor, they know that it is the U.S. government.  So the

01:59:19PM 8    creators of Tor have a phrase they use, and they use it in

01:59:23PM 9    research papers and elsewhere, it is that anonymity loves

01:59:27PM 10   company.  If you want to have a technology that lets

01:59:30PM 11   people blend into the crowd, you need a crowd.  And so the

01:59:33PM 12   creators of Tor from day one knew that there would be uses

01:59:38PM 13   of Tor that society would love and uses of Tor that

01:59:42PM 14   society would not love as much.

01:59:44PM 15   By Mr. Becker:

01:59:46PM 16   Q.   Let's back around to my question.  We agree you can

01:59:50PM 17   use Tor to mask your identity while committing crimes,

01:59:53PM 18   correct?

01:59:54PM 19   A.   You can use Tor to mask your identity when you are

01:59:58PM 20   online, and people can commit crimes online.

02:00:00PM 21   Q.   You can use Tor to mask your identity while you

02:00:03PM 22   commit crimes online through Tor?

02:00:07PM 23   A.   Tor is a communication technology.  That is like

02:00:11PM 24   saying, can you use a car to commit a crime?  Well, yeah,

02:00:14PM 25   I guess so.  But it is a regular technology that has good

02:00:17PM 1    users and bad users.  That doesn't mean the technology has

02:00:21PM 2    some kind of morality associated with it.  It is like

02:00:25PM 3    FedEx, or the post office, or the telephone line, it is a

02:00:29PM 4    core communications and transportation technology.

02:00:31PM 5    Q.   Sure.  And I'm sure we would agree that no matter

02:00:34PM 6    what sort of communication technology that criminals are

02:00:38PM 7    using, law enforcement needs to take action based on

02:00:41PM 8    whatever that technology is; is that fair to say?

02:00:43PM 9    A.   I think if law enforcement is concerned about people

02:00:47PM 10   using Tor -- about criminals using Tor, I think the most

02:00:51PM 11   rational approach would be to stop the U.S. government

02:00:54PM 12   from funding Tor.

02:00:55PM 13   Q.   You don't want criminals who are using Tor to be

02:00:58PM 14   investigated?

02:00:58PM 15   A.   No, I am not saying that.  I am saying if you don't

02:01:01PM 16   want criminals to hide their identity using Tor, then the

02:01:05PM 17   U.S. government should stop writing the checks that are

02:01:09PM 18   paying for Tor to be developed.  If you are worried about

02:01:11PM 19   the availability of a technology that lets people hide,

02:01:14PM 20   and you don't think -- you think it is being misused, why

02:01:17PM 21   are you paying for it?  Just cut it off.

02:01:23PM 22   Q.   Let me ask you some questions about a different area.

02:01:26PM 23   You haven't reviewed any computers or digital evidence

02:01:28PM 24   related to this case; is that right?

02:01:29PM 25   A.   No, sir.

02:01:30PM 1   Q.   You haven't reviewed any of the computers that were

02:01:33PM 2   seized from the defendant's home?

02:01:34PM 3   A.   No, sir.

02:01:34PM 4   Q.   You haven't reviewed any computer code that has been

02:01:38PM 5   provided in discovery, correct?

02:01:39PM 6   A.   So Vlad, who is our other expert, he has reviewed

02:01:44PM 7   computer code provided to him by DOJ.  I have read the

02:01:48PM 8   report that Vlad sent to me, but I have not personally

02:01:52PM 9   reviewed the NIT code.

02:01:55PM 10        MR. BECKER:  Your Honor, I would make a Jencks

02:01:57PM 11  request for that report, if we don't have it.

02:01:59PM 12        MR. FIEMAN:  I actually don't either, your Honor.

02:02:01PM 13  I was unaware of any written report from Mr. Cirkovic.  I

02:02:12PM 14  am not sure there is one at this point.  Although, there

02:02:14PM 15  has been, obviously, a lot of conversations with the

02:02:15PM 16  various experts on all sides.  So I don't have a report to

02:02:21PM 17  turn over.  I will make inquiries, your Honor, absolutely.

02:02:22PM 18  By Mr. Becker:

02:02:23PM 19  Q.   Dr. Soghoian, can you describe the written

02:02:25PM 20  communications you have had with the defense expert about

02:02:26PM 21  the analysis of the code?

02:02:28PM 22  A.   Sure.  He sent me a few-paragraph email describing

02:02:31PM 23  his initial analysis of the shell code.

02:02:34PM 24  Q.   Did you sign a protective order before you received

02:02:37PM 25  that?

02:02:37PM 1  **A.   I agreed to a protective order when I first got**

02:02:42PM 2  **retained.   Whether I signed something, I don't remember.**

02:02:47PM 3  **I am pretty sure I did.   The public defender definitely**

02:02:51PM 4  **sent me the protective order and asked me to agree to it.**

02:02:54PM 5  **I would have to consult my records to see if I signed**

02:02:57PM 6  **something and sent it back.**

02:02:58PM 7          **MR. BECKER:   Your Honor, I would request --  The**

02:03:01PM 8  **witness has testified about a particular written**

02:03:03PM 9  **communication during the course of this proceeding.   I**

02:03:06PM 10  **would request that and other communications.**

02:03:11PM 11          **MR. FIEMAN:   No objection, your Honor.**

02:03:13PM 12          **THE WITNESS:   Is there any way I can ask for a**

02:03:15PM 13  **glass of water?   Is that possible?**

02:03:46PM 14  **By Mr. Becker:**

02:03:48PM 15  **Q.   Doctor, just a basic point.   In terms of**

02:03:50PM 16  **communications on Tor, it is correct that when a user**

02:03:54PM 17  **communicates through Tor, the user is still using IP**

02:03:58PM 18  **addresses in order to communicate, correct?**

02:04:02PM 19  **A.   Someone doesn't use an IP address to communicate.**

02:04:05PM 20  **Q.   IP addresses route communications, even through Tor?**

02:04:08PM 21  **A.   No, an IP address is a number assigned to you.   You**

02:04:12PM 22  **use the internet, and in particular the IP protocol, to**

02:04:16PM 23  **communicate.   But you don't use your address.   It is not**

02:04:19PM 24  **like --  When you write a letter to someone, you don't use**

02:04:21PM 25  **your physical address to communicate, you use the post**

02:04:24PM 1    office to communicate, and your address is printed in the

02:04:26PM 2    top left-hand corner of the letter.

02:04:28PM 3    Q.   Very well.   Does Tor not use IP addresses?   Would

02:04:32PM 4    that be a fair statement?

02:04:33PM 5    A.   Tor is what is called an overlay network.   So there

02:04:37PM 6    is a network on top of the internet.

02:04:43PM 7    Q.   Would it be correct to say using Tor means you are

02:04:46PM 8    not using IP addresses to communicate?

02:04:48PM 9    A.   Again, as I said before, you don't use an IP address

02:04:51PM 10   to communicate.   You have an IP address.   You use the IP

02:04:55PM 11   protocol to communicate.   I am sorry if it sounds like I

02:04:59PM 12   am lost on these details, but you don't use an IP address

02:05:05PM 13   to communicate.

02:05:06PM 14   Q.   You used and defined the term earlier that you called

02:05:12PM 15   "malicious."   You defined that as someone who -- an entity

02:05:17PM 16   that was sending something or using something without

02:05:21PM 17   knowledge or consent; is that fair?

02:05:24PM 18   A.   I'm sorry.   Can you ask that question again, please?

02:05:26PM 19   Q.   Sure.   You were defining a term earlier as

02:05:29PM 20   "malicious."   You said in your community you define that

02:05:33PM 21   as something happening without knowledge or consent?

02:05:35PM 22   A.   That is a component of malware, yes, sir.

02:05:40PM 23   Q.   Would it be possible for that communication to be

02:05:44PM 24   authorized and for you to still describe it as malicious?

02:05:49PM 25   A.   So the question is, can something be authorized and

02:05:51PM 1  still malicious?

02:05:53PM 2  Q.   Yeah.

02:05:54PM 3  A.   Authorized by whom?

02:05:56PM 4  Q.   A court.

02:05:59PM 5  A.   I think in the computer security community malware is

02:06:05PM 6  really about -- the definition of malware depends on the

02:06:08PM 7  knowledge of the user and the consent of the user.

02:06:11PM 8  Q.   So you don't think the courts have the ability to --

02:06:21PM 9          MR. BECKER:  I will withdraw that.  No further

02:06:22PM 10 questions, your Honor.

02:06:24PM 11         MR. FIEMAN:  Very briefly, your Honor.

02:06:27PM 12                  REDIRECT EXAMINATION

02:06:30PM 13 By Mr. Fieman:

02:06:31PM 14 Q.   Mr. Becker started with a very simple question.  He

02:06:33PM 15 asked you whether Tor --  Tor does not promise to deliver

02:06:36PM 16 perfect security.  Do you recall that?

02:06:38PM 17 A.   I do recall that exchange.

02:06:39PM 18 Q.   Is it also fair to say that a burglar alarm or a home

02:06:43PM 19 alarm does not deliver perfect security?

02:06:45PM 20 A.   That is correct, and neither does the lock on my

02:06:48PM 21 front door.

02:06:48PM 22 Q.   But the fact that it doesn't deliver perfect

02:06:51PM 23 security, does that make it okay for somebody to break the

02:06:54PM 24 lock on your front door and go in and take information

02:06:56PM 25 from your home?

02:06:57PM 1   A.   I am not sure if that is the right question for me.

02:07:01PM 2   I will say --

02:07:01PM 3   Q.   Just as a matter of common sense.

02:07:03PM 4   A.   As an individual, no, it doesn't make it okay.

02:07:08PM 5        MR. FIEMAN:  Thank you.  No further questions.

02:07:15PM 6        THE COURT:  It sort of sounds like no one should

02:07:19PM 7   expect privacy with whatever is on their computer and on

02:07:25PM 8   the internet?

02:07:26PM 9        THE WITNESS:  It is very hard for individuals to

02:07:28PM 10  protect their privacy online.  It is for that reason that

02:07:35PM 11  the government has spent so much money trying to create

02:07:39PM 12  technologies that let people protect their privacy.  It is

02:07:43PM 13  really hard for the average person to protect their

02:07:45PM 14  privacy online.  Those of us who are trying to protect our

02:07:48PM 15  privacy, we have to work hard.  Sometimes we get a slower

02:07:52PM 16  internet experience.  Sometimes we have to use software

02:07:57PM 17  that is not as easy to use in order to protect our

02:08:00PM 18  privacy.

02:08:00PM 19       There is a huge amount of research that is going on in

02:08:03PM 20  this space to create tools that let the average person

02:08:06PM 21  protect themselves.  I have spent much of the last few

02:08:11PM 22  years trying to help the legal community to protect their

02:08:13PM 23  privacy, trying to get law firms and the courts to employ

02:08:17PM 24  basic privacy and security technology to protect what you

02:08:21PM 25  all are doing.  It is hard for the average person when

02:08:24PM 1    this stuff is so high-tech.  My hope is over the next few

02:08:27PM 2    years we will get better and easier technology that will

02:08:31PM 3    protect people.

02:08:34PM 4            THE COURT:  We started this -- or in the middle of

02:08:39PM 5    it, I guess, we came to the Tor instructions, or whatever,

02:08:45PM 6    that say that it does not deliver perfect security.  Is

02:08:49PM 7    there any perfect security at this point, other than not

02:08:55PM 8    putting it in there?

02:08:57PM 9            THE WITNESS:  In my community, and in the computer

02:09:00PM 10   security community, we use concepts like defense in depth.

02:09:03PM 11           THE COURT:  What?

02:09:04PM 12           THE WITNESS:  Defense in depth.  So rather than

02:09:08PM 13   having one wall protecting your castle, you have ten

02:09:12PM 14   walls.  That way if the barbarians get over the first

02:09:15PM 15   wall, they still have nine more they have to overcome.

02:09:18PM 16           THE COURT:  That is kind of what Tor does?

02:09:21PM 17           THE WITNESS:  The Tor has at least two walls.

02:09:23PM 18   Probably over the next few years they are going to add

02:09:25PM 19   some more.  I was having lunch with a DHS official this

02:09:32PM 20   week -- a Department of Homeland Security official, about

02:09:34PM 21   the technology they are funding to help create even more

02:09:37PM 22   walls.  When you look at some of the data breaches that

02:09:41PM 23   have happened in the last few years, the OPM breach, where

02:09:45PM 24   all these federal employees had their private information

02:09:48PM 25   lost and stolen by China, it is really hard to design

02:09:51PM  1    secure software and to protect data.

02:09:54PM  2        The old approach was let's keep the bad guys out.  Now

02:09:58PM  3    the approach is, how do we stop the bad guys before they

02:10:01PM  4    get all the way to the inner room of the house, or how do

02:10:05PM  5    we limit their access to information.  There is an arms

02:10:11PM  6    race going on right now between those who are trying to

02:10:13PM  7    protect data and those who are trying to exploit data.

02:10:17PM  8    This is a really interesting time.  The unfortunate thing

02:10:20PM  9    is for regular people it is really hard to protect

02:10:23PM 10    yourself online.

02:10:25PM 11            THE COURT:  Okay.  Thank you.

02:10:28PM 12            THE WITNESS:  Thank you, sir.

02:10:33PM 13            THE COURT:  Any other evidence to be offered here?

02:10:35PM 14            MR. FIEMAN:  No other evidence, your Honor, from

02:10:37PM 15    the defense.

02:10:47PM 16            THE COURT:  Let me figure here a little bit.  In a

02:11:17PM 17    practical sense, you have about a half hour apiece to

02:11:20PM 18    argue this, which should be enough.  When you get to the

02:11:24PM 19    U.S. Supreme Court they won't give you that much time.

02:11:29PM 20            MR. FIEMAN:  Who would you like to hear from

02:11:31PM 21    first?

02:11:31PM 22            THE COURT:  Well, it is your motion, or motions.

02:11:39PM 23            MR. FIEMAN:  Your Honor, I think we are down to

02:11:41PM 24    essentially the core issue around which everything else

02:11:45PM 25    revolves.  And it is really a brick and mortar issue.  We

02:11:53PM 1    have resolved it.  This search happened on a computer

02:11:59PM 2    located in Vancouver, Washington.  The warrant on its face

02:12:07PM 3    is limited to persons and property in the Eastern District

02:12:11PM 4    of Virginia.

02:12:12PM 5        The first question that you asked us to respond to,

02:12:18PM 6    your Honor, when you issued your order on Wednesday was,

02:12:22PM 7    where did this search happen?  We gave you a written

02:12:28PM 8    response citing the government's own stipulations in other

02:12:35PM 9    NIT cases, and its own pleadings.  This was a Washington

02:12:40PM 10   search.

02:12:42PM 11       Now, in and of itself, is that unconstitutional, or a

02:12:46PM 12   bad thing?  No.  But the problem that the government is

02:12:50PM 13   confronting is severalfold.

02:12:52PM 14       One is, as we cited, they obtained a warrant in

02:12:56PM 15   Virginia that on its face is limited to Virginia.  And it

02:13:00PM 16   is a simple, straightforward rule.  We cited Sedaghaty,

02:13:06PM 17   and all the other cases, that say if the search exceeds

02:13:12PM 18   the scope, the authorization occurs at a location that is

02:13:15PM 19   not authorized, suppression is automatic.  There is no

02:13:19PM 20   good-faith issues, there are no Franks issues.

02:13:22PM 21       So the question is then, why did the government submit

02:13:27PM 22   a warrant to the magistrate judge in Virginia which on its

02:13:33PM 23   face informed Judge Buchanan that this is an Eastern

02:13:37PM 24   District of Virginia search, when previously they had at

02:13:42PM 25   least indicated in the Cottom case and the other, that the

02:13:46PM  1    searches occurred both in the district and elsewhere?

02:13:51PM  2        I respectfully submit to your Honor that you have seen

02:13:57PM  3    in the course of these several hours of proceedings

02:14:00PM  4    exactly why they did that.  Because after Judge Smith's

02:14:05PM  5    decision in In Re Warrant, and looking at the plain

02:14:09PM  6    language of Rule 41, which they are in the process of

02:14:14PM  7    trying to get changed, because it does not allow for this,

02:14:20PM  8    they obtained authorization.  No matter whether it was

02:14:24PM  9    well intentioned, whether they disclosed everything, that

02:14:26PM 10    warrant says Eastern District of Virginia.

02:14:29PM 11        And Mr. Michaud's data was not only seized here in

02:14:35PM 12    Washington, but they in fact had to bypass security

02:14:39PM 13    measures, like the house alarms, on his computer in

02:14:42PM 14    Washington, look through the data on his computer in order

02:14:46PM 15    to get the identifying information that they sought, and

02:14:49PM 16    then took it back to the evidence room in Virginia.

02:14:54PM 17        In their own pleadings that we have shown to you, they

02:14:58PM 18    always refer to this as information seized from

02:15:00PM 19    Mr. Michaud's computer.  So all of this about the

02:15:03PM 20    target -- the target being the server in Washington, that

02:15:07PM 21    they are going to retrieve the data from there, the whole

02:15:09PM 22    point of this is they couldn't get that information in

02:15:12PM 23    Virginia.  They had to go everywhere else to target

02:15:16PM 24    computers to get it.  Your Honor, that is, first of all,

02:15:19PM 25    unfortunately for them, still not allowed by Rule 41.

02:15:24PM 1      More importantly, what has been driving my sense of

02:15:26PM 2  frustration with this case, if you want to do that, make

02:15:32PM 3  it clear to the judge that you are trying to do that.

02:15:35PM 4      I honestly believe that Judge Buchanan, when she

02:15:38PM 5  looked at this warrant, because it is what I interpreted

02:15:41PM 6  the warrant to mean when I first read it, that they were

02:15:45PM 7  going to search any number of computers in the Eastern

02:15:47PM 8  District of Virginia that might be logging into this site.

02:15:50PM 9  But you will not find anything that tells the judge this

02:15:53PM 10  is a worldwide warrant.  If you look at the face of the

02:15:56PM 11  warrant itself, it says Eastern District of Virginia,

02:15:59PM 12  stop, period, nothing more.  So for those defendants who

02:16:04PM 13  are in Virginia that have been caught up in this case,

02:16:07PM 14  they may have to raise different issues.

02:16:12PM 15      And that's why I have been hitting at the duty of

02:16:15PM 16  candor.  Your Honor, it may be that this needs to work its

02:16:20PM 17  way through the courts.  It may be that the judges, in

02:16:23PM 18  amending the rule -- the Supreme Court amending the rule,

02:16:25PM 19  if eventually that's what it does, because that is what

02:16:28PM 20  the Department of Justice is hoping for, then the law will

02:16:31PM 21  change.

02:16:31PM 22      But as long as the law stands, the government needs to

02:16:33PM 23  tell the judges exactly what kind of authorization they

02:16:37PM 24  are seeking.  And not in the words of their own head of

02:16:42PM 25  operations and technology, Amy Hess, as we cited, not

02:16:46PM 1   leaving it for the judges to try and figure out what is

02:16:49PM 2   going on, hoping against hope they won't ask the follow-up

02:16:53PM 3   questions, but to make it plain.  And that is exactly what

02:16:58PM 4   Judge Kozinski said in the CDT decisions, a duty of

02:17:06PM 5   candor.

02:17:06PM 6       Now, your Honor, I just ask you, in terms of the

02:17:09PM 7   dispositive issue, to look at the four corners of the

02:17:12PM 8   warrant, what is printed on the face, and after all of

02:17:16PM 9   this testimony and the government's pleadings, which we

02:17:19PM 10  would direct you to, it is a Washington search on an

02:17:22PM 11  Eastern District of Virginia warrant.  It sounds like a

02:17:27PM 12  very simple way to decide a very complex issue, but

02:17:30PM 13  everything else feeds into that.

02:17:36PM 14      Why did they draft it that way?  Now let's move

02:17:40PM 15  forward.  Because Rule 41 doesn't allow it.  And they have

02:17:44PM 16  never said or claimed that Rule 41 does not apply.  There

02:17:48PM 17  is no exemptions to Rule 41.  Rule 41 is codified in

02:17:54PM 18  18 U.S. 3103.  It is the law.  Sometimes we don't agree

02:18:00PM 19  with it.  Sometimes if you are the government you wish it

02:18:03PM 20  was more expansive, but it is the law.

02:18:07PM 21      And regardless of the fact that they clearly and

02:18:12PM 22  deliberately violated Rule 41, and their explanations

02:18:17PM 23  about how Rule 41 might apply would not pass muster in a

02:18:23PM 24  1L class, the upshot is still that the warrant itself says

02:18:28PM 25  the Eastern District of Virginia, full stop.

02:18:33PM  1        And Judge Smith in his In Re warrant opinion got it

02:18:38PM  2    right.  We may be talking about technology in cyberspace,

02:18:43PM  3    and data, but it is not just a cloud.  They have a

02:18:48PM  4    physical location for these searches.  And all the

02:18:52PM  5    testimony and the government's pleadings establishes the

02:18:54PM  6    physical location of that data search and extraction

02:18:57PM  7    occurred in Washington State.

02:19:04PM  8        Now, your Honor, I have indicated under Sedaghaty and

02:19:07PM  9    the other cases the fact that the warrant was executed in

02:19:10PM 10    Washington with a -- excuse me, that the search was

02:19:13PM 11    executed in Washington with an Eastern District warrant

02:19:16PM 12    requires suppression.  But I am also going to say that the

02:19:20PM 13    Rule 41 violations require suppression also.  Because in

02:19:24PM 14    all of the pleadings that have come from the government,

02:19:26PM 15    not once have they talked about Weiland, which is the case

02:19:29PM 16    that we cited, which says that suppression is required for

02:19:32PM 17    a Rule 41 violation, regardless of good intentions or

02:19:35PM 18    investigatory need, or anything like that.  It is required

02:19:39PM 19    if the violation was deliberate.  We believe it clearly

02:19:45PM 20    was deliberate.  DOJ's own policies and internal analysis

02:19:49PM 21    of Rule 41 that we cited at length to the court actually

02:19:52PM 22    tracks Weiland and the Rule 41 analysis.

02:19:57PM 23        Now, I can appreciate that internet crime is hard to

02:20:00PM 24    investigate.  And I do not think that any of the gentlemen

02:20:05PM 25    sitting here are malicious in the sense that it has been

02:20:10PM 1    used in this courtroom.  But what I do believe is that

02:20:13PM 2    this was deliberate.

02:20:15PM 3        And regardless of whether it was deliberate, we know

02:20:17PM 4    that this is an issue of constitutional magnitude, which

02:20:21PM 5    is the other Weiland factor.  Because as your Honor just

02:20:24PM 6    heard, we are dealing with core privacy issues and the

02:20:27PM 7    ability of the courts to oversee the application of

02:20:32PM 8    executive powers.

02:20:37PM 9        And unless and until the Supreme Court changes

02:20:40PM 10   Rule 41, those are the rules.  Those are the rules.  And

02:20:44PM 11   there is no question the Department of Justice knows that.

02:20:47PM 12       THE COURT:  What do you make of Rule 3103a?  That

02:20:55PM 13   seems to open a door, but there is not, to my knowledge,

02:21:01PM 14   much law about how it applies.

02:21:03PM 15       MR. FIEMAN:  Your Honor, I think we responded to

02:21:07PM 16   what 3103a was directed to, which is --

02:21:10PM 17       THE COURT:  Pardon me?

02:21:11PM 18       MR. FIEMAN:  I'm sorry.  You are talking about

02:21:12PM 19   3103a?

02:21:14PM 20       THE COURT:  Yeah.

02:21:16PM 21       MR. FIEMAN:  Correct.  But that is addressing the

02:21:18PM 22   mere evidence rule.  We are not disputing that they had --

02:21:20PM 23   they could legally seize evidence, data, if they had a

02:21:25PM 24   proper warrant to do it.

02:21:32PM 25       Now, your Honor, I think where this is ultimately

02:21:38PM 1    going to end up --  And that Rule 41 issue, your Honor, is

02:21:41PM 2    entirely different from what the face of the warrant says.

02:21:44PM 3    That is a core Fourth Amendment principle, but the scope

02:21:48PM 4    of the search or the location of the search cannot exceed

02:21:52PM 5    the jurisdictional boundaries that appear on the face of

02:21:55PM 6    the warrant.  That is just hornbook Ninth Circuit law.

02:21:58PM 7         THE COURT:  Part of the question is, if there was

02:22:10PM 8    a violation of Rule 41, what should be done about it.  And

02:22:16PM 9    I know your position is that it demands suppression.  I

02:22:24PM 10   asked the question, what if a district judge had issued

02:22:28PM 11   this warrant instead of the magistrate judge, what

02:22:34PM 12   difference would it have made?

02:22:37PM 13        MR. FIEMAN:  Ultimately no difference, your Honor,

02:22:40PM 14   because if the district court had signed a warrant that

02:22:43PM 15   says that the location of the search is the Eastern

02:22:46PM 16   District of Pennsylvania, period, that is it.  That

02:22:51PM 17   decision by the judge, whether it is magistrate judge or

02:22:53PM 18   district court judge, that is the scope of the

02:22:56PM 19   authorization, that is the limits of the geographic

02:22:59PM 20   boundaries of the search.  And that is separate and apart

02:23:02PM 21   from Rule 41.

02:23:03PM 22        THE COURT:  So you are saying that there is no way

02:23:06PM 23   to get a warrant that would address the particular problem

02:23:10PM 24   or issue that the government faced in this case?

02:23:14PM 25        MR. FIEMAN:  First of all --  Two things, your

02:23:18PM 1    Honor:  That problem needs to be directed to the Supreme

02:23:25PM 2    Court and the rules committee in Congress, if and when

02:23:27PM 3    they decide that weighing the privacy interests --

02:23:30PM 4         THE COURT:  So they find an answer in five or ten

02:23:33PM 5    years.  Those guys don't move very fast.

02:23:36PM 6         MR. FIEMAN:  Meanwhile, the government needs to

02:23:39PM 7    respect the law as it stands.

02:23:40PM 8      More importantly, there are alternatives.  We have

02:23:44PM 9    seen plenty of, in this court alone, child pornography

02:23:50PM 10   investigations, where, for example, you have targets

02:23:56PM 11   visiting illicit websites, the undercover has engaged in

02:24:01PM 12   messages, they exchange emails, they redirect them to

02:24:06PM 13   sites in the jurisdiction where they want to get a

02:24:09PM 14   warrant.  What they could have done, for example, is --

02:24:12PM 15   We talked a little bit about spoofing.  You can redirect

02:24:15PM 16   someone from the homepage when they go into the site into

02:24:19PM 17   servers located anywhere that you want them to go.  It

02:24:22PM 18   takes more effort, that's true.  Sometimes doing things

02:24:26PM 19   right and legally does take more effort.  But they were

02:24:30PM 20   not without investigatory alternatives.

02:24:33PM 21      And here, ultimately, your Honor, even if they were,

02:24:37PM 22   which just simply is not the case, the investigatory ends

02:24:43PM 23   cannot justify illegal means.  And I mean "illegal" in the

02:24:48PM 24   sense that they didn't follow what was on the face of the

02:24:51PM 25   warrant, they didn't follow Rule 41, I believe they were

02:24:55PM 1  not candid with Judge Buchanan, and all the things that we

02:24:59PM 2  have probably briefed to death, your Honor.

02:25:02PM 3      Now, in some ways this seems like a somewhat

02:25:09PM 4  old-fashioned, simple way to resolve a complicated case,

02:25:13PM 5  because we know you have to go by what the warrant says.

02:25:21PM 6      Hopefully if the court rules against the government --

02:25:23PM 7  Please bear in mind this is a situation of their own

02:25:26PM 8  making.  Why didn't they get a warrant from Judge Buchanan

02:25:31PM 9  that said United States of America -- person or property

02:25:34PM 10  located in the United States of America, persons and

02:25:36PM 11  property -- like they did in the other case before Judge

02:25:40PM 12  Smith's decision, and they knew they had a problem, that

02:25:42PM 13  say Eastern District of Virginia and elsewhere?  That is

02:25:47PM 14  something they should have tried for, that they could have

02:25:51PM 15  tried for.  And if Judge Buchanan thought that was legal

02:25:55PM 16  and appropriate, we would probably be arguing a separate

02:25:58PM 17  set of issues.  They didn't do that.  And I think we have

02:26:02PM 18  laid out why.

02:26:04PM 19      Their investigatory ends may have been justifiable,

02:26:10PM 20  but their means were unconstitutional.  Thank you, your

02:26:15PM 21  Honor.

02:26:21PM 22          THE COURT:  Mr. Becker.  Let's take ten so I don't

02:26:25PM 23  interrupt you.

02:38:50PM 24      (Break.)

02:38:50PM 25          THE COURT:  Mr. Becker.

02:38:52PM 1          MR. BECKER:  Thank you, your Honor.  Appreciate

02:38:54PM 2  the recess.  Your Honor, I will start with the broader

02:39:01PM 3  picture from our perspective, which is that in this

02:39:06PM 4  investigation law enforcement identified and recognized a

02:39:11PM 5  serious problem of illegal activity occurring in a way

02:39:17PM 6  that was technically advanced that required action.  And

02:39:26PM 7  in the course of pursuing that investigation, and

02:39:30PM 8  obtaining process in order to obtain evidence, went to the

02:39:35PM 9  courts and sought authorization to use lawful techniques

02:39:40PM 10 and court-authorized techniques to counter the sort of

02:39:43PM 11 challenge they faced from criminals committing crimes and

02:39:47PM 12 exploiting children using an advanced technology.  That is

02:39:51PM 13 the problem that law enforcement faced in this case.  And

02:39:54PM 14 I think that is the light in which the court should view

02:39:57PM 15 the various issues in this case, because that's what is at

02:40:01PM 16 issue.

02:40:01PM 17      This is a criminal case.  It is a child pornography

02:40:03PM 18 case.  It pertains to a website on which users were

02:40:08PM 19 engaging in the trafficking of child pornography.  And

02:40:10PM 20 that is what it is about, it is about criminal

02:40:14PM 21 enforcement, and the tools that law enforcement uses in

02:40:18PM 22 order to counter the tools that criminals use.  That is

02:40:20PM 23 the context we are in.

02:40:22PM 24      I will start with the Rule 41 issue.  Undoubtedly --

02:40:26PM 25 You know, we disagree in terms of the defense's read of

02:40:30PM 1    Rule 41.  We have set that forth in our papers.  I won't

02:40:34PM 2    belabor that issue.

02:40:35PM 3         The Supreme Court has said very clearly that Rule 41

02:40:39PM 4    is to be interpreted flexibly.  We do believe that it can

02:40:42PM 5    be interpreted to allow the sort of search that the

02:40:45PM 6    magistrate authorized in this case.

02:40:49PM 7         But we think it makes more sense for the court to

02:40:52PM 8    focus on the question of whether or not --  And we don't

02:40:55PM 9    believe it is necessary for the court to decide that

02:40:57PM 10   particular issue, because we do believe it is absolutely

02:41:00PM 11   clear that suppression for a violation or purported

02:41:04PM 12   violation of Rule 41 in this case is not warranted for a

02:41:10PM 13   number of reasons.

02:41:11PM 14        So suppression, according to the Ninth Circuit, would

02:41:15PM 15   be warranted generally only for a fundamental violation,

02:41:18PM 16   that is, a violation of constitutional magnitude.  And

02:41:22PM 17   that is not what happened in this case, because the

02:41:25PM 18   pillars of the Fourth Amendment were complied with by law

02:41:32PM 19   enforcement.

02:41:32PM 20        The FBI requested and obtained a warrant from a

02:41:35PM 21   neutral and detached magistrate based on a finding of

02:41:38PM 22   probable cause, certainly from our perspective a strong

02:41:41PM 23   showing of probable cause, that obviously the magistrate

02:41:44PM 24   judge agreed with in authorizing the warrant.

02:41:47PM 25        The other pillars of the Fourth Amendment were

complied with, that is, probable cause particularly describing the information to be seized.  The particularity requirement is met here.  It is absolutely clear from the warrant exactly what information law enforcement may collect and did collect pursuant to the warrant itself.

We think it is clear there is no basis for suppression based on an argument there was a fundamental or constitutional violation in this context, where law enforcement goes to a court for authorization to do exactly what it is asking for authorization to do, that authorization is granted, the warrant describes -- meets the particularity requirement.  That is obviously very clear and really spelled out exactly what this warrant is designed to collect.

Without that being a fundamental violation, a mere technical violation of Rule 41 would properly result in suppression only where the defendant can establish prejudice or intentional and deliberate disregard, a violation of the rule.

I will start with the intentional or deliberate violation.  There is simply no evidence of that in this case.  There is no controlling law that was out there that said that a magistrate authorizing this sort of search would be or is a violation of Rule 41.  There is one

02:43:10PM 1   magistrate's opinion that exists, from a magistrate who --

02:43:17PM 2   law enforcement applied for that warrant, and the

02:43:18PM 3   magistrate rejected it.  That could happen in any

02:43:21PM 4   scenario.  That could happen every time law enforcement

02:43:24PM 5   applies for a search warrant.

02:43:25PM 6       That doesn't indicate --  Certainly if and when law

02:43:29PM 7   enforcement goes, in a different scenario, regarding a

02:43:32PM 8   different investigative technique, to a different

02:43:34PM 9   magistrate in a different investigation, and requests

02:43:36PM 10  authority for that particular investigative technique,

02:43:39PM 11  that just because some magistrate elsewhere in a different

02:43:43PM 12  case had rejected a warrant, that by requesting that

02:43:46PM 13  authority for something different, if arguably similar,

02:43:49PM 14  makes it an intentional or deliberate violation of the

02:43:52PM 15  rule, particularly in light of the fact, as this court is

02:43:56PM 16  aware, and is clearly noted in this record, other

02:43:58PM 17  magistrate judges have approved network investigative

02:44:01PM 18  techniques in similar scenarios to this one.

02:44:04PM 19      And so among that landscape, where you have a

02:44:07PM 20  magistrate who has rejected a warrant, arguably similar, a

02:44:11PM 21  number of magistrates who have approved warrants arguably

02:44:15PM 22  similar, I think it is impossible to say that law

02:44:17PM 23  enforcement is acting with a deliberate disregard of the

02:44:19PM 24  rule by presenting the facts in the investigation to a

02:44:22PM 25  neutral and detached magistrate who decides there is

02:44:24PM 1    probable cause and this warrant should issue.

02:44:28PM 2        The other side of the technical violation would be

02:44:33PM 3    prejudice, and that is the prejudice in that if the rule

02:44:37PM 4    had been followed, the search would not have occurred.

02:44:42PM 5        And here, the defendant's argument falls flat, because

02:44:46PM 6    his prejudice argument is that no court ever, anywhere,

02:44:49PM 7    could ever authorize a search of Mr. Michaud's computer,

02:44:53PM 8    or any of the users of this particular website, purely

02:44:57PM 9    because they decided to use the Tor network, and therefore

02:44:59PM 10   that makes them immune to any court-authorizing process in

02:45:03PM 11   order to take steps to identify their location; that

02:45:07PM 12   because their location is unknown at the time, no court

02:45:12PM 13   may authorize investigative steps in order to identify

02:45:15PM 14   them.  That is not the sort of prejudice this court should

02:45:19PM 15   account, not the sort of prejudice that is called for and

02:45:21PM 16   certainly focused on in the law talking about prejudice in

02:45:26PM 17   terms of a technical error.

02:45:28PM 18       There are cases where at a time where the location of

02:45:32PM 19   the search is known, so either the object of the search

02:45:36PM 20   was a house in a known location, a car in a known

02:45:40PM 21   location, that was outside of the magistrate's district,

02:45:42PM 22   that prejudice has been found.  But that's not this case.

02:45:45PM 23   In this case the location of the user is unknown, and the

02:45:50PM 24   technique is being applied for and requested precisely in

02:45:53PM 25   order to find information that will help locate that user,

02:45:58PM 1      the information about it.  So a very, very different

02:46:00PM 2      context here.

02:46:01PM 3          And so, ultimately, your Honor, we think the

02:46:05PM 4      suppression argument fails, because law enforcement acted

02:46:08PM 5      reasonably in account of all of the circumstances of the

02:46:12PM 6      investigation, by going to a magistrate, articulating

02:46:18PM 7      probable cause, and articulating what would happen to the

02:46:22PM 8      warrant and whose computers would be searched.

02:46:24PM 9          We don't agree certainly with the defense's argument

02:46:27PM 10     that somehow the magistrate was misled, or did not or

02:46:30PM 11     would not have understood that the request was to search

02:46:34PM 12     computers that accessed this website wherever they were

02:46:37PM 13     located.  That is because the warrant affidavit

02:46:39PM 14     specifically says, on Page 29, "It is respectfully

02:46:46PM 15     requested that the court issue a search warrant

02:46:49PM 16     authorizing the following:  The NIT may cause an active

02:46:53PM 17     computer, wherever located, to send to a computer

02:46:55PM 18     controlled to or known by the government," and then it

02:46:58PM 19     goes through the sort of information that it is requesting

02:47:02PM 20     to be delivered.

02:47:02PM 21          In light of that, as well as the warrant application

02:47:05PM 22     as a whole, makes it unmistakably clear that the purpose

02:47:09PM 23     of the warrant and the technique is to identify the

02:47:12PM 24     locations of users' computers who are then -- whose

02:47:16PM 25     location is at that time unknown.

02:47:19PM  1        So I don't think there is any fair read of this

02:47:21PM  2   application that could show the magistrate was misled

02:47:26PM  3   about the purpose of the warrant, or the fact that it was

02:47:29PM  4   requesting authority to be deployed to computers, wherever

02:47:35PM  5   they were located.  It is right there in the application.

02:47:37PM  6        Now, in terms of the warrant itself, the defendant

02:47:40PM  7   just sort of -- in his argument that it was cabined into

02:47:46PM  8   computers only in the Eastern District of Virginia, the

02:47:49PM  9   defendant really reads out the warrant attachment.

02:47:53PM 10        And that is, Attachment A of the warrant, incorporated

02:47:57PM 11   into the warrant, makes it clear that the activating

02:47:59PM 12   computers are those of any user or administrator who logs

02:48:03PM 13   into the target website by entering a user name and

02:48:06PM 14   password.  It does not say any user or administrator

02:48:11PM 15   located only in the Eastern District of Virginia.  The

02:48:14PM 16   warrant clearly requested authority to deploy to computers

02:48:17PM 17   wherever located.

02:48:18PM 18        And I don't believe, again, it is a fair read of the

02:48:20PM 19   attachment to say -- particularly where it specifies that

02:48:24PM 20   the server is located in the Eastern District of Virginia,

02:48:28PM 21   and then authorizes on activated computers of any user or

02:48:35PM 22   administrator who logs into the target site, that that is

02:48:40PM 23   somehow cabined in, or that that was the intent of the

02:48:41PM 24   magistrate in authorizing it.

02:48:43PM 25        The application makes unmistakably clear what sort of

02:48:45PM 1    authority the government was requesting.  And that is the

02:48:47PM 2    authority that the magistrate -- certainly we would argue

02:48:50PM 3    that the magistrate was granting in approving of this

02:48:54PM 4    warrant, as she did.

02:48:58PM 5        In terms of --  Your Honor had a question about the

02:49:05PM 6    location of the search.  Here, we are dealing in a

02:49:09PM 7    context, which we think is clear, where there are two-way

02:49:13PM 8    communications going on between users and a computer

02:49:16PM 9    server.

02:49:17PM 10       But there is no question that at the time the NIT is

02:49:20PM 11   authorized, at the time the NIT is deployed, the computer

02:49:22PM 12   server onto which that NIT code is deployed is in the

02:49:26PM 13   Eastern District of Virginia.  The computers of -- the

02:49:29PM 14   activating computers, the users, are communicating with

02:49:32PM 15   the Eastern District of Virginia when they access that

02:49:36PM 16   website, that two-way communication that is going on.  The

02:49:39PM 17   information that is collected by the NIT is returned to a

02:49:42PM 18   computer in the Eastern District of Virginia.

02:49:45PM 19       And so in requesting this authority, and with the

02:49:49PM 20   warrant being authorized, law enforcement is going to the

02:49:52PM 21   district that has the closest, strongest connection to all

02:49:55PM 22   of the communications that are pertinent.  The warrant

02:49:59PM 23   deals with users who are making a voluntary choice to step

02:50:02PM 24   into the Eastern District of Virginia and access that

02:50:05PM 25   website.  And that's where they get that code.

02:50:08PM  1      It is certainly true that the code then goes to that

02:50:11PM  2  user's computer, as described in the warrant, and then

02:50:15PM  3  returns -- has to go to that user's computer, wherever

02:50:18PM  4  located, in this situation it was here in Washington, and

02:50:22PM  5  then return the information back to the Eastern District

02:50:24PM  6  of Virginia.

02:50:26PM  7      I don't think it is a fair analysis, though, to say

02:50:29PM  8  that means the search occurred only in Washington, because

02:50:33PM  9  that -- it reads out -- that sort of analysis would have

02:50:36PM 10  to read out this two-way factor sort of communication that

02:50:41PM 11  is going on, and the fact that the user is entering the

02:50:45PM 12  Eastern District of Virginia when the communications are

02:50:47PM 13  taking place.

02:50:49PM 14      The other aspect, your Honor, that we would ask you to

02:50:52PM 15  consider is certainly the good-faith argument here.  And

02:50:55PM 16  that is that law enforcement in this case acted in

02:50:58PM 17  objectively reasonable reliance upon the authorization of

02:51:02PM 18  a magistrate, who found probable cause, who found

02:51:07PM 19  particularity, who authorized the particular technique

02:51:10PM 20  that law enforcement applied for.

02:51:12PM 21      This is not a scenario where law enforcement was

02:51:15PM 22  granted a warrant and then took some action in the

02:51:18PM 23  execution that was somehow different than what they

02:51:21PM 24  applied for, or outside of what they applied for, which

02:51:24PM 25  might justify suppression, such as a case where law

02:51:29PM 1    enforcement, which is -- when they are required to leave a

02:51:31PM 2    copy of a warrant in a premises, deliberately decides not

02:51:34PM 3    to do so, and not with any authority from the court.

02:51:38PM 4        Here, law enforcement acted expressly within their

02:51:44PM 5    articulated requests to the magistrate, and that is the

02:51:46PM 6    website operates in the Eastern District of Virginia, the

02:51:49PM 7    NIT gets deployed to the activated computers wherever

02:51:54PM 8    located, and returns information to the Eastern District

02:51:55PM 9    of Virginia.  Law enforcement relied in good faith on that

02:51:59PM 10   authorization.  And so that's a further reason, your

02:52:03PM 11   Honor, why suppression is inappropriate in this scenario.

02:52:08PM 12       The one other issue that we would present to the

02:52:15PM 13   court, if I may tender it, just today --  And I referenced

02:52:18PM 14   this earlier.  May I approach?

02:52:20PM 15           THE COURT:  Yes.  I think somebody put a copy of

02:52:28PM 16   this on my desk.  I already have a copy of it.

02:52:36PM 17           MR. BECKER:  Just today, your Honor, a report and

02:52:38PM 18   recommendation was filed in the case of United States

02:52:39PM 19   versus Epic.  It is 15 -- for the record, 15CR163, Docket

02:52:49PM 20   No. 53.  In that case the same network investigative

02:52:54PM 21   technique warrant, as in this case, was challenged on a

02:52:57PM 22   motion to suppress.  That defendant raised a Rule 41

02:53:01PM 23   challenge, as well as a probable cause challenge to the

02:53:04PM 24   warrant.  That magistrate has reported to the district

02:53:07PM 25   judge, finding sufficient probable cause to support the

02:53:11PM 1      issuance of the warrant, declining to ultimately rule on

02:53:14PM 2      the Rule 41 issue, but finding, nonetheless, suppression

02:53:17PM 3      was inappropriate in this scenario.  And so that is what

02:53:22PM 4      we would propose your Honor rule.

02:53:24PM 5          We think, again, we have made our Rule 41 argument,

02:53:28PM 6      but that ultimately it is not necessary, that law

02:53:32PM 7      enforcement acted reasonably here, and that suppression is

02:53:35PM 8      not warranted.  So we would request that your Honor deny

02:53:37PM 9      the defendant's motions to suppress.  Thank you.

02:53:40PM 10             THE COURT:  Let me ask you a couple of questions.

02:53:42PM 11     One of the things I commented on was, what does 3103a mean

02:53:53PM 12     in light of this role argument?

02:53:56PM 13             MR. BECKER:  We have reviewed it, your Honor.  We

02:53:58PM 14     don't believe, and wouldn't make the argument, that that

02:54:01PM 15     would provide sort of an independent basis from Rule 41 in

02:54:07PM 16     order for a district court or a magistrate judge to

02:54:10PM 17     authorize the warrant.  I think, having briefly researched

02:54:14PM 18     it, it was a more sort of discrete purpose.  I don't think

02:54:19PM 19     the defense is necessarily --  I think the defense may be

02:54:21PM 20     correct in terms of the purpose of the amendment to that

02:54:23PM 21     statute.  And so we are not arguing that that would impact

02:54:27PM 22     the court's analysis here.

02:54:30PM 23             THE COURT:  What difference would it make if a

02:54:35PM 24     district judge had issued this warrant?

02:54:38PM 25             MR. BECKER:  While we think it is something the

02:54:40PM 1    court can consider, in terms of the reasonableness of law

02:54:43PM 2    enforcement's actions, that a district judge did approve a

02:54:46PM 3    wiretap in this case, which allowed for the collection of

02:54:50PM 4    a much greater set of evidence, that is, the ongoing

02:54:54PM 5    collection of content, which a district judge found

02:54:57PM 6    appropriate, and that the court consider that in terms of

02:55:01PM 7    the overall reasonableness of the government's conduct, we

02:55:03PM 8    don't think it would make a difference -- we wouldn't

02:55:06PM 9    argue it makes a difference in terms of a Rule 41 analysis

02:55:09PM 10   if a district judge had authorized the search.

02:55:17PM 11            THE COURT:  Let me ask you one other question.  If

02:55:34PM 12   a good warrant is issued for material in the state of

02:55:49PM 13   Washington, and the search turns up information of a crime

02:55:54PM 14   in an adjoining state --  That's not what you went after

02:56:03PM 15   to begin with, but very often drug dealers keep records,

02:56:08PM 16   and so forth.  So you have information then about a crime

02:56:14PM 17   in another state.  You are free to use that information

02:56:18PM 18   going after a criminal in the adjoining state, are you

02:56:22PM 19   not?

02:56:22PM 20            MR. BECKER:  We believe that to be true, your

02:56:26PM 21   Honor.  It is sort of a plain-view type argument that we

02:56:32PM 22   do think could be justified here.  And so if under the

02:56:36PM 23   defense view only searches of computers in EDVA were

02:56:42PM 24   authorized, but during the course of that authorized

02:56:45PM 25   conduct that they would, I gather, concede it was

02:56:48PM 1    appropriate, at least for EDVA computers, information

02:56:52PM 2    pertaining to criminal acts and criminal evidence of other

02:56:56PM 3    computers was observed by law enforcement in plain view, I

02:57:01PM 4    do think that would be -- could be a reason that law

02:57:05PM 5    enforcement would be able to use that evidence in a

02:57:07PM 6    criminal prosecution, and it would not necessarily be

02:57:10PM 7    suppressible.  I have a brief note on that.  I will leave

02:57:36PM 8    that there, your Honor.

02:57:37PM 9        The last point I would make -- the one thing we

02:57:40PM 10   haven't discussed in terms of the reasonableness, and kind

02:57:43PM 11   of bringing this back to the evidence, is that the IP

02:57:48PM 12   address information is really different in quality than

02:57:51PM 13   the MAC address information, in that IP address

02:57:55PM 14   information, this circuit, other circuits, have

02:57:58PM 15   consistently found not to be something over which a user

02:58:02PM 16   has a reasonable expectation of privacy.  It is the IP

02:58:05PM 17   address information that ultimately furnishes the probable

02:58:09PM 18   cause in order to ultimately have a residential search

02:58:11PM 19   warrant granted, and for the evidence that ultimately was

02:58:15PM 20   found on Mr. Michaud's devices to be seized.

02:58:19PM 21       So here, when we are talking about the fundamental

02:58:24PM 22   violation issue, the reasonableness issue, we do think the

02:58:27PM 23   court is right to consider the limited scope of the search

02:58:30PM 24   that was authorized and conducted in this case.

02:58:33PM 25       This wasn't a full-blown search of everything in

02:58:36PM 1    someone's home, or even everything on someone's computer.

02:58:40PM 2    This is a search that delivered information that was

02:58:43PM 3    limited, that was targeted, and with respect to the IP

02:58:46PM 4    address information, that users do not have a reasonable

02:58:49PM 5    expectation of privacy over.  And even while communicating

02:58:53PM 6    over Tor, that doesn't change the nature of the

02:58:56PM 7    communication, or that IP address information, which

02:59:00PM 8    belongs to an internet service provider, not to any

02:59:02PM 9    individual.

02:59:04PM 10       And so we do think that is a factor, as the court

02:59:09PM 11   hones in on what is really the piece of evidence that

02:59:12PM 12   matters in terms of going forward, it is that IP address

02:59:15PM 13   information.  Again, a limited, focused search that was

02:59:18PM 14   conducted here contributed to its reasonableness.

02:59:26PM 15       If the court has no further questions, thank you, your

02:59:28PM 16   Honor.

02:59:29PM 17            THE COURT:  Thank you, Mr. Becker.

02:59:37PM 18            MR. FIEMAN:  Your Honor, since I have the burden,

19   can I have a couple of minutes to respond?

02:59:38PM 20       Let me knock out a couple of simple points that

02:59:41PM 21   Mr. Becker said, and then get back to the crux of this.

02:59:44PM 22   The privacy interest is not the IP address.  The privacy

02:59:48PM 23   interest is Mr. Michaud's home.  It is like saying you

02:59:51PM 24   have a telephone number, and the government can't tell

02:59:56PM 25   where you are calling from because you have caller ID

02:59:59PM  1    blocking, well, then it is just fine to go into somebody's

03:00:03PM  2    house and take their address book.

03:00:05PM  3        We have cited several times that the quality or

03:00:08PM  4    quantity of information or evidence seized is irrelevant

03:00:10PM  5    for Fourth Amendment purposes.  And if there was no

03:00:14PM  6    privacy interest, and this was shared with the service

03:00:17PM  7    provider, they could have gone to Comcast and asked for

03:00:20PM  8    it.  But they couldn't and they didn't.

03:00:23PM  9        The question then is whether this intrusion on

03:00:26PM 10    Mr. Michaud's home, whether it is for a matchbook or kilos

03:00:30PM 11    of drugs, doesn't matter.  It is the intrusion, not the

03:00:33PM 12    information that is taken, that is protected by the Fourth

03:00:36PM 13    Amendment.  So that, we firmly believe, is a red herring.

03:00:40PM 14        Your Honor, I think Mr. Becker interpreted this

03:00:43PM 15    question as helpful to the government in terms of if, for

03:00:47PM 16    example, in the course of operating the Virginia website

03:00:50PM 17    there was information in plain view or had been turned up

03:00:55PM 18    in the course of operating that site, that would have led

03:00:58PM 19    them to believe they could conduct a search in another

03:01:01PM 20    jurisdiction.

03:01:02PM 21        Well, two things would have happened.  Let me point

03:01:05PM 22    out two things.  One is, they did not get the information

03:01:08PM 23    and data from the Virginia server.  They have not

03:01:11PM 24    contested at this point that the data extraction, the

03:01:16PM 25    search, occurred in Washington.  That is true.

03:01:17PM 1      If they had gone back through their server records and

03:01:19PM 2  found an IP address associated with Pewter, or anybody, in

03:01:23PM 3  the course of exercising that Virginia warrant, and then

03:01:27PM 4  took that information, went to Comcast, said we now know

03:01:31PM 5  this is a Washington address, and then came to this court

03:01:34PM 6  and asked for a warrant, that is the way it is supposed to

03:01:36PM 7  work.

03:01:38PM 8      So this is not a plain-view situation, because they

03:01:41PM 9  never saw it in Virginia.  They had to search

03:01:44PM 10 Mr. Michaud's home to find it.  It is a little like saying

03:01:46PM 11 if I drive my car into Virginia, you can search my

03:01:49PM 12 Washington home, if that is the only connection.

03:01:51PM 13     Your Honor, let me also say that the Title III

03:01:55PM 14 authorization specifically said that the NIT warrant

03:02:00PM 15 application was going to be separate.  This isn't a

03:02:03PM 16 Title III case, because it doesn't deal with those

03:02:05PM 17 communications.

03:02:06PM 18     The Epic decision only addressed probable cause, did

03:02:11PM 19 not reach the issues that we briefed here.

03:02:14PM 20     Let me talk briefly about the probable cause issue.

03:02:18PM 21 We have, according to the government, a warrant that

03:02:20PM 22 authorizes up to 100,000 searches, because that is the

03:02:24PM 23 number of account users that accessed while the FBI was

03:02:27PM 24 operating this site.

03:02:29PM 25     It is a site, your Honor, that does not, even

03:02:31PM 1    according to the criteria that we have seen from Gourde

03:02:35PM 2    and the other cases, unabashedly announce it is illegal.

03:02:39PM 3        I will put this back up.  The court has seen it many

03:02:40PM 4    times.  What we are talking about is --  Is that the

03:02:45PM 5    correct way for it to face for your Honor?  We are talking

03:02:48PM 6    about something that has a teenager who is -- I have seen

03:02:54PM 7    in my daughter's Sixteen magazine much more skin or

03:02:59PM 8    provocation.  It advertises itself as a chat room.  There

03:03:02PM 9    is no reference to child pornography.  There is no

03:03:07PM 10   indication that this is anything more than a fetish site

03:03:12PM 11   or chat room.  It doesn't even have what arguably would

03:03:15PM 12   qualify as lascivious pornography on it.

03:03:20PM 13       As your Honor has recognized in other cases, the scope

03:03:22PM 14   of the search has to be firmly grounded in the probable

03:03:26PM 15   cause -- the extent to which probable cause is

03:03:31PM 16   established.

03:03:32PM 17       Now, this would be a close call if we were dealing

03:03:35PM 18   with one search.  I argued the Gourde case, and the Martin

03:03:39PM 19   cases.  And that's why the court created something of a

03:03:44PM 20   bright line, because of the inability often to segregate

03:03:50PM 21   legal, if maybe distasteful, activities that are protected

03:03:54PM 22   from things that clearly establish an illicit illegal

03:03:59PM 23   intent.

03:04:00PM 24       This warrant authorized the deployment of 100,000

03:04:03PM 25   searches anywhere in the world based upon what is on that

03:04:06PM 1    web page.  That is a pretty slim read on which to hang

03:04:11PM 2    such an unprecedented sweeping authorization.

03:04:17PM 3        Now, your Honor, in terms of that authorization, you

03:04:20PM 4    can look at the attachments, and there is not one word,

03:04:24PM 5    not one word, about this warrant being executed outside

03:04:28PM 6    the Eastern District of Virginia.  And just compare what

03:04:33PM 7    the government did in 2012, where they submitted a warrant

03:04:38PM 8    that indicates that the searches -- the deployment of a

03:04:42PM 9    NIT in this Texas slayer case -- actually, the defendant

03:04:46PM 10   has not been apprehended, but they got a warrant, clearly

03:04:49PM 11   states that the NIT will be deployed in Colorado and

03:04:52PM 12   elsewhere.  Now, if that particular defendant is ever

03:04:57PM 13   apprehended, there may be good Rule 41 issues.  But we are

03:05:00PM 14   not at the Rule 41 issues.

03:05:02PM 15       What they have here, by their own submission, is a

03:05:07PM 16   warrant that says Eastern District of Virginia, period.

03:05:13PM 17   They drafted that.  That's what they presented to Judge

03:05:20PM 18   Buchanan.

03:05:22PM 19       And even if they are now hung on the horns of their

03:05:25PM 20   own dilemma, your Honor, the law is clear, the search

03:05:30PM 21   warrant controls.  And if the search occurs outside the

03:05:35PM 22   authorized scope of the warrant or location authorized,

03:05:40PM 23   then suppression is mandated.  Good faith is irrelevant.

03:05:43PM 24       So if I get a warrant that says I am going to search

03:05:48PM 25   2304 Elm Drive, and I decide I am going to search 1606

03:05:56PM 1  Apple Lane, and 1405 President Street, it doesn't matter

03:06:04PM 2  what you intended, it is an illegal search.

03:06:10PM 3       It only bears repeating, your Honor, that this is the

03:06:13PM 4  warrant they drafted, and there is nothing in the

03:06:15PM 5  attachment that changes it.

03:06:16PM 6       And they have some choices.  They have some options.

03:06:20PM 7  They can resubmit the warrants in future investigations

03:06:25PM 8  that candidly say that they are United States in scope.

03:06:27PM 9  They can pursue the rule changes, which would be decided

03:06:30PM 10  by the end of this year.

03:06:31PM 11      Even if Rule 41 changes, they still need to put on the

03:06:35PM 12  face of the warrant, regardless of the rule, the locations

03:06:37PM 13  where they are searching.

03:06:41PM 14      Your Honor, to come back to this, we are dealing in

03:06:46PM 15  some ways with new territory.  But the Fourth Amendment

03:06:49PM 16  principles and guidelines are well established.  It is

03:06:53PM 17  exactly the kind of governmental overreaching, or the

03:06:58PM 18  ability to conduct seemingly endless searches on the basis

03:07:04PM 19  of a single authorization, that drove a lot of what the

03:07:07PM 20  founders were concerned about with general warrants.  It

03:07:11PM 21  does require care, candor, and specificity in order to get

03:07:15PM 22  a valid warrant that is as sweeping as this one.

03:07:19PM 23      Your Honor, however this ultimately rules out -- maybe

03:07:25PM 24  it is a matter of this case going up alongside Essick, and

03:07:29PM 25  it may ultimately be a decision for the Supreme Court, but

160

03:07:33PM 1    unless we are going to not only -- just forget about 41,

03:07:36PM 2    ignore what is on the face of the warrant, and disregard

03:07:39PM 3    the constitutional guidelines that really are the core

03:07:42PM 4    issue in this case, suppression is not only the

03:07:47PM 5    appropriate and necessary remedy, it is something that is

03:07:51PM 6    desperately needed, so that these issues can be resolved

03:07:55PM 7    in a way that protects core privacy interests in the face

03:07:59PM 8    of such sweeping governmental authority.

03:08:05PM 9        I respectfully disagree with Mr. Becker about the

03:08:08PM 10   investigatory alternatives that are available.  I

03:08:10PM 11   respectfully disagree with him about their intentions in

03:08:14PM 12   presenting this warrant to Judge Buchanan.  I do respect

03:08:19PM 13   that he is a law enforcement officer with good intentions

03:08:23PM 14   personally, all of which is irrelevant.  The warrant says

03:08:28PM 15   what it says.

03:08:29PM 16       And when we have all of this background, and the scale

03:08:32PM 17   of such an unprecedented search, and such paucity of PC to

03:08:37PM 18   begin with on the face of this homepage, your Honor, it

03:08:41PM 19   seems to me that suppression is not only appropriate but

03:08:45PM 20   required in every view of the law that we have presented

03:08:49PM 21   to the court.  Thank you.

03:08:50PM 22          THE COURT:  Thank you.  Well, you know, I have

03:08:56PM 23   been at this a long time, 45-plus years.  I have issued, I

03:09:07PM 24   don't know, probably hundreds of search warrants.  I have

03:09:11PM 25   ruled on suppression motions hundreds of times, I suppose,

03:09:15PM 1   over that period.  This is likely the most complex one

03:09:19PM 2   yet.  The hearing today has clarified a number of things

03:09:27PM 3   that were in my mind.  But I've got to read your prolix

03:09:36PM 4   brief again, the warrant applications, and the warrants

03:09:40PM 5   and put this together.

03:09:46PM 6       I've got no hearings or trials for the next week, so

03:09:51PM 7   this is on top of the pile, and I should be able to get

03:09:54PM 8   you an answer by the middle of the week next week, either

03:10:02PM 9   in writing or, if I choose to do it orally, if you are not

03:10:05PM 10  in town we can do it on the telephone.  I typically rule

03:10:09PM 11  orally when I can.  I am not ready to rule yet.  I will

03:10:18PM 12  let you know as soon as I can, and we will get you an

03:10:22PM 13  answer.  Thank you.

14                    (Proceedings adjourned.)

15

16

17

18

19

20

21

22

23

24

25

1                  **C E R T I F I C A T E**

2

3

4       I, Barry Fanning, Official Court Reporter for the

5  United States District Court, Western District of

6  Washington, certify that the foregoing is a true and

7  correct transcript from the record of proceedings in the

8  above-entitled matter.

9

10

11

12  _____

    **/s/ Barry Fanning**
13  **Barry Fanning, Court Reporter**

14

15

16

17

18

19

20

21

22

23

24

25